IN THE UNITED STATES DISTRICT COURT,
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

---

| | |
|---|---|
| LEON TANNA, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| vs. | ) |
| | ) |
| | ) |
| | ) |
| BRITTANY GREENE, | ) |
| Warden, Western Illinois Correctional | ) |
| | ) |
| Respondent. | ) |

---

## PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF HABEAS CORPUS

The Petitioner, Leon Tanna, who is currently a prisoner at the Western Illinois Correctional Center, located in Mount Sterling, Clayton County, Illinois, by and through his attorney, Richard Dvorak, of DVORAK LAW OFFICES, LLC, pursuant to 28 U.S.C. § 2254, the Rules Governing Proceedings in the United States District Courts under said section, as well as the Constitution of the United States, respectfully moves this Honorable Court for an order vacating the decision of the Illinois Appellate Court, which denied the Petitioner's post-conviction petition. In support of this request for relief, the Petitioner states the following:

### PARTIES

1. The Petitioner, Leon Tanna, is a prisoner, in custody at the Western Illinois Correctional Center, located in Mount Sterling, Clayton County, Illinois.

2. The Warden of the Western Illinois Correctional Center is Brittany Greene.

3. The Petitioner is currently serving a term of 22 years imprisonment on one count of first-degree murder and 25 years for personally discharging a firearm that proximately resulted in death in the case of *People of the State of Illinois v. Leon Tanna*, 01 CR 17104.

## CONVICTIONS, SENTENCES IMPOSED, AND APPELLATE REVIEW

4. The Petitioner's conviction in Case Number 01 CR 17104 was imposed by the Hon. Judge Thomas J. O'Hara, a circuit court judge in the Circuit Court of Cook County, County Department, Criminal Division.

5. The Petitioner was charged by way of indictment with the April 11, 2001, shooting death of Dwight Vance (Sup. R. 558, 1012-1020).

6. On April 29, 2004, following a jury trial where he was represented by Cook County Assistant Public Defenders Connie Jordan and John Wilson, the Petitioner was convicted of first-degree murder (C. 12); (Sup R. 948, 1115).

7. After the trial, on May 26, 2004, the Petitioner filed a Motion for New Trial (Sup R. 1112). The Petitioner argued, *inter alia*, that the State failed to prove the Petitioner guilty beyond a reasonable doubt, the Petitioner was denied due process of law, the Petitioner did not receive a fair and impartial trial as guaranteed under the Fourteenth Amendment and Article I of the Constitution, the court erred in denying the Petitioner's motion of a directed finding at the close of the State's case (Sup R. 1112-1113). On November 5, 2004, the Petitioner

filed an Amended Motion for New Trial (Sup R. 1091). The Petitioner argued, *inter alia*, that the State failed to prove every allegation of the offense beyond a reasonable doubt, that the court erred in overruling the Petitioner's motion for a directed finding at the close of the State's case, and that the prosecutors improperly argued in his closing arguments regarding a second-degree murder instruction and finding (Sup R. 1091-1092).

8. The court denied the Petitioner's motion for new trial.

9. On November 30, 2004, the Petitioner filed a Notice of Appeal, and the Office of the State Appellate Defender was appointed to represent him on appeal (Sup R. 1098).

10. On direct appeal to the Illinois Appellate Court, the Petitioner argued that the prosecutor's closing arguments were improper, and his defense attorneys were ineffective when they: (1) failed to request a second-degree murder instruction based upon provocation engendered by mutual combat or provocation engendered by substantial physical injury or assault; (2) elicited testimony from State's witnesses concerning gang evidence, thereby opening the door for the State to introduce evidence of the Petitioner's gang affiliation; (3) failed to question potential jurors about possible gang bias; and (4) emphasized gang evidence during closing arguments. *People v. Tanna*, 368 Ill. App. 3d 1222 (2006).

11. On October 27, 2006, the First District Appellate Court Sixth Division affirmed the Petitioner's conviction and sentence. *People v. Tanna*, 2006 IL App (1st) 1043569.

12. After a timely petition for rehearing was filed, the Appellate Court denied the petition on December 18, 2006.

13. On March 28, 2007, the Petitioner filed a *pro-se* Petition or Post-Conviction Relief (C. 10-17).

14. On that same date, March 28, 2007, the Illinois Supreme Court denied the Petitioner's petition for leave to appeal.

15. The Petitioner did not file a petition for writ of certiorari.

16. On May 21, 2007, the circuit court dismissed the Petitioner's petition without prejudice because the court believed, mistakenly, that the mandate had been recalled (C. 102-104), although the mandate had issued again when the court dismissed the petition without prejudice (C. 9, 55).

17. On December 5, 2007, the Petitioner filed a *pro-se* Petition for Leave to Refile Post-Conviction (C. 119-121). On January 18, 2008, the circuit court appointed post-conviction counsel and docketed the petition (C. 5, R. B2).

18. After appointed counsel filed a supplemental petition, the circuit court orally dismissed the *pro se* petition and supplement to that petition, without granting an evidentiary hearing, on April 15, 2016, and on May 13, 2016, the court denied the Petitioner's motion to reconsider (C. 478, Sup3 R 61-98).

19. On September 23, 2021, the First District Court of Appeals affirmed the denial of the Petitioner's petition in an unpublished order. *People v. Tanna*, 2021 IL App (1st) 161797-U, ¶¶ 71, 76.

20. The Petitioner filed a Petitioner for Leave to Appeal to the Illinois Supreme Court, and on March 30, 2022, the Illinois Supreme Court denied his petition. *People v. Tanna*, 187 N.E.3d 709 (2022).

21. The Petitioner did not file a petition for writ of *certiorari*.

22. This timely petition for writ of habeas corpus follows.

## VENUE

23. The Petitioner was prosecuted in the Circuit Court of Cook County, and thus the Northern District of Illinois is the proper venue for this case. 28 U.S.C. § 93(a)(1)(c); 28 U.S.C. § 2241(d).

24. Both the facility where the Petitioner is housed, as well as the place of conviction, are proper venues for this action, however, this District is a more convenient forum because, *inter alia*, the records will be found there, as well as most of the participants in the case.

## PETITIONER'S CLAIMS

25. The Petitioner challenges the direct appeal and collateral review decisions of the Illinois Appellate Court to affirm the Petitioner's conviction on direct appeal, and the judgment of the circuit court dismissing the Petitioner's post-conviction petition at the second stage of proceedings, without granting an evidentiary hearing.

26. The Petitioner also raises certain claims under a cause-and-prejudice basis, and he has begun the process of raising these same claims in a motion for leave to file successive post-conviction petition in state court. The Petitioner seeks a stay of these proceedings on

5

this basis, but understands that this Court may want the State to weigh in on this request before this Court rules on the matter. The Petitioner suggests this Court order briefing on the issue.

27. In support of this claim, the Petitioner submits the following Memorandum of Law.

## NATURE OF THE CASE

The Petitioner was charged with the first-degree murder of Dwight Vance, while personally discharging a firearm, a 9mm handgun, which proximately causing Vance's death (Sup R. 1094).[1] At trial, the Petitioner raised the affirmative defense of self-defense, and the court also granted a defense request for a second-degree murder jury instruction, although defense counsel only requested one form of the instruction (imperfect self-defense), not the alternative form of second-degree murder (provocation).

At the Petitioner's jury trial, it was uncontested that Vance had been physically violent towards the Petitioner prior to the shooting, with Vance initiating the confrontation by kicking the Petitioner in the face, leading to a physical altercation[2] between Vance and the Petitioner in the apartment of Vince's friend, Patricia Heard, a witness who did not testify at trial. There was also no dispute at trial that after police were called to the scene of the shooting,

---

[1] The common law record and report of proceedings from the post-conviction proceedings are cited as "PC C" and "PC R" respectively. The direct appeal common law and report of proceedings are contained in one volume of e-record, cited as "Sup R."

[2] The Petitioner contended there were two physical altercations before he left the apartment, while Vance's friends testified to one physical altercation.

6

Ford Heights police found a .357 revolver in the bushes outside of Heard's apartment where the shooting occurred, and that this weapon belonged to one of Vance's friends, Jerome Anderson, who died before trial and thus was unable to testify. The lead investigator in the case also conceded that Anderson's weapon was never tested for fingerprints or DNA.

There were two hotly contested factual issues at trial. First, the parties disputed why the Petitioner returned to the apartment after the physical altercation had ended. Vance's three friends testified the Petitioner came back into the apartment and began to immediately shoot an unarmed Vance. The Petitioner, meanwhile, testified that he returned to the apartment because he forgot his keys and jacket, and when he came back inside the apartment he was threatened by Vance, who was armed with Anderson's weapon.

In this Petition, the Petitioner raises several issues that were raised on direct appeal and on appeal from the denial of the Petitioner's post-conviction petition, which was dismissed at the second stage of proceedings, without granting an evidentiary hearing. This case also presents a compelling case to allow the Petitioner to raise Constitutional issues that were not raised in the Petitioner's post-conviction petition due to attorney error on behalf of his appointed post-conviction counsel, and the Petitioner can also demonstrate actual innocence, both of which would allow for the filing of a successive post-conviction petition, and eventually, after exhaustion, the ability to raise these issues raised in this Petition.

## STATEMENT OF FACTS

<u>Pre-Trial Discovery, Pre-Trial Motions, and Affirmative Defenses</u>

On July 31, 2001, according to the public docket in this matter, the Petitioner filed a motion for discovery, however this document is not on the public docket, nor is it in the Record on Appeal. On January 8, 2002, the prosecutor stated on the record that the parties are "still in discovery status" and that he has tendered a copy of the transcript of a videotaped statement that the Petitioner made to police, but is waiting on the videotaped statement itself, as the original tender "was of poor sound quality." (Sup R. 571). The prosecutor continued, "[o]ther than that and a possible crime scene report, which I'm not sure exists, but I'm tracking down." (Sup R. 571). The prosecutor stated that, if the "possible crime scene report" does exist, the videotaped statement and report are "the only two things we're waiting for." (Sup R. 571). On the following date, the prosecutor stated that the State tendered "a videotape confession, supplemental reports, police report, officer's notes, sheriff's bulletin, arrest card, arrest record," and a "rights waiver." (Sup R. 575).

On the following date of March 14, 2002, ASA Delehanty appeared on behalf of the State (Sup R. 577-578). [3] The prosecutor informed the court that discovery was tendered to the defense, which included "the Cook County Sheriff Police Department crime scene investigator reports, photos listing sheet, ET

---

[3] ASA Delehanty later appeared as a witness for the State to testify regarding the videotaped interview with the Petitioner after his arrest.

report, property inventory, crime scene diagram, and lab." (Sup R. 578).[4] When the court asked if more discovery was coming, ASA Delehanty responded, "I have a tendency to believe. I am not the lead attorney on this case," and that ASA Felgenhauer was the lead attorney on the case (Sup R. 578-579). She continued, "[b]ased on the fact that we are still on discovery, I believe our answer is that discovery is either complete or substantially complete." (Sup R. 579). Defense counsel responded that she "think[s] the only thing" that counsel sought from the State was a "completed autopsy report" from the coroner, as she had received "no detailed ones that are supposed to be made out." (Sup R. 579).

On this same date, March 14, 2002, according to the public docket (the stamp on the document is hard to read), the State filed a written answer to the Petitioner's motion for discovery (Sup R. 1029-1033). In the State's Answer, the State disclosed it may call Jon Flaskamp, identified him as "Illinois State Police Department Personnel," but not as a forensic scientist (Sup. R. 1030). This disclosure did not identify on what subject matter Flaskamp would testify, did not disclose him as an expert witness, nor did it disclose any CV or specific laboratory report he may have authored. *Id.* This disclosure did not specific any laboratory reports that were tendered, only referencing that the State may call as witnesses at trial "Personnel from the Crime Lab" named in any "laboratory reports." (Sup R. 1039). The State answer did not make any reference to any keys, clothing, or any weapons or bullets (Sup R. 1029-1033).

---

[4] Copies of the aforementioned "lab," or other laboratory reports, do not appear in the common law record.

The State disclosed that "reports of experts, if any, made in connection with this particular cause, including the results of physical or mental examinations, scientific tests, examinations and comparisons, will be tendered to the defense upon being received by the People." (Sup. R. 1032).

On the following date, the State tendered a seven-page "general progress report" authored by the Cook County Sheriff's Police Department (Sup R. 583). By September 24, 2002, defense counsel indicated to the court that the State had tendered the remaining discovery previously requested by defense counsel, which were copies of background information for all lay parties, and that she now has everything she needs in order to file motions or answers (Sup R. 596).

Between the dates of February 18, 2003, and November 13, 2003, at which points defense counsel initially notified the court about a potential 402 conference and then later informed the court that the Petitioner was rejecting the offer presented at that 402 conference, defense counsel also introduced and filed a motion to suppress statements. The motion to suppress was filed on May 16, 2003, but then later withdrawn on February 26, 2004 (Sup R. 1071-1073, 666-667).[5] On June 16, 2003, counsel notified the court that "[t]here is also a couple of other outstanding discovery matters . . . " (Sup R. 636).

―――――――――――――

[5] A 402 conference was initially mentioned on the record on February 18, 2003, when defense counsel stated that "[t]here are a couple more matters that are letters," and that she is "potentially seeking a 402 conference." (Sup R. 614). On October 6, 2003, at defense counsel's request, the court entered into a 402 conference and stated on the record that it would "continue that conference," setting a date for October 22, 2003 (Sup R. 648-650). On November 13, 2003, defense counsel informed the court that the Petitioner was rejecting

On January 28, 2004, defense counsel stated on the record that the Petitioner "wants to speak to the Court about a new attorney," and the Petitioner asked whether the court could "appoint [him] a TASC worker on [his] case." (Sup R. 663). This request was denied (Sup R. 663-664). On April 8, 2004, defense counsel filed an answer to the State's Motion for Pre-Trial Discovery (Sup R. 1076). The answer disclosed the defense's potential witnesses as any person mentioned in "any and all discoverable materials tendered by the State," and stated that, "[a]dditionally, the defense may or may not call following witnesses:" but contained no additional witnesses following this paragraph (Sup R. 1076). On the same date, defense counsel stated on the record that the case was "motioned up by the State because [she] had neglected to file [her] answer to [the State's] motion for discovery." (Sup R. 672).[6] In response, the court allowed for leave to file the answer to discovery (Sup R. 672). Then, counsel continued, stating that she "spoke to the State about it. Basically, it's self-defense, imperfect self-defense. Basically, I cited the section and statute that I would be asking for the instructions on." (Sup R. 672). On April 26, 2004, prior to jury selection, the prosecutor asked for clarification on defense counsel's answer to the defense counsel's answer to the State's motion

---

the offer made at the 402 conference, and the offer was subsequently withdrawn (Sup R. 656).

[6] On April 1, 2004, the State filed a Motion to Advance the case from its original date, April 26, 2004, to April 8, 2004 (Sup R. 1074-1075). The State's motion was granted on the same day.

for discovery (Sup R. 695). According to the record, the Petitioner was present with his counsel (Sup R. 693). The prosecutor began by stating that, in the defense's answer, the "first affirmative defense of self-defense" was cited with the statutory citation of the second-degree statute, and he did not know if it was the "affirmative defense of self-defense under 7-3," or if it was "self-defense, which is listed under second degree." (Sup R. 695). The court responded that, "[t]echnically, self-defense can become second degree. So, I don't know if there was some confusion there." (Sup R. 695). Defense counsel stated that she was alleging the affirmative defense of self-defense (Sup R. 695). The jury was then brought in, and jury *voir dire* began (Sup R. 696).

**Motions in *Limine* (Sup R. 166 – 169)/**
**Jury Selection (Sup R. 672-765); (Sup R. 4-154)**

The State did not file a motion to admit gang evidence, defense counsel did not make a motion to exclude such evidence, and neither the party nor the court inquired with jurors about any bias regarding gangs.

Trial

**The State's Case-in-Chief**

The State presented eyewitness testimony from Vance's lifelong friends, Elmer Conway (Sup R. 181-208); Mark Fulwiley (Sup R. 211-235); and Reggie Anderson (Sup R. 354-372); (Sup R. 186, 224, 355, 366). The State also presented testimony from Maggie Vance, Dwight Vance's mother (Sup R. 235-242); Cook County Sheriff's Police Investigator Frank Laskero (Sup R. 255-277); Assistant Medical Examiner Dr. Joseph Lawrence Cogan (Sup R. 277-321);

12

Cook County Sheriff's Police Sergeant Matt Rafferty (Sup R. 329-351); and Cook County Assistant State's Attorney Maureen Delehanty (Sup R. 376-441).

**Elmer Conway (Sup R. 181 – 208)**

Elmer Conway testified that he went to Patricia Hurd's apartment with Reggie Anderson on the night of April 11, 2001 (Sup R. 183). Conway briefly left Hurd's home to stop at his own house, and when he returned, Jerome Anderson, Michael Cunnigan, Mark Fulwiley, Dwight Vance, and the Petitioner had arrived at Hurd's house (Sup R. 184-185). Conway testified to knowing Vance "all of [his] life" and identified State's Exhibit 1 as a photograph of Vance (State's Exhibit 1); (Sup R. 186). When Conway returned to the house, everyone was sitting down and talking, and the Petitioner was eating polish sausage (Sup R. 187). Vance asked the Petitioner if he could have a piece of his polish sausage and the Petitioner told Vance to go get his own and that there was some in the kitchen (Sup R. 187). Vance went to the kitchen and came back with another polish sausage and told the Petitioner that if the polish sausage isn't good, he is going to kick the Petitioner in the face (Sup R. 187). Vance then took a bite of the sausage and kicked the Petitioner in the face (Sup R. 188). Vance and the Petitioner then began wrestling and the two fell through the glass table, shattering the glass (Sup R. 188). The rest of the group broke up the fight and Hurd asked everyone to go outside (Sup R. 188). Everyone went outside, but Conway stayed inside with Hurd to help clean the glass up off of the floor (Sup R. 188). Conway testified that, other than the initial fight

between Vance and the Petitioner, there was no other altercation that happened that night between Vance and the Petitioner (Sup R. 192).

At some point, everyone who was outside began to come back inside the apartment, but Vance and the Petitioner did not come back (Sup R. 189). When the Petitioner eventually came back inside, Vance was still outside (Sup R. 189). After the Petitioner came back inside, the Petitioner said that he was going to pick up Dana Cunnigan from the police station in Chicago Heights (Sup R. 189). Conway testified that at the time that the Petitioner left to pick up Cunnigan, Vance was still outside (Sup R. 190). Vance then came back inside and used the phone, which was located in the middle of Hurd's living room (Sup R. 190). As Conway was sweeping up the glass, Vance sat on the chair with his back facing the entryway door and used the phone (Sup R. 191-192). Conway testified that he was "probably ten feet" from Vance when he heard gunshots from inside the house, looked up, and saw the Petitioner "shooting [Vance] in the back" as Vance was laying face-down on the ground (Sup R. 191-192). Vance still had a phone in his hand as the Petitioner was "standing over him," and shooting (Sup R. 192). Conway testified that Vance had nothing else in his hand and that no one else in the apartment that night had a gun (Sup R. 192). After the shooting, Conway ran into the kitchen and then ran home (Sup R. 195).

The prosecutor showed Conway various photos of Hurd's house, living room, and the chair that Vance was sitting in, which Conway identified (State's Exhibits 2, 3, 4); (Sup R. 193). Conway identified State's Exhibit 5, which was a

14

picture of Vance laying on the floor and the chair that he was sitting in (State's Exhibit 5); (Sup. R. 193). Conway then identified State's Exhibit 6, which was a photo of Vance laying on the floor, the chair that he was sitting in, and the phone that he was using (State's Exhibit 6); (Sup R. 194). Finally, Conway identified State's Exhibit 7, which was a photo of the area where Conway was cleaning up broken glass (State's Exhibit 7); (Sup R. 194).

On cross-examination, defense counsel asked Conway whether he or Reggie Anderson had a "street name," and Conway responded that neither of them had a "street name" and that Reggie Anderson went by Reggie (Sup R. 196). Conway testified that he and Vance were both members of the same street gang, the Black Gangster Disciples (Sup R. 196). Conway testified that he did not know the Petitioner, but he knew Vance and had been friends with Vance all his life (Sup R. 203, 205). Conway had been a member of the gang for approximately eight years and did not know how long Vance had been a member but testified that Vance was a member of the gang for as long as Conway had known Vance (Sup R. 197). Conway testified that he does not carry a weapon as a member of the Black Gangster Disciples, and never carries a weapon for this organization (Sup R. 199). Conway did not know if Vance was drinking that night and did not think anyone in the house was using drugs (Sup R. 200). Conway did not know whether Patricia Hurd was related to anyone who was at the house that night (Sup R. 201). Conway testified that when Vance initially kicked the Petitioner in the face, the Petitioner was seated and

15

had not said anything to Vance beyond his previous statement that Vance could not have a bite of the sausage (Sup R. 202). When Conway initially heard the gunshots, he was facing away from Vance and did not see the Petitioner when he came back into the room (Sup R. 203-204). Conway testified that he did not go to the police after the shooting, did not render aid to Vance, and did not call for an ambulance (Sup R. 205-206). The police came to Conway to find out what happened to Vance after he passed away (Sup R. 206).

On redirect examination, the prosecutor asked Conway if everyone in the house – including Vance and the Petitioner – were members of the Black Gangster Disciples (Sup R. 207). Conway answered that everyone in the house was a member of the same gang (Sup R. 207). Conway also testified that when the police came to Conway to ask questions, he told then what happened (Sup R. 207). Conway also met with a state's attorney, and he told the state's attorney what happened (Sup R. 207).

On recross examination, Conway testified that he told the prosecutor on redirect examination that the Petitioner is a Gangster Disciple, but he told defense counsel during her cross-examination that he does not know the Petitioner (Sup R. 208).

**Mark Fulwiley (Sup R. 211 – 235)**

Mark Fulwiley testified that Vance was his friend and that he "grew up around [Vance] all of [his] life." (Sup R. 212-213). Fulwiley testified that he "knew of [the Petitioner]," and had seen him around for a couple of years (Sup

16

R. 213).  Fulwiley admitted that he had prior criminal cases involving delivery of a controlled substance and unlawful possession of a weapon (Sup R. 214).  He was convicted of three separate charges of delivery of a controlled substance in July of 1999, for which he was sentenced to boot camp (Sup R. 214).  He was also charged with possession of a gun on April 6, 2004 (Sup R. 214).  The prosecutor asked if he was made any promises or deals concerning his gun charge "to testify here in court today" and Fulwiley responded, "no." (Sup R. 214).

Fulwiley testified that, on April 11, 2001, he was at Hurd's apartment, sitting in the living room (Sup R. 215).  The Petitioner was on the phone with Dana Cunnigan when Hurd told him that his polish sausage was ready (Sup R. 215).  The Petitioner got his polish sausage from the kitchen, sat back down, and continued talking on the phone (Sup R. 215-216).  Then, the Vance asked the Petitioner for a piece of his polish sausage and the Petitioner said, "no." (Sup R. 216).  Fulwiley testified that Vance told the Petitioner, "if you were one of my guys, you would have gave me a piece of polish sausage." (Sup R. 216).  As Vance and the Petitioner argued, Hurd said that there is "another polish sausage in the pot," but the two still argued "back and forth." (Sup R. 216).

Vance then went to get himself a polish sausage and told the Petitioner that "if this polish sausage is good, he was going to kick [the Petitioner]." (Sup R. 216).  Vance, while standing up, kicked the Petitioner as the Petitioner was sitting down, and the two began to wrestle. (Sup R. 217).  Vance and the

17

Petitioner fell through a glass table before Fulwiley and the others broke up the fight (Sup R. 217). After they broke up the fight, Hurd asked everyone to go outside (Sup R. 217). Fulwiley testified that Vance and the Petitioner "were still arguing for a minute," and then they "shook hands and agreed that everything was over." (Sup R. 217). Then, everyone except for Vance went back inside of Hurd's apartment (Sup R. 217). At this point, the Petitioner got on the phone and said that he was going to go bond Dana Cunnigan out of jail (Sup R. 219). The Petitioner asked for the keys to a "car that everybody used" and then left Hurd's apartment (Sup R. 219). By the time that the Petitioner left, Vance returned to Hurd's apartment, sat down in the chair with his back turned towards the door, and began to use the phone (Sup R. 219, 221).

Fulwiley testified that the Petitioner was gone for approximately fifteen to twenty-five minutes before he came back to the apartment (Sup R. 220). Then, the Petitioner walked back into the apartment with a gun in his hand and, without saying anything, raised his arm, and shot Vance in the head (Sup R. 220-221). Fulwiley testified that when the Petitioner came in, "he had the gun already out. And it was close, if he extended his arm out, the gun would be to [Vance's] head." (Sup R. 221). After Vance was shot, he fell out of the chair and onto the floor and the Petitioner fired additional shots at Vance's back (Sup R. 221). After seeing Vance get shot in the head, Fulwiley put a pillow over his face because he thought that the Petitioner was going to "kill everybody in the house." (Sup R. 221). Fulwiley testified that he heard approximately "thirteen

18

or fourteen more shots" after Vance fell out of the chair (Sup R. 221).  After the
shots stopped, Fulwiley looked up and saw the Petitioner "standing over Vance
with the gun [slide] stuck back." (Sup R. 222).  The Petitioner then "put another
clip in" the gun, "walked himself out of the house," and said, "I'll holler at y'all,
G" as he left the apartment (Sup R. 222).  After the Petitioner left, Fulwiley said
that everyone stood there for "possibly, like, five minutes" in a "state of shock,"
and then "[a]fter everyone got out of shock, they ran out of the house." (Sup R.
223).

    Eventually, the police came to talk to Fulwiley (Sup R. 223).  He also
spoke to an assistant state's attorney about what he saw (Sup R. 223).  The
prosecutor then showed Fulwiley a photograph of the inside of Hurd's
apartment with Vance laying on the ground, and Fulwiley marked the place
where he was sitting on the couch when he saw the Petitioner shoot Vance
(State's Exhibit 5); (Sup R. 223-224).  Fulwiley testified that no one else in the
apartment had a gun that night and that he did not see anybody else with a gun
that night other than the Petitioner (Sup R. 224).

    On cross-examination, Fulwiley testified that he is a member of the Black
Gangster Disciples (Sup R. 226).  Fulwiley stated that he did not know whether
Vance was a member of the Black Gangster Disciples (Sup R. 226).  He testified
to knowing that Jerome Anderson was a Black Gangster Disciple (Sup R. 226).
When Vance stated that he was going to kick the Petitioner in the face "even if
the polish sausage is good," Fulwiley did not think that Vance was serious, but

admitted that he knew that Vance was serious when he kicked the Petitioner in the face (Sup R. 227). Fulwiley did not know if Vance was drinking that night and denied that anyone was using drugs that night (Sup R. 228). Fulwiley did not know exactly how many times he heard the gun fired but knew that "it was a lot of times." (Sup R. 230). Fulwiley testified that when he went outside after the shooting, he called the police on his cell phone, but was not there when the police arrived because he was scared and went to his friend's house (Sup R. 231-232). Fulwiley denied cleaning up the apartment, seeing a .357 Magnum, or going through Vance's pockets while he was at the house after the shooting occurred (Sup R. 232).

On redirect examination, Fulwiley testified that he never saw Vance with a gun that night (Sup R. 233). The prosecutor stated, "[c]ounsel asked you about a lot of gang membership and who was in a gang," and asked Fulwiley, "[d]o you know if [the Petitioner] was in a gang?" and Fulwiley answered, "[y]eah, I think he is." Defense counsel objected to this question and the court sustained counsel's objection (Sup R. 233). The prosecutor then asked again, "[d]id you now whether [the Petitioner] was in a gang?" This time, defense counsel did not object, and Fulwiley replied, "[y]eah, he was in a gang" and stated that the Petitioner was a member of the Gangster Disciples (Sup R. 233).

On recross examination, Fulwiley admitted that although he previously testified that he did not know whether Vance was a member of the Black Gangster Disciples, he was "scared to say [Vance] was in a gang. He was in the

20

same gang I was in." (Sup R. 233). Defense counsel asked, "[a]nd you stated you didn't really know [the Petitioner], right?" and Fulwiley responded that he knew the Petitioner but did not know him "like [he] knew [Vance]." (Sup R. 233). After admitting that Vance was in the gang, Fulwiley admitted to lying on cross-examination "because [he] thought that would make this case look bad if [he] had said that," and it would look bad for Vance to be in a gang (Sup R. 234).

## Maggie Vance (Sup R. 235 – 242)

The State called Vance's mother, Maggie Vance, to testify (Sup R. 236). Maggie Vance testified that Dwight Vance did not have any children at the time of his death but has a daughter that was born after his death (Sup R. 237). On April 11, 2001, Maggie Vance testified to seeing Dwight Vance at 9:30 p.m. (Sup R. 237). The prosecutor and defense counsel stipulated as to State's Exhibit 8, which Maggie Vance would identify as a photo of Dwight Vance as he appeared at the Cook County Medical Examiner's Office after his death (Sup R. 238).

## Frank Laskero (Sup R. 255 – 277)

Frank Laskero, a Cook County Sheriff's investigator, testified for the State. Laskero testified that, in the early morning hours of April 12, 2001, he and his two partners were requested to respond to the scene to investigate a homicide (Sup R. 257). Upon arriving to the scene, Laskero and his partners photographed, searched, and recovered shell casings from the scene (Sup R. 257-258). The prosecutor then showed Laskero State's Exhibits 2 through 7 and 9 through 18, which Laskero identified as various views of Hurd's apartment

and living room area as well as photographs of Vance in the position that
Laskero and the other investigators "found [Vance] when [they] got there." (Sup
R. 259-265). Laskero testified that they placed placard numbers to mark and
identify where evidence was recovered, stating, "we searched the scene, and we
found spent shell casings, and we found a spent projectile that we marked. We
marked the shell casings 1 through 11. We marked the spent projectile No. 12."
(Sup R. 262). Laskero then identified State's Exhibit 12, which was a
photograph of a spent shell casing on a couch and was marked by investigators
as Number 1 (State's Exhibit 12); (Sup R. 262). Laskero testified that "[t]hat
shell casing is stamped 9 millimeter Luger CVC," and was photographed in the
located that it was found when he arrived at the scene, "on the couch along the
west wall." (Sup R. 262). Laskero was also shown State's Exhibit 13, a
photograph depicting placard number 2, which he testified as having "the same
headstamp" and stated that all of the shell casings recovered at the scene
contained a 9-millimeter Luger CVC headstamp (State's Exhibit 13); (Sup R.
262-263). Referring to State's Exhibit 13, Laskero testified that this shell
casing photograph was located in "the northeast corner" where there was "a
nick-nack table and an end table." (Sup R. 262). State's Exhibit 14 depicted two
shell casing labeled Numbers 3 and 4, which contained the "same headstamp,"
and were found in "the bottom of the nick-nack table or end table." (State's
Exhibit 14); (Sup R. 263). State's Exhibit 15 contained casings labeled Numbers
5, 6, 7, and 8, and were found "on the floor between the end table and the nick-

nack table in the northwest corner." (State's Exhibit 15); (Sup R. 264). State's Exhibit 16 was a photograph of where spent shell casing labeled Number 9 was found, "on the couch on the north wall, again, in that same corner." (State's Exhibit 16); (Sup R. 264). State's Exhibit 17 contained photographs of spent shell casings Numbers 10 and 11, located "again, in the northeast corner." (State's Exhibit 17); (Sup R. 264). He then stated that "[a]ll of these casings were located in an area about 5'5" square from the northeast corner, all within that area." (Sup R. 264).

Laskero then identified State's Exhibit 18, which was a photograph of a "projectile" on the ground near a stereo system that was marked with placard Number 12 (State's Exhibit 18); (Sup R. 264). Laskero described this piece of evidence as a "spent copper jacketed lead projectile," found "on the other side of the room along the stereo system along the west wall of the room." (State's Exhibit 18); (Sup R. 264-365). Laskero explained that the projectile was "fully formed," meaning that it was not "broken up" and "was the full projectile that came out of the gun from the bullet." (Sup R. 265). The prosecutor then asked whether the projectile – which Laskero previously stated "came out of the gun from the bullet" – was a "shot bullet," and Laskero responded, "yes." (Sup R. 265). At no time during Laskero's testimony did Laskero discuss bullets coming from any gun other than the Petitioner's and only discuss the evidence of shell casings and bullets in the context of the discussion of the Petitioner's 9mm gun,

making no mention of any of this evidence relating to a .38 Smith & Wesson
Magnum or another weapon for that matter.

The prosecutor then showed Laskero a diagram of the crime scene, which
Laskero testified to preparing himself (State's Exhibit 22); (Sup R. 265). In
open court, Laskero circled the area on the diagram where "all of" the spent
shell casings were found (Sup R. 266). Laskero testified to finding other shell
casings at the scene that were not photographed (Sup R. 266). When asked
what else he found, Laskero testified:

> [W]hen we moved the victim's body to view the victim, to
> photograph the victim, when we turned him over, there was an
> additional spent shell casings, the same headstamp as the eleven.
> So, that was twelve total inside the living room area. And there
> was a projectile fragment. Unlike the first one I talked about, this
> one was not fully intact. So, it had to have hit something and
> broke (Sup R. 266).

After photographing and taking measurements, Laskero and the other
investigators collected the spent projectile, the spent projectile fragment, and
the shell casings to be "inventoried and sent to the Illinois State Police Crime
Lab." (Sup R. 267). The prosecutor asked Laskero to identify State's Exhibit 19,
which was a "glassine envelope" that contained the ".9 millimeter Luger CVC
shell casings." (Sup R. 268). The prosecutor asked him whether he sealed the
envelope and sent it to the crime lab and whether "[Laskero] and [the
prosecutor] open[ed] that envelope earlier today?" (Sup R. 268). Laskero
responded to both questions in the affirmative (Sup R. 268). The prosecutor
then asked Laskero to remove the twelve shell casings from the envelope and to
tell the jury how they are headstamped, which he did (Sup R. 269).

The prosecutor also asked about the "two spent projectiles" found at the scene (Sup R. 270). He identified one of these items, State's Exhibit 20, which was an envelope that contained "a bloody copper jacketed lead projectile fragment," "found underneath [Vance's] body when [they] turned [him] over," and that "that's why it had blood on it." (State's Exhibit 20); (Sup R. 269-270). State's Exhibit 20 also contained a smaller envelope inside of it, which Laskero described as "the deformed lead projectile fragment" that he recovered from underneath Vance (Sup R. 270). When asked if it was sent to the crime lab, Laskero answered, "[y]es. I didn't transport it, but it was sent." (Sup R. 271). Another, smaller, envelope contained in the State's Exhibit 20 envelope was described as a "copper-jacketed lead projectile," recovered "near the west wall of the living room by where that stereo system was at that was in the drawing and the photographs." (Sup R. 271).

Laskero testified that on April 12, 2001, he did not recover any weapons, but that Ford Heights police officers recovered a Smith and Wesson .357 revolver containing three unfired shells, found under a bush outside of Hurd's apartment (Sup R. 272-273). When asked why Ford Heights kept the .357 revolver and Laskero did not take it, Laskero testified, "first of all, the weapon hadn't fired recently. You could tell that. And it also was not – it was a 9 millimeter automatic that was used in the scene. There was no other evidence of any other weapon having been used at the scene. So, Ford Heights, they do find guns all spread out around that area." (Sup R. 273). Defense counsel

25

objected and the court sustained counsel's objection, stating that "[i]t will be stricken." (Sup R. 273). Laskero testified that he did not take the .357 revolver personally (Sup R. 273).

On cross-examination, Laskero testified that he saw the .357 revolver that Ford Heights Police showed him, but he did not inventory this gun, and instead the Ford Heights Police Department kept the gun (Sup R. 274). Laskero also admitted that he had not requested the gun back, and he did not seek to have it checked for fingerprints (Sup R. 275). Laskero testified that he was not going to investigate whether the gun was involved in the incident because the gun was found "in an area that was hidden behind some bushes, and it wasn't relative to what [his] crime scene was." (Sup R. 275-276). Laskero admitted to making this determination without having talked to any other witnesses that were at the scene, "[b]ut Ford Heights was not going to throw out the gun." (Sup R. 276). Laskero testified that he knows that there were three live bullets in the .357 revolver and that the gun was found near the crime scene (Sup R. 276). However, at the time of the trial, Laskero testified he did not know the location of the .357 revolver (Sup R. 276).

**Dr. Joseph Lawrence Cogan (Sup R. 277 – 321)**

The State called Dr. Joseph Lawrence Cogan, an assistant medical examiner for the Cook County Medical Examiner's Office (Sup R. 278). Dr. Cogan testified as an expert in the field of pathology (Sup R. 281). Dr. Cogan performed an autopsy of Vance on April 13, 2001 (Sup R. 281). Dr. Cogan

observed "numerous gunshot wounds to the body," "two gunshot wounds to the head," several to the left shoulder," and "several more to the back." (Sup R. 284). Vance died as a result of multiple gunshot wounds (Sup R. 284, 316). Eight bullets were recovered from Vance's body, but "[o]ne was recovered from the clothing, and one was an old bullet," so Dr. Cogan estimated that "about six bullets [were] recovered from the body." (Sup R. 285).

Vance had two bullet wounds to his head, and Dr. Cogan testified as to the path of these wounds (Sup R. 291). Dr. Cogan testified as to the similarities in the path of the two bullet wounds observed on Vance's head (Sup R. 291). Dr. Cogan identified State's Exhibit 28, which was a photograph of the "left arm" and "back of the left shoulder," that depicted bullet wounds 3, 5, 6, 7, and 4 (Sup R. 292). Dr. Cogan mentioned wound 4 but noted that it was "outside the picture." (Sup R. 291). He characterized three of the wounds as entrance wounds with "oval, circular, nice sharp borders," and compared it to one another wound, which was "more atypical" and not easily recognized as an entrance wound (Sup R. 291). He then identified State's Exhibit 29, which was another photograph of the back left arm "with the left arm lifted." (State's Exhibit 29); (Sup R. 292). Dr. Cogan testified that State's Exhibit 29 showed bullet wounds 3, 5, and 6 (Sup R. 292). He testified that "[y]ou can't quite see 7," and that it "looks like" he numbered bullet wound 8 as an entrance wound "in the back." (Sup R. 292). Vance also had a blood-alcohol level of .139 (Sup R. 286). On

27

cross-examination, Dr. Cogan testified there was no evidence of a close-range firing (Sup R. 319).

**Matt Rafferty (Sup R. 329 – 351)**

Matt Rafferty, a sergeant with the Cook County Sheriff's Department, testified that he was assigned to assist in the investigation of the April 11, 2001, homicide (Sup R. 329-330). Rafferty obtained copies of the Ford Heights police reports and obtained information on witnesses to the homicide (Sup R. 330). Rafferty obtained an arrest warrant for the Petitioner after interviewing witnesses (Sup R. 331). On June 26, 2007, after Chicago Police arrested the Petitioner, Rafferty went to Area 4, where the Petitioner was in custody and interviewed him with his partner, Detective Davis (Sup R. 332). Rafferty testified to reading the Petitioner his *Miranda* rights from a preprinted form prior to interviewing him, which the Petitioner and Rafferty signed and placed the time as 11:45 p.m. on the form (Sup R. 333-335). After his interview, Rafferty transported the Petitioner to the Markham Courthouse to meet with Assistance State's Attorney, Maureen Delehanty (Sup R. 336).

On cross-examination, Rafferty testified that he was assigned to the case five days after the incident and brought himself up to speed by reviewing other police reports, including reports created by the Ford Heights Police Department (Sup R. 337). Through his review, Rafferty learned that Vance was shot with a 9mm gun and that another gun was recovered, a .357-revolver (Sup R. 338). Rafferty could not recall who the .357 revolver belonged to but recalled that he

learned of this information through the Ford Heights police reports and
information from the evidence technicians (Sup R. 338). Defense counsel
showed Rafferty Defense Exhibit 1, an incident report prepared by Ford Heights
Police Officer Treiche, to refresh Rafferty's memory as to the owner of the .357
Magnum (Defense Exhibit 1); (Sup R. 338-339). After reviewing the report,
Rafferty identified the gun as a .357 Smith & Wesson (Sup R. 341)[7]. Defense
counsel then asked Rafferty about an interview that he conducted with Jerome
Anderson, which was allowed over the State's objection due to the unavailability
of the witness (Sup R. 342-343). Rafferty had the conversation with Anderson
on April 17, 2001, at the Sheriff's Office in the Markham Courthouse building
(Sup R. 346). Defense counsel asked Rafferty, "did you show Jerome Anderson
the picture of the 357 Magnum or caliber – 357 caliber revolver?" to which
Rafferty responded "[t]hat's possible." (Sup R. 346). Upon further inquiry by
counsel, Rafferty could not recall if he showed Jerome Anderson the .357
revolver, so counsel refreshed his recollection with Defense Exhibit 2, a copy of
Rafferty's police report dated May 9, 2001 (Defense Exhibit 2); (Sup R. 347).
Rafferty was then asked if he showed Jerome Anderson "a picture" of the .357
revolver, to which he responded, "[c]orrect, yes I did." (Sup R. 248). Rafferty
testified that Anderson identified the .357 revolver as belonging to him (Sup R.

---

[7] Rafferty referred to this weapon as a .357 "Smith and Wesson," while other witnesses referred to as
a .357 Magnum. Smith & Wesson manufactures the .357 Magnum, so both descriptions are
accurate. https://en.wikipedia.org/wiki/.357_Magnum.

348).  Rafferty also learned from his conversation from Jerome Anderson that Anderson was at the house that day (Sup R. 350).

Rafferty testified that other items were found at the crime scene, including a black leather Pele jacket and a key ring with 9 keys on it (Sup R. 348-349).  Rafferty admitted that the jacket belonged to the Petitioner (Sup R. 348).  Rafferty's responses to defense counsel's questions regarding the recovered keys were as follows:

COUNSEL:     And also you found some key ring – a key ring with 9 keys on it, is that correct?

RAFFERTY:    The keys may have been recovered at the crime scene, that's possible.

COUNSEL:     Do you recall finding some keys?

RAFFERTY:    Me personally, no.

COUNSEL:     Well, so you recall reviewing the report and learning that keys were found?

RAFFERTY:    Possibly, sure.

COUNSEL:     And those keys that were found, did you learn that they belonged to [the Petitioner]?

RAFFERTY:    Okay.

COUNSEL:     Is that a yes, Officer?

RAFFERTY:    Yes. (Sup R. 349).

## Reggie Anderson (Sup R. 354 – 372)

Reggie Anderson was in custody during his testimony (Sup R. 352). Anderson testified that he was currently incarcerated in the Cook County Department of Corrections for a driving under the influence charge, for which he received a sentence of two years of probation (Sup R. 354). In June, 2001,

Anderson also pled guilty to unlawful possession of a weapon (Sup R. 354).
Anderson testified to knowing Vance his entire life (Sup R. 355). Reggie
Anderson's brother, Jerome Anderson, had been killed one month after the
April 11, 2001, incident in a gang-related killing (Sup R. 357).

On April 11, 2001, Reggie Anderson was at Patricia Hurd's house when
polish sausage was made (Sup R. 357). When Anderson was asked what
happened when the polish sausage was made, Anderson answered, "I just know
that they was – they supposed to have been fighting over polish sausage." (Sup
R. 357). After Vance and the Petitioner began to argue, they began fighting and
Vance "slammed" the Petitioner through the living room table (Sup R. 347-358).
After the fight, Vance and the Petitioner went outside, and after the group came
back in, the Petitioner left (Sup R. 358).

Anderson testified that Vance came back into the apartment with
everyone and used the phone (Sup R. 358-359). As Vance was sitting down and
using the phone, the Petitioner "walked in, he shot [Vance] in the head. [Vance]
fell right in [Anderson's] lap." (Sup R. 359). Anderson testified that the
Petitioner "walked in shooting," and that the first shot hit him in the head (Sup
R. 360). After Vance fell on Anderson, the Petitioner continued to shoot Vance
in the back "over five times." (Sup R. 360-361). Anderson testified that, after
the shooting stopped, the Petitioner "took his clip out and put another one in.
And he picked the other clip off the ground and put it in his pocket. When he
walked off, he didn't turn his back on us. He just walked back and he said,

'G.D.' " (Sup R. 362). After the Petitioner left, Anderson and the others were in shock and called an ambulance (Sup R. 362). Anderson testified that he did not see anybody else in the house with a gun other than the Petitioner (Sup R. 363).

On cross-examination Anderson testified that Jerome Anderson was a Gangster Disciple (Sup R. 363). Reggie Anderson testified that his brother was killed approximately a month after the incident (Sup R. 364). Defense counsel asked, "[w]as that gang related also?" and Anderson replied in the affirmative (Sup R. 364). Anderson testified that he was not using drugs and that no one else at the house that night was using drugs (Sup R. 365). Anderson testified that he does not carry guns as a member of the gang (Sup R. 365-366). He also testified that his brother, Jerome Anderson, did not carry a gun, but that during April of 2001, he owned a .357 Magnum (Sup R. 366). He denied that Jerome Anderson used to keep his gun at Hurd's house and denied seeing Jerome Anderson's gun the day Vance was killed (Sup R. 366). He did not know how the .357 Magnum got to the crime scene, denied putting it there, and denied his brother putting it there (Sup R. 366-367). Anderson testified that, after the shooting, he "ran to [his] friend Elmer's grandmother's house and called the police." (Sup R. 367). Anderson returned to where the incident occurred when the police arrived but left because he had a warrant for his arrest (Sup R. 367-368). Anderson also testified that everyone at the house except for Hurd was a member of the Gangster Disciples (Sup R. 371).

**ASA Maureen Delehanty (Sup R. 376 – 441)**

Cook County Assistance State's Attorney Maureen Delehanty testified that, on June 27, 2001, at 2:45 a.m., she interviewed the Petitioner in the presence of Detectives Rafferty and Davis (Sup R. 378-385). One hour after the interview, with the Petitioner's consent, a videographer arrived and recorded the remainder of Delehanty's interview with the Petitioner (Sup R. 389-390). The prosecutor then asked that State's Exhibit 52 be published, and the videotaped statement was played in open court (Sup R. 391-392).

In the videotaped statement, the Petitioner stated that, on the afternoon and evening of April 11, 2001, he was at Patricia Hurd's apartment at 1220 East 11th Street in Ford Heights (Sup R. 399).[8] Michael Cunnigan, Jerome Anderson, Reggie Anderson, Mark Fulwiley, and Dwight Vance were also present at Hurd's apartment (Sup R. 402-403). Dana Cunnigan was at the apartment as well but was taken away by police after cursing at them outside of the apartment (Sup R. 404-405). After Cunnigan was transported from the apartment by police, everyone went into Hurd's apartment and Hurd cooked four Polish sausages for the Petitioner (Sup R. 405-406). Hurd served two of the sausages to the Petitioner, and Vance asked the Petitioner for some sausage (Sup R. 407). Vance and the Petitioner argued over the sausage, and then the Petitioner, Vance, and Hurd agreed that Vance could take some of the sausage that was still in the kitchen (Sup R. 408-409). Vance retrieved a sausage and

---

[8] The transcript of the videotaped portion of the Petitioner's statement is also included in the record at (Sup R. 770-793).

told the Petitioner that if the food was "nasty," he would kick the Petitioner in the face (Sup R. 410).

Then, Vance took a bite of the sausage and subsequently kicked the Petitioner in the face (Sup R. 411). The Petitioner then threw Vance through a glass table before the others broke up the fight and everyone went outside, where everyone told Vance to cool off (Sup R. 411-412). After everyone returned back into the apartment from outside, Vance hit the Petitioner in the jaw, the Petitioner threw Vance to the floor, and everyone pulled them apart again (Sup R. 413-414). Vance stated, "I'm fitting to kill your motherfucking ass," and reached for a gun from Jerome Anderson's pocket (Sup R. 413). When Vance reached for the gun, Jerome pushed him back and did not give him the gun (Sup R. 414).

The Petitioner then asked Jerome for keys to Jerome's vehicle so that he could go and bond Dana Cunnigan out of jail (Sup R. 414). The Petitioner then walked towards the car, but then turned around once he reached the corner of the building, and came back because he "was scared, feared for [his] life" because Vance had threatened to kill him (Sup R. 414-415). When he came back in, he shot Vance (Sup R. 416). The prosecutor asked the Petitioner, "What was he doing when you shot him? (Sup R. 416). The Petitioner then answered, "He had, he had the phone in his hand like he was –" and then the prosecutor interrupted and asked, "He had the telephone in his hand?" and the Petitioner answered, "Yeah." (Sup R. 416).

34

Vance was on the phone, facing sideways, with the telephone in his hand when the Petitioner shot him (Sup R. 416).  The Petitioner aimed for "his head" and shot him twice, and then Vance fell to the floor (Sup R. 417).  After Vance fell, the Petitioner "was still shooting" and estimated that 13 shots went off altogether, because that is "all the guns could hold." (Sup R. 417-418).  He was told that he has to go, and then he left to his girlfriend's house in Chicago Heights (Sup R. 418-419).

As he walked to his girlfriend's house, he thew the gun in a cornfield and took his clothes off because he was hot (Sup R. 419).  After going to his girlfriend's house, he went to his grandmother's house, where he had been staying since April 11 (Sup R. 420).  The Petitioner was then shown a photo of Vance, identified him in the photo, and signed the photo (Sup R. 421).  He also identified where he was standing in various photos, marking an X in the place where he was standing outside of Hurd's home when the group was shooting dice, the place he was standing inside of Hurd's house when he shot Vance, and where Vance was sitting when he was shot (Sup R. 421).  The video then played a portion of the video when Delehanty asks the Petitioner about the circumstances of his arrest and stated that he was picked up by Chicago police and then whether he was picked up by Cook County Sheriffs Detectives, to which the Petitioner answered "yes" to both questions (Sup R. 423).  The Petitioner confirmed that he was been treated fine while in custody, ate food from White Castle, drank pop, and has been able to use the bathroom (Sup R. 424).  The Petitioner stated that his statement was freely given, and that he had not been promised anything in exchange for giving his statement (Sup R. 424-425).  At this

point, the statement concluded, and the video stopped playing in open court (Sup R. 425).

On cross-examination, Delehanty testified that she arrived at approximately 1:30 a.m. on June 27, and met with Detective Rafferty, his partner, and Detective Davis (Sup R. 425-426). (Sup R. 426). Delehanty testified that she read the witness statements taken by the other felony review assistants and spoke with detectives but did not remember whether she reviewed the police reports or not (Sup R. 426). Delehanty spoke to detectives for approximately an hour and 15 minutes prior to interviewing the Petitioner (Sup R. 426). Delehanty had the Petitioner sign a *Miranda* waiver at 2:45 a.m. and then proceeded to talk about the incident with him (Sup R. 427). The conversation that Delehanty had with the Petitioner at 2:45 a.m. was not the same conversation that was memorialized on videotape, and this earlier conversation was not reduced to writing (Sup R. 427). The conversation prior to the videotaped statement was also not signed, written, or otherwise acknowledged by the Petitioner (Sup R. 428).

Delehanty testified that this initial conversation lasted approximately half an hour, while the videotaped conversation was approximately 20 minutes long (Sup R. 428). At 3:15 a.m., the Petitioner signed a consent to videotape the statement and then the videographer arrived at approximately 4:30 a.m. (Sup R. 428). Delehanty continued to have a conversation with the Petitioner regarding the incident before the videographer arrived, during the time between

3:15 a.m. and 4:30 a.m. (Sup R. 428-429). Delehanty testified that they did not only talk about the incident, but also a general conversation (Sup R. 429). By the time the videographer arrived and set up the tape, it was approximately 4:42 a.m. (Sup R. 430). Delehanty understood that the Petitioner had been in custody of either Chicago or Cook County Sheriff's Office since 1 p.m. the previous afternoon, and the video statement began at approximately 4:45 a.m. the following morning (Sup R. 431). Defense counsel showed Delehanty Defense Exhibit 3, which was a photo of Vance (Sup R. 433). Counsel asked whether Delehanty showed the Petitioner "a picture of a .357 Magnum gun that wasn't used as an exhibit," and Delehanty answered, "I am sorry. I don't think that I remember a picture of a gun, if that was marked as one of the exhibits. Maybe I did, but I am not sure." (Sup R. 433). Delehanty could not recall whether she showed the Petitioner a photograph of the .357 revolver (Sup R. 433-434). Delehanty admitted that, at the conclusion of the statement, she did not give the Petitioner an opportunity to add anything on his own and stated that "[h]e didn't pipe up and say anything." (Sup R. 434). She did not ask the Petitioner if he wanted to add to the statement (Sup R. 434).

On redirect examination, the prosecutor showed Delehanty State's Exhibits 54, 55 and 56, which were the photographs that she showed to the Petitioner during the interview (State's Exhibit 54, 55, 56); (Sup R. 435-438). Delehanty agreed that she "would have used" "any other photographs that were used or shown" to the Petitioner "as an exhibit and shown them in the video."

(Sup R. 438-439). She did not recall any other photos or exhibits being shown to the Petitioner besides the photo of Vance and the two photos of inside Hurd's home (Sup R. 439).

On recross examination, Delehanty admitted that she does not recall every detail in every case (Sup R. 441). After the conclusion of Delehanty's testimony, the State rested its case-in-chief (Sup R. 442).

## Motion for Directed Verdict (Sup R. 444 – 446)

After State's Exhibits 1 through 56 were entered into evidence, defense counsel moved for a directed verdict, which was denied (Sup R. 444, 446).

The Defense Case

## Leon Tanna (Sup R. 451 – 507)

The Petitioner testified he did not graduate high school due to family issues and that he has been convicted of a drug conviction in 1998 (Sup R. 454). The Petitioner then testified as to the events of April 11, 2001 (Sup R. 453). On April 11, 2001, the Petitioner was with Vance, Fulwiley, Jerome Anderson, Reggie Anderson, Mike Cunnigan, Dana Cunnigan, and Patricia Hurd in front of Hurd's apartment (Sup R. 453-454). The Petitioner was playing dice with everyone for approximately three or four hours (Sup R. 454).[9] At some point, everyone went inside of the house where Hurd prepared food for the Petitioner (Sup R. 455). While inside, Hurd handed the Petitioner the phone and stated that Dana Cunnigan was

---

[9] The Supplemental Record at this point in the Petitioner's testimony (Sup R. 454-455), does not include two pages that range from page numbers JJ131-JJ132. The record then begins again at JJ133 (Sup R. 455).

on the phone for the Petitioner (Sup R. 455). Dana Cunnigan informed the Petitioner that "she had a warrant" and was at the Chicago Heights Police Station (Sup R. 456).

As the Petitioner began to eat his food and spoke to Cunnigan on the phone, Vance asked for a piece of the Petitioner's food and the Petitioner refused, stating "[n]aw, I ain't giving you shit." (Sup R. 456-457). Vance became upset with the Petitioner and stated, "I will take your motherfucking food from you." (Sup R. 457). At this point Hurd interrupted and told Vance, "[w]hy you messing with [the Petitioner]? He ain't doing nothing to nobody. Leave him alone." (Sup R. 457). After Hurd stepped in, Vance continued to speak, stating, "y'all treat him like he a king or something," that they don't "even know" the Petitioner, and that they will "murk" the Petitioner, which the Petitioner took to mean "killing." (Sup R. 457-458). Hurd intervened again and told Vance that there was more food left in the pot for him (Sup R. 458). The Petitioner testified that he told Vance, " '[y]eah, man, you can have those two polishes,' " and " '[m]an, it ain't even that serious.' " (Sup R. 458). Although the Petitioner had paid for the food, he did not mind sharing the food that was left over with Vance and did not ask him for any money (Sup R. 458).

Vance then went to the kitchen to get his food (Sup R. 458). As Vance used a fork to retrieve the food from the kitchen, the Petitioner testified that Vance stated, " 'I will come over there and stab your ass in your motherfucking neck with this fork.' " (Sup R. 459). Dana Cunnigan was on the phone with the Petitioner during this time and asked what was going on (Sup R. 459). Vance then walked past the

Petitioner and came within three feet, or reaching distance, of the Petitioner when he stated, "[o]h, you think I am a motherfucking joke or something?" (Sup R. 459-460). The Petitioner continued to speak on the phone and asked Cunnigan about her situation, when Vance told the Petitioner, " '[w]hen I take a bite of this polish, if this motherfucking polish is nasty, I am going to kick you in your face.' " (Sup R. 461). Vance then took a bite of the polish sausage, stated "[o]h, you thought that I was joking, motherfucker," and proceeded to kick the Petitioner in his face (Sup R. 461). The blow caused the Petitioner to hit the ground and drop his food (Sup R. 461). The Petitioner then grabbed Vance, "slung him around and slung him onto [Hurd's] table, which broke her table." (Sup R. 461).

After Vance and the Petitioner wrestled in the glass for approximately 5 to 10 minutes, the group broke up the fight (Sup R. 461-462). Hurd then asked everyone to leave her house (Sup R. 462). The Petitioner apologized to Hurd and offered to pay for the damage to her table before proceeding outside to join the rest of the group (Sup R. 461-462). While outside, the Petitioner spoke with Vance (Sup R. 463). Vance informed the Petitioner that he "need[s] to watch his motherfucking mouth," and the Petitioner told Vance, "if I said anything to offend you or disrespect you, I apologize." (Sup R. 463). Vance responded, "[a]ll right," and the two shook hands (Sup R. 463).

The group then proceeded to go back into Hurd's apartment to help clean the glass up (Sup R. 464). While inside, Vance turned to the Petitioner and told him again that he "need[s] to watch [his] motherfucking mouth at this moment." (Sup R.

464).  The Petitioner asked Vance if he was trying to "prove a point" at which point Vance swung and hit the Petitioner in his jaw (Sup R. 464).  After Vance hit the Petitioner, the two began wrestling for approximately two to three minutes, with Vance hitting the Petitioner in the face and the Petitioner attempting to grab Vance's arm in order to prevent him from hitting the Petitioner (Sup R. 465).

The group broke the fight up again, at which point Vance stated to Jerome Anderson, " '[g]ive me the for motherfucking gun.  I am fixing to kill this motherfucker.' " (Sup R. 465).  Defense counsel showed the Petitioner Defense Exhibit 4, which was a photograph of the .357 Magnum that Jerome Anderson had in his pocket (Defense Exhibit 4); (Sup R. 466).  The Petitioner stated that this was the same gun that was at the State's Attorney's Office, wrapped in plastic, when he had his interview with Delehanty (Sup R. 466-467).  Vance reached for the .357 Magnum and Jerome Anderson told Vance to " 'get off that' " and to " 'leave that alone,' " in reference to the .357 Magnum (Sup R. 467).

The Petitioner testified that, at this point, Jerome Anderson gave the Petitioner Anderson's keys to Anderson's vehicle so that the Petitioner could drive to get Cunnigan out of jail (Sup R. 467).  After the Petitioner left the house, he realized he forgot his own keys, which were in his jacket, then turned back to retrieve his keys from Hurd's apartment (Sup R. 468).  When the Petitioner knocked on the door, he heard someone inside ask, " '[w]ho is it?' " and the Petitioner announced himself (Sup R. 468).  The Petitioner heard Hurd say, " ' [o]pen the door, that's [the Petitioner].' " (Sup R. 468).  The Petitioner came inside and saw

41

that his coat was on the couch next to where Vance was sitting as Vance was talking on the phone (Sup R. 469). The Petitioner testified that, in order to retrieve his keys and jacket, he would have needed to walk past where Vance was sitting on the couch (Sup R. 469).

The Petitioner heard Vance telling the person on the phone that he was waiting for the Petitioner to come back so that he could kill the Petitioner (Sup R. 469). As Vance spoke on the phone, he was holding Jerome Anderson's .357 revolver in his hand (Sup R. 470). The Petitioner testified that after he heard Vance referring to the Petitioner, the Petitioner "started shooting" and that he shot Vance because he was in fear for his life (Sup R. 470). He was in fear because Vance had already stomped and hit the Petitioner and threatened that he was going to kill the Petitioner when he had previously reached for Jerome Anderson's gun (Sup R. 471). The Petitioner testified that he emptied his gun and was "in a shock about what [he] had just [done]," and stood there without reacting more (Sup R. 472). Then, Michael Cunnigan told the Petitioner, " '[m]an, you had better gone.' " (Sup R. 472). The Petitioner then "turned around and took off." (Sup R. 472).

The Petitioner then testified regarding his interview with Delehanty on June 27, 2001 (Sup R. 472). At approximately 1:30 a.m. that morning, the Petitioner spoke with Delehanty and had been talking to Detective Rafferty prior to his conversation with Delehanty (Sup R. 472-473). The Petitioner had been awake since 7:30 or 7:45 a.m. the previous morning (Sup R. 473-474).

Delehanty was nice to the Petitioner, and while they had a conversation, she showed the Petitioner Defense Exhibit 4, which was a photo of the .357 Magnum (Sup R. 474). While speaking with Delehanty, prior to the videotaped statement, he was not able to tell his full version of what happened on the evening of April 11, 2001, because he was "under stress, frustration from being up all day and plus [Delehanty] was basically taking over the situation," so the Petitioner was trying his best to answer Delehanty's questions (Sup R.474-475).

When the Petitioner tried to add something to Delehanty's questions, she would not allow him to do so and told him to answer her questions (Sup R. 475). Thus, when the conversation was being videotaped, he just answered the questions that Delehanty asked him (Sup R. 475). Before the conversation was videotaped, the Petitioner did not give Delehanty a full explanation of why he went back to the house, and he was not able to tell Delehanty that he went back to the house in order to get his keys (Sup R. 476).

On cross-examination, the Petitioner testified that he brought his 9mm gun to the house on April 11, 2001, and that it was fully loaded (Sup R. 478). The Petitioner agreed with the prosecutor when asked if he had the gun with him "at all times." (Sup R. 478). The Petitioner testified that, prior to leaving the house to get Cunnigan from jail, when Vance threatened to kill the Petitioner and asked Jerome Anderson for his gun, the Petitioner was not scared for his life because he saw that Jerome Anderson was stopping Vance

from getting the gun (Sup R. 480). The Petitioner testified that he saw the .357
Magnum when he was inside Hurd's house (Sup R. 480).

The Petitioner testified that, during his videotaped interview, he did not
say that Vance stated "[w]e will murk you out here" because he did not get a
chance to say that (Sup R. 481). He was also not able to say in his taped
statement that Vance stated, "you thought I was joking, motherfucker?" prior to
kicking the Petitioner in the face (Sup R. 482-483). The Petitioner testified that
he was not able to get into specific detail while he was questioned by Delehanty
and that he was told to "make it brief" and answer the questions that he was
asked (Sup R. 482-483). The prosecutor asked, and Petitioner confirmed, that
Vance hit the Petitioner in the jaw after everybody came back inside after the
first fight (Sup R. 483). The Petitioner spoke to Detective Rafferty and
Detective Davis at Area 4 headquarters in an interview room (Sup R. 484). The
prosecutor asked whether the Petitioner told Rafferty that Vance swung at him,
and the Petitioner ducked, and the Petitioner responded, "[s]ir, no sir. Our
conversation was that he –" (Sup R. 484). At this point, the prosecutor cut the
Petitioner off, stating, "[t]here is no question pending." (Sup R. 484). The
prosecutor asked the Petitioner whether Vance's statement to Jerome
Anderson, "[g]ive me the gun so that I can kill this motherfucker," was in the
Petitioner's videotaped statement, and the Petitioner testified that he was not
able to explain that during his statement because he was "stressed and
frustrated" and was not "able to think how [he] was." (Sup R. 485).

44

The Petitioner testified that, when he shot Vance, there was already a round in the chamber and he had taken the safety off the gun (Sup R. 492). When asked whether he pointed it to Vance's head, the Petitioner stated that he "pointed it to [Vance's] direction," he did not intend to shoot a specific area on Vance's body (Sup R. 491). The Petitioner testified that the gun still went off after Vance fell out of the chair and that "the gun is automatic," so "[y]ou don't have to pull the trigger no time and time again." (Sup R. 493). As Vance fell on the floor on his stomach, the Petitioner testified that his finger was still on the trigger and that he "didn't know the gun would react that way." (Sup R. 494). The Petitioner denied taking the clip out of the gun after it was emptied and denied putting another clip in (Sup R. 496).

The Petitioner testified that the gun that he had that evening was a 9mm Luger, automatic (Sup R. 499). The Petitioner testified that he believed he received the gun from "a drug addict." (Sup R. 499). The prosecutor asked again whether the Petitioner neglected to say in his videotaped interview that Vance had a gun in his hand when the Petitioner returned to Hurd's apartment (Sup R. 505). Again, the Petitioner answered that he never had a chance to say that in his videotaped interview (Sup R. 5050). When the prosecutor asked whether Vance raised the gun, the Petitioner answered in the negative (Sup R. 505). The prosecutor asked, "if he never raised the gun, he never pointed it at you, right?" to which the Petitioner responded, "[s]ir, with all due respect, I didn't give him the chance to because I knew for a fact that he would kill me after the

things that I had already been through with him." (Sup R. 505-506). The prosecutor rephrased the question and the Petitioner responded, "[a]s I said at first, sir, due to the fact I know if I had allowed him to raise that gun, I would have been dead, sir." (Sup R. 506). The prosecutor then asked, "[y]ou didn't give him a chance to, is that what you just said?" and the Petitioner replied, "[s]ir, no sir. Because I was afraid that if I would have gave him a chance, he would have shot me, sir." (Sup R. 506).

On redirect examination, defense counsel asked the Petitioner about his statement to police and whether Delehanty asked the Petitioner what he heard or saw upon return to the house to retrieve his jacket and keys (Sup R. 507). The Petitioner testified that he was not asked about what he saw or heard, but only what he did (Sup R. 507). After the close of the Petitioner's testimony, the defense rested (Sup R. 508-509).

## The State's Rebuttal Case

### Detective Rafferty

The State recalled Detective Rafferty as a rebuttal witness (Sup. R. 836). Rafferty testified that he and Detective Davis had an interview with the Petitioner at Area 4 headquarters on June 26, 2001, at approximately 11:45 p.m. (Sup R. 837). Rafferty testified that the Petitioner told him that, during the second fight that occurred at the house after they came back into Hurd's apartment, the Petitioner stated that Vance swung at the Petitioner, but the Petitioner ducked (Sup R. 838). Rafferty also testified that the Petitioner stated

46

that he heard that Vance had a gun but that the Petitioner never actually saw the gun (Sup R. 838).  On cross-examination, defense counsel asked Rafferty if the statements that the Petitioner allegedly made were oral and whether these statements were reduced to writing, to which Rafferty answered that the statements were oral, and they were reduced to writing by someone other than the Petitioner (Sup R. 838-839).  Rafferty also testified that the Petitioner's signature was not on these statements (Sup R. 839).

**ASA Delehanty**

The State also recalled Maureen Delehanty as a rebuttal witness (Sup R. 839).  Delehanty testified that she had her first oral interview with the Petitioner on June 27, 2001, at approximately 2:45 a.m., and that Detectives Rafferty and Davis were present for this interview (Sup R. 840).  The prosecutor showed Delehanty Defense Exhibit 4 and was asked whether she showed it to the Petitioner at any point during the interview, to which Delehanty responded that she did not show this photo to him and added that she knew this because "[the Petitioner's] signature would be on it.  [Delehanty's] signature would be on it.  It would have been marked in some way.  In addition, we didn't have it there that night." (Sup R. 841).  On cross-examination, Delehanty clarified that the Petitioner's signature would have been on the photograph, that it was used with another witness, and that the signature on the photo belonged to "ASA Mary Beth Kent" and another signature belonged to "another witness in the case." Delehanty testified that the photograph was in existence at the time that the

Petitioner was in custody but was not available to Delehanty on the evening of her interview with the Petitioner (Sup R. 843). After Delehanty's rebuttal testimony concluded, the State rested its in rebuttal (Sup R. 843).

## Proposed Jury Instructions (Sup R. 844 – 849)

At the close of the parties' cases, defense counsel proposed jury instructions and verdicts regarding second-degree murder (Sup R. 844). The Petitioner expressed having discussed these jury instructions with defense counsel (Sup R. 844-845). The State made no objection to this instruction and the defense did not seek any additional instructions (Sup R. 849). Defense counsel specifically requested jury instructions defining the burden of proof for first-degree murder and second-degree murder based on the unreasonable belief in self-defense but did not request a jury instruction based on provocation engendered by mutual combat.

## Closing Arguments (Sup R. 855 – 906)

In his closing arguments, the prosecutor argued that the Petitioner returned to the apartment to execute Vance. The prosecutor focused on the defense's proposition that the Petitioner was justified in using the force that he used when he shot Vance (Sup R. 858). The prosecutor noted that eyewitness testimony never revealed that the Petitioner was threatened when he came back to the apartment and shot Vance and that the defense "[has] not given you any evidence of justification at all." (Sup R. 859-860). The prosecutor also argued that the eyewitnesses were credible despite their gang affiliations,

stating that, "when those guys were on that stand they were brutally honest," and thus, "their testimony alone is enough to tell you [the Petitioner] wasn't justified or he didn't believe he was justified in what he did." (Sup R. 860).

The prosecutor highlighted Investigator Laskero's testimony, arguing that the Petitioner shot Vance "from behind" and that Vance's body was positioned "[w]ith its back against the door. That's' how he fell. That's how he was shot. That's how he was killed. That's what the crime scene evidence shows. It corroborates." (Sup R. 860). The prosecutor also focused on the Petitioner's testimony as compared to his videotaped statement, stating that the Petitioner "left all those parts out" "about another gun being there," "wanting to go back to get [his] keys," "facing [Vance] when [the Petitioner]" came into the house, and "[Vance] saying he was going to kill [the Petitioner] when he came in." (Sup R. 866). Finally, the prosecutor argued that the defense was using the gang evidence "to dehumanize [Vance]." (Sup R. 869).

In her closing arguments, defense counsel argued this case arose out of a gang "lifestyle" and that the witnesses in the case were "gangbangers and thugs." (Sup. R. 871). Defense attempted to discredit the testimony of the State's eyewitnesses by pointing to their gang membership and close affiliation with Vance (Sup R. 872-873, 884).

Defense counsel argued that the Petitioner acted in self-defense, or alternatively, unreasonably believed that he was acting in self-defense (Sup R. 871-886). Defense counsel argued that, although eyewitnesses testified that no

one else had guns in the apartment, "we know now that they did." (Sup R. 871).

Defense counsel argued that the Petitioner's fear was warranted, as earlier that

day, Vance had already made good on his promise to kick the Petitioner in the

face is his polish sausage tasted bad (Sup R. 873, 878). Defense counsel also

stated in her closing argument that the State and police purposely failed to

fingerprint Jerome Anderson's .357-caliber revolver and introduce it into

evidence, suggesting that the revolver may have had Vance's fingerprints on it

(Sup R. 875-876). On this point, counsel stated:

> Where is that .357? All we got is a picture of it. But you didn't just get a
> picture of those bullets, did you? What was it, about a hour or two? They had
> people testifying and putting up shells. They had the bullets for you. And
> they had all of that for you. Why didn't they bring in the .357 Magnum? (Sup
> R. 875-876).

Defense counsel asked the jury, "[w]hy not take [the weapon] and fingerprint it?

[The Petitioner] said [Vance] had the gun in his hand. . . How much time does

that take? We are trying to find the truth here. Why not take that gun, have it

fingerprinted, analyze it, see if [Vance's] fingerprints were on the gun?" (Sup R.

876). Defense counsel further argued that, although the State purposefully

brought Vance's bullet-hole-covered sweater and showed it to the jury, the State

failed to introduce the Petitioner's jacket and keys, which were also at the scene

of the crime and corroborated the Petitioner's testimony that he returned to the

apartment to retrieve them (Sup R. 876-877).

Defense counsel argued that the prosecution's characterization that

Vance was "shot brutally in the back of the head" did not comport with the

evidence and the angle of gunshot wound, as evidence showed that the angle of the entrance wound was on the side of Vance's head, Vance was sitting with his side facing to the door prior to being shot, and Vance would have been able to see the Petitioner (Sup R. 877-878). Defense counsel questioned the reliability of the Petitioner's videotaped statement to police, arguing that the State rehearsed a statement that conformed with their theory and failed to show him a photo of the .357 revolver because it would not have matched the State's theory (Sup R. 880-882).

In his rebuttal argument, the prosecutor argued the Petitioner wanted to be portrayed as a "hero" for shooting an unarmed man in the back multiple times, and this is "taking the law of self-defense and turning it on its ear." (Sup R. 886). The prosecutor continued:

> That law that's written in our statute books to protect us, they are twisting it around. Because self-defense, ladies and gentleman, it's an honorable thing. Is there anything, you need to ask yourselves, anything honorable or decent about what Leon Tanna did? Absolutely not. What is self-defense, ladies and gentlemen? True self-defense where you are justified, a woman who is in her home late at night and someone breaks into her home and accosts her with some kind of weapon, a knife, gun, whatever. That women gets a gun of her own and shoots and kills that intruder. That is true self-defense. She is justified.
> What the defense wants you to believe, ladies and gentlemen, is that this defendant who had a gun in his pocket the whole day, fully loaded gun, who after leaving the apartment for 15 to 25 minutes, said I'm in fear for my life; I have to go back in, bang, bang, bang, bang, bang, bang, bang. That is the same as the lady who is in her house getting accosted by the intruder? No way, that is not the law (Sup. R. 887).

Later, the prosecutor argued that even under the Petitioner's own version of events he could not properly claim self-defense. The prosecutor commented,

"Even if you believe his story, he's not justified.  Not justified like that woman whose house got broken into by intruder would be justified.  That is straight-up self-defense.  He's not justified."  (Sup R. 902).

In this same rebuttal closing argument, the prosecutor made similar remarks regarding the law the regarding second-degree murder based on unreasonable self-defense.  The prosecutor told the jury:

> Unreasonable belief would be if someone suddenly turns around and points and object at you.  If you are in imminent fear of death or great bodily harm, you react right then and there and you should kill that person.  But it later turns out that object they had in their hand was a cell phone.  That would be unreasonable self-defense.
> Sneaking up behind Dwight Vance and shooting him in the back thirteen times, where is the unreasonable belief there? Again, even if you want to disregard everything and believe everything he says yesterday about how the victim had a gun in his hand, there's no unreasonable belief.  He pulls the gun out, takes the safety off, and pulls the trigger, aims it, and fires.  Imminent fear. No. Reasonable belief.  No. He could have just walked right out.  He is trying to get away with murder (Sup R. 904).

There was no objection to any of these arguments, and thus the jury was never told to disregard these comments.

In reference to the fact that Jerome Anderson's weapon and the Petitioner's jacket were not introduced into evidence, the prosecutor argued that, in reference to the fact that Jerome Anderson's .357 revolver and the Petitioner's jacket were not introduced into evidence by the defense:

> Where is that .357?  You ask yourselves why didn't they bring that in here.  Where is [the Petitioner]'s coat?  You asked them why and they didn't bring that in here.  First of all, let me make this especially clear.  The defense has no burden whatsoever.  They have no burden whatsoever to put on evidence.  But once they do,

> you get to consider that. Not only what they do put on, but what
> they don't put on (Sup R. 895).

Defense counsel objected, the court sustained the objection, and asked the

prosecutor to "move on." (Sup R. 895).

The prosecutor argued that Vance just had a phone in his hand and that

there was no gun in his hand in the photograph of Vance at the crime scene

"because he never had it." (Sup R. 896). The prosecutor continued by arguing

that Laskero's testimony that he did not touch Vance's body until he received

clearance from the medical examiner's office supports the State's argument that

Vance did not have a gun (Sup R. 897). On this point, the prosecutor argued

that Laskero's testimony showed that "[o]nce they rolled that over," the only

things found under Vance's body were "spent shell casings and a fired bullet," so

a gun "was never there," and "if it was, he would have fell right on it." (Sup R.

897).

**Jury Instruction, Deliberation, and Verdict (Sup R. 907 – 953)**

The jury was instructed on the elements of first-degree murder, self-

defense, and second-degree murder based on the unreasonable belief in self-

defense. During deliberations, the jury sent a note to the court asking, "Where

is [the Petitioner]'s jacket and keys now?" (Sup R. 946, 1114). The court,

without objection from either party, responded with a note informing the jury

that they have seen and heard the evidence and to keep deliberating (Sup R.

946, 1114). The jury subsequently returned a verdict of guilty of first-degree

murder (Sup R. 948, 1115).

## Post-Trial Motions and Sentencing

The Petitioner filed a posttrial Motion for New Trial and an Amended Motion for New trial, which were both denied (Sup R. 1112-1113). Following a sentencing hearing, the Petitioner was sentenced to 22 years imprisonment for first-degree murder and an additional 25 years based on the jury's finding that he personally discharged the firearm that caused Vance's death (Sup R. 993, 1094).

## Direct Appeal and the Appellate Court's Decision

On direct appeal, the Petitioner argued (1) the Petitioner was denied his Sixth Amendment right to the effective assistance of counsel where his attorney did not request a second-degree murder instruction based on provocation; introduced irrelevant and prejudicial gang evidence; failed to conduct *voir dire* concerning this prejudice; and (2) the trial prosecutor committed prosecutorial misconduct in his closing argument when he shifted the burden of proof by arguing that the defense could have produced the gun Vance was alleged to have been holding and the Petitioner's jacket and keys (**Exhibit A** – Direct Appeal Opening Brief of then Petitioner)[10].

On October 27, 2006, in an unpublished Order, the Illinois Appellate Court denied the appeal (C. 57-100). First, the Appellate Court conceded that it is

---

[10] The Appellate Court has indicated to an attorney in this office that it does not have the briefs on the direct appeal, and they were not contained in the Record on Appeal. The Petitioner adds them as exhibits in this case because they were part of the Record on Appeal, but were not preserved. The undersigned obtained these briefs from the file of the Cook County Public Defender's Office.

permissible to instruct a jury as to both types of second-degree murder (imperfect self-defense and provocation), even though the two theories have inconsistent states of mind (C. 75) (citing *People v. Bailey*, 141 Ill. App. 3d 1090, 1104 (1986)). Pursuant to *Bailey*, a defendant presents evidence that he or she made a deliberate choice to shoot based on an imminent fear of bodily harm or death, this act cannot also justify a provocation defense since this was the result of a conscious choice (C. 75).

The Appellate Court also acknowledged that the Petitioner cited to another Illinois case where the court found counsel was ineffective in only submitting one second degree instruction, but not the other (C. 80) (citing *People v. Parker*, 260 Ill. App. 3d 942 (1994)). The Appellate Court distinguished this case from *Parker* because in this case, unlike in *Parker*, "there was no evidence of an immediate struggle before defendant shot Vance," citing to the 10-15 minute time period between when the Petitioner left the apartment and when he returned, but then noting "all three of the State's witnesses testified that when defendant returned, the victim was unarmed" instead of citing to the Petitioner's version of events that Vance was armed and threatening the Petitioner again immediately before he began to shoot (C. 80-81). Importantly, the Appellate Court never ruled there was not "some evidence" to support the giving us such an instruction, but instead found that the evidence of provocation was weaker than the evidence to support an unreasonable self-defense instruction and that the two instructions posed a "choice of potentially conflicting second degree murder instructions." (C. 75-81).

The Appellate Court also concluded the Petitioner could not satisfy the prejudice prong of *Strickland*, pointing to his videotaped statement, which supposedly did not mention that Vance had a gun, and his trial testimony, where the Petitioner did make this claim. The Appellate Court ruled:

> [I]n his virtually unrecanted confession, at trial, defendant admitted that before he entered the apartment, he had the safety switch in the off position, and a live round in the chamber of his gun. Furthermore, when questioned at trial as to whether the victim ever raised his gun toward him, defendant testified, 'With all due respect, I didn't give him a chance.' (C. 82).

Second, the Appellate Court found the Petitioner was not denied the effective assistance of counsel where defense counsel introduced evidence of the Petitioner's gang membership, and also did not *voir dire* the jury about potential gang bias. The Appellate Court acknowledged that Illinois law generally disfavors gang evidence unless there is a specific reason for its introduction, and that such evidence can be highly prejudicial, the Appellate Court found the introduction was a matter of sound trial strategy (C. 83-90). The Appellate Court found this was a matter of sound trial strategy because the witnesses' gang membership would supposedly raise the inference that they were all armed, and that this gang evidence would "destroy any sympathy the jury might harbor toward the victim." (C. 85). Given that the Appellate Court found the introduction of gang evidence was a matter of sound trial strategy, it also found it was part of this same strategy not to voir dire the jury about potential gang bias (C. 86-90).

Finally, the Appellate Court found that the State's rebuttal argument constituted error, stating that the prosecutor's argument "attempted to shift the

burden by suggesting that once defendant introduced testimony regarding specific items at trial, the jury automatically had a right to consider what evidence he had not introduced." (C. 94). The Appellate Court, however, declined to find that it was subject to the plain-error rule, finding that the evidence against the Petitioner was not closely balanced, citing to the same evidence it referenced in its *Strickland* prejudice analysis (C. 96-97).

### Petition for Rehearing/Petition for Leave to Appeal

The Petitioner filed a Petition for Rehearing, which was denied on December 16, 2018[11]. The Illinois Supreme Court denied the Petitioner's Petition for Leave to Appeal on March 28, 2007. *People v. Tanna*, 223 Ill. 2d 676 (2007).

### Post-Conviction Petition

On March 31, 2007, the Petitioner filed a *pro se* post-conviction petition, in which he argued that his due process rights under the Fifth and Fourteenth Amendment were violated when: (1) the State withheld evidence from defense counsel, which included the Petitioner's jacket, a set of keys, a black and gray sweater, and a .357 Magnum that was inventoried by the Ford Heights Police Department, and (2) Crime Scene Investigator Laskero failed to collect the .357 Magnum that was found at the crime scene and send it to the lab for fingerprint and other testing (C. 13). He also argued that he was denied effective assistance of trial counsel in violation of his Sixth and Fourteenth Amendment rights when: (1) defense counsel unreasonably proceeded to trial without the State's complete

---

[11] The Petitioner has been unable to obtain this petition, nor the Order denying the petition, and neither are contained in the Record on Appeal.

compliance with the rules of discovery, (2) defense counsel failed to notify the court for the record that the State failed to comply with discovery rules, (3) defense counsel failed to file a motion to dismiss based on the State's failure to comply with discovery rules by withholding the Petitioner's jacket, set of keys, a black and gray sweater, and the .357 Magnum inventoried by the Ford Heights Police Department, (4) trial counsel failed to call Detective Triche, who gathered the evidence at the scene and authored a Police Report that was used by Detective Laskero, and (5) trial counsel failed to call witness Patricia Hurd to rebut the State's theory of the offense (C. 13-14). Finally, the Petitioner argued that (1) he was denied a right to a fair trial by the trial court's failure to answer the jury's question regarding the whereabouts of the Petitioner's jacket and keys during deliberations, and (2) appellate counsel was ineffective for failing to raise the above claims on direct appeal (C. 11-16). In support of his motion, the Petitioner attached a transcript of defense counsel's closing argument, a police report from the Ford Heights Police Department, a transcript of Lakero's and Rafferty's trial testimony, a Ford Heights Police Department report authored by Officer M. Triche, a transcript of the prosecutor's closing argument and argument on rebuttal, and a transcript of the court informing counsel of the jury's note during deliberation (C. 17-54).

On May 21, 2007, the circuit court dismissed the Petitioner's postconviction petition without prejudice because the mandate had been recalled and the matter was presently appealed (C. 102-104, 107). The mandate was originally issued on January 25, 2007 (C. 9, 118). After the Appellate Court learned of the Petitioner's February 7. 2007, Petition for Leave to Appeal to the Illinois Supreme court, the

Appellate Court recalled the mandate, pending the decision of the Supreme Court on his petition (C. 118). It was recalled on February 13, 2007, and re-issued on May 9, 2007 (C. 9, 55).

On December 5, 2007, the Petitioner filed a *pro se* "Petition for Leave to Refile Post-Conviction." (C. 110-112, 120-121). On December 2, 2009, the Petitioner filed a Freedom of Information Request with the Clerk of the Circuit Court of Cook County (C. 130). On August 27, 2010, the Petitioner filed a *pro-se* Motion for Rule to Show Cause against the Cook County Sheriff's Police Department to request a response to subpoenas issued in April and June, 2010 (C. 179).

On January 18, 2008, the circuit court appointed postconviction counsel and docketed the petition.[12]

On December 11, 2009, post-conviction counsel appeared before the court and stated that he "had originally planned to file a motion for discovery in this case but due to some things [he] found out actually today, [he] think[s] [he will] hold off on that and get a shorter date than usual on this." (PC R. L2). On March 12, 2010, counsel informed the court for the record that he and the prosecutor "had some discussions concerning a couple of – oh, well, one major issue," being that counsel "was going to ask to see if we can get the original statements that were made by the witnesses and by the eyewitnesses in this matter." (PC R. N2). Counsel explained that he was making this request because "there is a large time about two months between the time that the murder takes place and the time that the warrant

---

[12] The Petitioner was represented by Cook County Assistant Public Defender Jeffrey Walker during his postconviction proceedings (C. 181).

59

actually goes out, which is a little unusual," and that he does have the trial file of

the case, but "would like to see if maybe something had been neglected because it

just seem[ed] very unusual to [him]." (PC R. N2). The court asked, "the original

statements are not in there, I am assuming –" at which point the prosecutor stated,

"I am skeptical that they are, let's just put it that way. Does he want the originals?"

(PC R. N3). Counsel responded "[y]es," and clarified that there were two

departments involved – Ford Heights and Cook County Sheriff's Department, "[s]o

who knows, because [he] think[s] Ford Heights Police started the investigation,"

which "also resulted in the loss of certain physical evidence that was involved." (PC

R. N3).

      On July 16, 2010, counsel stated that he "received some material from the

Ford Heights Police Department this morning," and that "[t]here are outstanding

materials from the Cook County Sheriff's Police Department that we are looking

for." (PC R. P2). By August 27, 2010, counsel stated that he has not yet received

anything from the Cook County Sheriff Police, "which is the bulk of the work in this

case," so he proposed writing a motion for a Rule to Show Cause, and that he

"served two subpoenas on them and received nothing but [he did not] want to do

anything with that as of yet," and would rather "put the motion on file and send it

with a third subpoena." (PC R. S1). Counsel asked the court not to take any action

for the Rule to Show Cause that he would file against the Cook County Sheriff's

Police Department, and the court granted leave to file the motion (PC R. S2-S3).

On October 1, 2010, post-conviction counsel did not appear before the court, but the prosecutor indicated that a detective came in and brought subpoenaed materials for the motion for rule to show cause, which she tendered to the court until post-conviction counsel could retrieve the tendered materials from the police department (PC R. T1-T2). Post-conviction counsel picked up the materials tendered by the Cook County Sherriff's Police on the following status date of October 29, 2010 (PC R. U1-U2).

On June 21, 2013, postconviction counsel informed the court for the record that he filed a notice of a motion for discovery (Sup3 R. 14). The prosecutor objected to the motion (Sup3 R. 14). Defense counsel argued that the "two items that were most relevant to [the Petitioner's] defense were both lost by the Ford Heights Police Department. They were clearly relevant." (Sup3 R. 15). Defense counsel continued, pointing out that the jury asked "what the whereabouts of the clothing was" during deliberations (Sup3 R. 15). Additionally, defense counsel argued that the Petitioner's "testimony in the case showed that the gun that was lost he stated that was in the hand of the individual who he shot before he shot him" and thus the defense sought to subpoena the Ford Heights Police and Cook County Sheriffs Departments regarding "their rules" for the "maintenance of evidence." (Sup3 R. 16-17). In response, the prosecutor argued:

> [T]he .357 Magnum according to the police report had nothing to do with the shooting. There is no issue regarding that .357 Magnum at trial. What the Ford Heights Police Department did with the weapon that was recovered outside of someone house where the victim was shot twice in the head and 11 more times by a .9 millimeter has no bearing, has no relevancy on this post-conviction order (Sup3 R. 18).

In addition, the prosecutor argued that the whereabouts of the clothing were presented to the jury at the time of trial through testimony and that "[c]ounsel is attempting to create a constitutional violation by going into the minds of the jury during deliberations. Which is not proper in post-conviction. Its not constitutional violation and cannot be done. This is a fishing expedition in order to create a violation." (Sup3 R. 19). The court asked defense counsel, "[s]o you are telling me that there is extensive cross examination about the recovery and extensive cross examination about [the .357 Magnum] not being present in court, but nobody asked the question did you destroy it?" (Sup3 R. 23). Defense counsel responded, "[n]ot specific destruction, no." (Sup3 R. 23). The court denied defense counsel's motion for discovery, citing that the record indicates that "the Cook County Sheriff Police never had possession of the weapon and/or clothes," and ruled the same as for the Ford Heights Police Department (Sup3 R. 24-25). The court did, however, allow counsel to re-raise the issue if he brought an affidavit on the issue (Sup3 R. 25). Defense counsel later informed the court that he had been in contact with "[r]epresentatives of the Ford Heights Police Department, and representatives of the Cook County Sheriff's Police Department," who informed him that the .357 Magnum and articles of clothing had been "lost or destroyed." (Sup3 R. 30).

On July 18, 2014, the court ordered the Cook County Sheriff's Police Department to allow post-conviction counsel and his investigator to examine items in the Department's custody, including the .357 revolver, the Petitioners jacket and keys, and a gray sweater (C. 429). On August 15, 2014, the Petitioner's post-conviction counsel located the requested discovery items in the custody of the Cook

County Sheriff's Police Department, where the items had been stored throughout the duration of the Petitioner's trial (C. 456).

The Petitioner filed a supplemental postconviction petition and Rule 651(c) certificate on June 5, 2015 (C. 431-432). In the petition, the Petitioner raised three claims in addition to the Petitioner's *pro-se* petition, arguing that (1) the State violated the Petitioner's due process rights where it failed to tender exculpatory evidence that was specifically requested by defense counsel as required under *Brady*, (2) because his due process rights were violated by the State's failure to tender exculpatory evidence, the Petitioner's sentence violated his Eighth Amendment rights, and (3) the Petitioner received ineffective assistance of appellate counsel in violation of his Sixth Amendment rights by not raising a challenge to his sentence (C. 432-448).

In support of his petition, the Petitioner included several pages of the original police reports (C. 449-452); and the affidavits of Connie Jordan, the Petitioner's trial counsel, and Alicia Stewart, an investigator from the public defender's office (C. 453-456). In her affidavit, trial counsel averred that after she was informed that the Petitioner left his coat and keys in the apartment and returned to retrieve these items when the shooting occurred, she "informed then ASA Tim Felgenhauer, that these items were recovered by the police" and she "requested that [Felgenhauer] speak with the Cook County Sheriff and the Ford Heights Police Department regarding the location of these items." (C. 454). Trial counsel continued in her affidavit, stating:

> Between the dates of September 8, 2003 and October 16, 2003, I addressed this missing evidence with ASA Felgenhauer, at which time

he informed me that he had inquired with the police departments and that neither had the evidence I requested. I informed ASA Felgenhauer that this evidence was crucial to our defense, as this evidence was the reason out client went back to the apartment and not to seek revenge and shoot the decease. Based on this discrepancy, the State offered to participate in a 402 Conference with the understanding that they would not request the enhancement of 25 years, but would allow for a 20 to 60 year sentence.

The items listed above were subpoenaed and requested by me and never received. The State Police not the Ford Heights police department responded to the subpoena or produced any of the requested items (C. 454).

Trial counsel's affidavit did not address a request for the .357-caliber revolver or whether testing was ever sought or requested. In the second affidavit, the public defender's investigator, Alicia Stewart, attested that, on August 25, 2014, she "accompanied Attorney Jeffery Walker to the Cook County Sheriff's Police Department" in Maywood, Illinois, where the Cook County Sheriffs produced the .357-caliber revolver, and the Petitioner's keys and jacket (C. 456). The investigator attested to taking photographs of these items (C. 456).

In this supplemental petition, defense counsel alleged, "the prosecutors failed to produce the .367 Magnum that Tanna testified Vance had Magnum that Illinois State Police Crime Lab technician Jon Flaskamp states could have fired a .38 caliber bullet which could not have been fired by Leon Tanna (Exhibit 3), even though these items were present in the evidence inventory room of the Cook County Sheriff's Department." (C. 441). However, Exhibit 3 was the affidavit of Ms. Stewart, and did not support these assertions (C. 456). There was no affidavit from Flaskamp presented in this supplemental petition, although there was one obtained from Flaskamp on June 24, 2015 (C. 428), before the State moved to dismiss the

petition.

On September 18, 2015, the State filed a motion to dismiss the petition (C. 457). In that motion, the State argued that no *Brady* violation occurred, as defense counsel was aware of the recovery of the Petitioner's clothing and keys inside the apartment as well as the .357-caliber revolver, which was found outside of the building, and that these items were not hidden from defense counsel (C. 457-463). The State further argued that the Petitioner's trial counsel "conducted a vigorous defense on behalf of the [P]etitioner" and that the Petitioner's postconviction petition lacked documentation to support an ineffective trial counsel or appellate counsel claim (C. 464-466).

On December 18, 2015, defense counsel filed a written response to the State's motion to dismiss (C. 457). In this response, defense counsel argued the Petitioner's due process rights were violated when the State suppressed the .357 revolver as well as the Petitioner's jacket and keys, and that these items were material to the Petitioner's theory of defense – that the Petitioner returned to the apartment to retrieve his keys and coat and that he did not fire at Vance until Vance "pointed the .357 Magnum which belonged to Jerome Anderson," at the Petitioner (C. 419-420). Defense counsel attached to this written response an affidavit from Jon Flaskamp, a forensic scientist employed by the Illinois State Police (C. 428). In that affidavit, Flaskamp averred: (1) he examined the cartridge cases and bullets said to have been recovered by the Ford Heights Police Department at the scene of the Vance shooting on April 11, 2001; (2) that those bullets and cartridges were inventoried with the Illinois State Police Forensic Science Center in Chicago on April 25, 2001;

(3) that he examined Exhibit 5H, a .38 caliber bullet, which was "fired from a different firearm than the 9 mm/38 caliber bullets received this this case as Exhibits #2, #3, and #5A through 5G;" (4) that "these findings were reported in my Laboratory Report dated August 14, 2001; and (5) that while the list of guns that could have fired the .38 caliber bullet (#5H) would be extensive, "a firearm chambered for a 357 Magnum would be one caliber of firearm in the list of firearms that could possibly have fired the bullet in Exhibit #5H." (C. 428).

Flaskamp's affidavit referenced his August 14, 2001 laboratory report in stating his findings, but defense counsel never attached that report, nor did defense counsel ever seek to amend or supplement the post-conviction petition with this information. The affidavit also does not specify what happened with the laboratory report, specifically whether it was ever tendered to the prosecution and/or whether this was made available to the defense. Defense counsel also never filed any supplemental affidavit from either defense counsel or the Petitioner regarding whether the defense was aware of such a report before trial. In a recently filed motion for leave to file a successive post-conviction petition, the Petitioner indicates he was not aware of this laboratory report before trial, and the undersigned has provided an affidavit that the Cook County Public Defender's case file does not contain this report.

During oral arguments, postconviction counsel argued in response to the State's argument that defense counsel did not do enough to retrieve the .357 Magnum and the Petitioner's jacket and keys (PC R. DDD3). By doing this, postconviction counsel argued, the State is essentially arguing that it can "mislead

counsel in cases where counsel specifically requested exculpatory material" and
"take advantage of the fact that counsel relied on their false representations in the
preparation of the case in order to argue that they did not violate their duty under
Supreme Court Rule 412 and the constitution of the United States." (PC R. DDD3-
4).

After hearing argument from the parties, the circuit court granted the State's
motion to dismiss (PC R. DDD1-22). With respect to the exculpatory evidence
claim, the court found that the evidence was never hidden from the Petitioner's trial
counsel because "everyone" knew that the .357 Magnum revolver, jacket, and keys
existed, and that the Petitioner was not prejudiced by the failure to introduce these
items as exhibits at trial (PC R. DDD19-20). According to the court, "[t]he fact that
the physical evidence was not actually present, I don't see how that's a substantial
constitutional deprivation looking at the trial as a whole here." (PC R. DDD19-20).
The court declined to speculate about the jury's intent in asking where the
Petitioner's coat and keys were during its deliberations (PC R. DDD20).

<u>Appeal from Denial of Post-Conviction Relief</u>

After the court dismissed the Petitioner's second stage postconviction petition
and denied his motion to reconsider, the Petitioner filed a notice of appeal (PC C.
482). On appeal, the Petitioner argued that the circuit court erred in dismissing his
post-conviction petition as he made a substantial showing of a Fifth and Fourteenth
Amendment due process violation where the State violated *Brady* by failing to
produce the .357-caliber revolver and the Petitioner's jacket and keys (Pet. Br. 17-
36). The Petitioner argued the evidence of the gun, jacket, and keys were all

material because (a) it would have supported the Petitioner's testimony Vance had a gun; (b) impeached the testimony of Vance's friends that nobody had a gun in the apartment that night; and (c) producing the gun would have allowed it to be forensically tested, noting that even though the gun was not tested, the Petitioner noted it should have been pre-trial and Illinois law presumes at the second stage that undisclosed evidence is favorable (Pet. Br. 17-24, 29-36). The Petitioner also noted that the prosecutor's closing argument must be viewed in a new light than it was on direct appeal because the prosecutor did not merely argue that the Petitioner could have produced this evidence, but instead this prosecutor deliberately misled the jury into believing defense counsel could have produced this evidence, even though this same prosecutor told defense counsel that these items were lost or destroyed (Pet. Br. 33-34). Similarly, the Petitioner argued, the jury's note asking about the whereabouts of these items similarly must be viewed differently now that it was known defense counsel was told that the items were lost and could not be produced (Pet. Br. 34). The Petitioner argued this evidence was suppressed because, even though there was a vague acknowledgement that these items of items existed, the parties agreed the Petitioner's attorney was told that they were lost, not just that they were not being produced at trial (Pet. Br. 25-26).

The Petitioner also argued that Petitioner made a substantial showing of a Sixth Amendment claim of ineffective assistance of counsel where defense counsel failed to move for sanctions after being notified that these three crucial items were

supposedly[13] destroyed (Pet. Br. 37-46). The Petitioner argued that the post-trial actions of counsel indicates that, with diligent effort, these items could have been found and then produced to the jury and/or forensically tested (Pet. Br. 42-43).

In an unpublished Order[14], the First District Appellate Court rejected the Petitioner's *Brady* violation claim, stating that "[e]ven presuming the evidence was suppressed and that it was favorable to the [Petitioner], we agree with the State that this evidence was not material to the verdict." *People v. Tanna*, 2021 IL App (1st) 161797-U, ¶ 71. The Appellate Court ruled, "[t]he exclusion of the revolver, jacket, and keys thus did not serve to undermine the verdict where the jury was presented with uncontradicted evidence that these items existed. In fact, these items were thoroughly discussed through witness testimony, physical evidence, and trial counsel's cross-examination and argument." *Id.* at ¶ 76. The court reasoned that the jury was presented with testimony that these items were recovered and where they were found, and "it was left to the jury to determine whether the items recovered from Hurd's apartment supported [the Petitioner's] version of events." *Id.*

---

[13] When the Petitioner filed his *pro se* post-conviction petition and when post-conviction counsel first began inquiring about these items of evidence, it was assumed they had been destroyed, but ultimately defense counsel learned they had not been destroyed.

[14] After the case was set for oral argument on September 9, 2021, 90 minutes before the argument was set to begin, the State filed an emergency motion to reschedule argument, noting that the prosecutor was "seeking emergency medical care." (Petition for Rehearing for Petitioner, Filed September 30, 2021). The Petitioner had no objection to *rescheduling* oral arguments and did not oppose the State's request to reschedule. *Id.* The court granted the State's motion on September 9, 2021, minutes before the oral argument was set to begin (Exhibit 1, Order, September 9, 2021). However, the argument was not rescheduled. *Id.* 11 days after the postponed argument and three days before issuing its unpublished order, the court entered an order stating that the case would be taken for consideration without oral argument (Exhibit 2, Order, September 20, 2021). The Appellate Court ruling was thus made without the benefit of oral argument.

at ¶ 72.  The Appellate Court also briefly addressed the Petitioner's argument that the weapon could have been tested for Vance's fingerprints. *Id.* at ¶ 74.  On this point, the court found that the Petitioner "present[ed] no authority which would allow us to make such a leap," and as such, the argument did not merit consideration. *Id.* at ¶ 74.  The Appellate Court also found there could be no prejudice, concluding the evidence that the Petitioner "acted in a premeditated manner continues to be overwhelming even in the absence of the suppressed evidence," citing the Petitioner's return to the apartment with a weapon "primed for firing," eyewitness testimony that he immediately shot Vance in the head, and the Petitioner's testimony at trial that he did not "give [Vance] a chance" to raise his weapon when he was asked if Vance aimed a weapon at the Petitioner. *Id.* at ¶ 75.

Regarding the ineffective assistance of counsel claims for failing to move for sanctions and for failure to argue this issue on appeal, the Appellate Court found the issue failed for the same reasons as the *Brady* claim, *i.e.* the lack of materiality and prejudice.  *Id.* at ¶¶ 86-87.

## Petition for Rehearing/Petition for Leave to Appeal

On September 30, 2021, the Petitioner filed a Petition for Rehearing.  In that Petition, *inter alia*, the Petitioner alleged that there were several material misrepresentations of the Record.  First, the Petitioner noted that, contrary to the Appellate Court's finding, the issue of the keys and jacket were not "thoroughly discussed at trial," (*Id.* at ¶ 18), as these items were not photographed as appearing on the crime scene, and the only witness to mention these items were Sgt. Rafferty, who was not at the crime scene but testified that he learned the jacket was found at

70

the crime scene, and that it was "possible" that the keys were found as well (Pet. 4-5).

The Petitioner also pointed out that the Appellate Court overlooked the significance of being able to produce the gun at trial, i.e. to counter Laskero's testimony that the .357 Magnum was unrelated to the crime scene and not recently used, since the fact that the police "recovered, inventoried, tested the bullets from inside the revolver, placed the revolver in the evidence locker, and kept a sufficient chain of custody such that the revolver could have been introduced as evidence to the jury." (Pet. Reh. 6). The Petitioner also testified that the Appellate Court ignored the significance of the State's closing argument because learning that the same prosecutor who shifted the burden in rebuttal argument that the defense should have produced this evidence was the same prosecutor who told the defense it had been destroyed (Pet. Reh. 7). With the new evidence discovered after trial, the Petitioner argued, the "State's argument to the jury takes on a very different sheen." (Pet. Reh. 7).

The Petitioner also took issue with the Appellate Court's errors in weighing the evidence, having looked at the evidence in the light most favorable to the State in its prejudice analysis, rather than citing to the Petitioner's version of events in this analysis (Pet. Reh. 9). The Petitioner also argued that the Appellate Court erred in finding a case where there as a credibility contest to be not closely balanced, and further the Appellate Court misstated the evidence in coming to this conclusion (Pet. Reh. 20-21). Specifically, the Petitioner pointed out that, contrary to the Appellate Court's conclusion, the Petitioner did not testify that he had the

safety on *when he entered the apartment*, but instead he testified that the safety

was off *when he shot the gun* (Pet. Reh. 21-22) (citing Sup R. 491-492).

## ARGUMENT

I. **The state court misapplied clearly established federal law when it decided, under plain-error doctrine, that the prosecutor's closing arguments were neither prejudicial nor so erroneous as to deny the Petitioner his right to a fair trial**

### A. Standard of Review

The Petitioner is in state custody, so his claim is brought pursuant to 28

U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty

Act of 1966 ("AEDPA"). This argument involves a claim that was at least

partially adjudicated on the merits in state court. Under 28 U.S.C § 2254(d), a

federal court can grant relief on a claim adjudicated on the merits in state court

where the state court decision was either contrary to, or involved an

"unreasonable application of," clearly established federal law. *Goodman v.*

*Bertrand*, 467 F.3d 1022, 20126 (7th Cir. 2006). A state-court decision "involves

an unreasonable application" of clearly established federal law if the state court

"correctly identifies the governing legal rule [from the Supreme Court's cases]

but applies it unreasonably to the facts of a particular prisoner's case." *Williams*

*v. Taylor*, 529 U.S. 362, 407-408 (2000). In other words, " 'the state court

decision must be both incorrect and unreasonable.' " *Goodman v. Bertrand*, 467

F.3d 1022, 1029 (7th Cir. 2006) (quoting *Woods v. McBride*, 430 F.3d 813, 817

(7th Cir. 2005)).

**B. Because the Petitioner's due process rights were violated by the prosecutor's improper closing arguments, the Illinois Appellate Court unreasonably concluded that the prosecutor's arguments were neither prejudicial nor so erroneous as to deny the Petitioner his right to a fair trial.**

The prosecutor in this case made highly improper comments that shifted the burden of proof, which were so prejudicial that the Illinois Appellate Court on direct appeal was unreasonable in finding that a new trial was not warranted. In this case, in his rebuttal closing argument, the prosecutor shifted the burden of proof by suggesting that once the defense introduced testimony on cross-examination regarding specific exculpatory or impeachment evidence, the jury automatically had a right to consider what evidence *the Petitioner* had not introduced, and implied that the Petitioner had a duty to produce exculpatory evidence. In reference to the fact that the .375 Magnum and the Petitioner's jacket were not introduced into evidence, the prosecutor argued:

> Where is that .357? You ask yourselves why didn't they bring that in here. Where is [the Petitioner]'s coat? You asked them why and they didn't bring that in here. First of all, let me make this especially clear. The defense has no burden whatsoever. They have no burden whatsoever to put on evidence. But once they do, you get to consider that. Not only what they do put on, but what they don't put on (Sup R. 895).

Defense counsel objected, the court sustained the objection, and asked the prosecutor to "move on." (Sup R. 895).

The Appellate court found that the prosecutor's implication that the Petitioner had the duty to produce exculpatory evidence "which was clearly not

within his control," was improper (PC C. 94). The Petitioner agrees with this conclusion.

However, the Appellate Court unreasonably applied federal law in concluding that the prosecutor's arguments during closing were neither prejudicial nor so erroneous as to deny the Petitioner his right to a fair trial. When evaluating whether a prosecutor's closing argument was so prejudicial as to require reversal of a criminal conviction, courts must look at six factors: (1) whether the prosecutor misstated the evidence, (2) whether the remarks implicate specific rights of the accused, (3) whether the defense invited the response, (4) the trial court's instructions, (5) the weight of the evidence against the defendant, and (6) the defendant's opportunity to rebut. *Bartlett v. Battaglia*, 453 F.3d 796, 802 (7th Cir. 2006); *Darden v. Wainwright*, 477 U.S. 168, 181-182 (1986). An evaluation of these factors weighs heavily in favor of the Petitioner. In analyzing these factors, this Court should weigh not just what the Illinois Appellate Court had available at the time of the direct appeal, but how the Illinois Appellate Court should have re-visited this issue on appeal from the denial of the post-conviction petition based on withheld Brady material. See *Goudy v. Basiniger*, 604 F.3d 394, 399 (7th Cir. 2010) (courts cannot consider pieces of withheld evidence "in seriatim"); *Beaman v. Freesmeyer*, 776 F.3d 500, 507 (7th Cir. 2015) ("It is clear that the cumulative effect of all the suppressed information should be considered, *Goudy*, 604 F.3d at 399, and an omission is 'evaluated in the context of the entire record.'"). The

"entire record" in this case is the record on direct appeal and the record developed during post-conviction proceedings, which importantly contains an affidavit from the trial attorney that she was told before trial that the coat and keys had been lost (the attorney's affidavit is silent as to what was told to her about the availability of the .357 Magnum but the Petitioner's affidavit indicates he wanted the gun tested and was told they no longer existed (C. 11-16).

First, the prosecutor misstated the evidence in commenting the the defense even had the ability to bring the .357 Magnum and the Petitioner's coat (the Petitioner testified his keys were in the pocket and testified this was the reason he came back into the apartment). Even on the record that existed at the time of the direct appeal, the processor of the crime scene, Frank Laskero, admitted he did not know the location of the .357 Magnum (Sup R. 276), and there was no indication that the coat and keys were inventoried as evidence and available for production, as Sgt. Lafferty only had a vague recollection of those items being found on the scene (Sup R. 349). However, the post-conviction record makes that even more clear, i.e. it must be accepted as true that the same prosecutor who told jurors the defense should have produced these items also told defense counsel before trial these items no longer existed. In arguing to the jury that it was the Petitioner's responsibility to present evidence which had remained solely in the State's control, the prosecutor deliberately misled the jury to believe that the Petitioner *could have* presented the revolver, jacket,

and keys (Sup R. 895). The Petitioner's inability to introduce this evidence due to the State's violation coupled with the prosecutor's improper comments thus negatively affected the Petitioner's credibility with the jury and improperly shifted the burden of proof onto the Petitioner.

Second, these remarks implicated the Petitioner's due process right to require the Government to prove its case beyond a reasonable doubt, and to not have to shoulder any of this burden. *United States v. Cotnam*, 88 F.3d 487, 497 (7th Cir. 1996). Third, this was not an invited comment, as the Illinois Court correctly concluded (C. 94-95). Fourth, while the trial court did instruct the jury on these burden of proof (as every court does), it did not tell the jury to disregard the comment or strike that comment from the record, and furthermore, the jury did not appear to head any such instruction, as it sent a not asking about the whereabouts of this evidence. Fifth, the evidence in this case was not overwhelming. In this regard, the Illinois Appellate Court was simply wrong in interpreting the Petitioner's trial testimony as a "virtually unrecanted confession" in comparison to his videotaped statement (C. 82) since he never testified he entered the apartment with the safety on, but instead that the safety was on when he fired the weapon. Moreover, contrary to the Illinois Appellate Court's finding (C. 82), not giving a person with a gun a chance to raise a weapon is not a confession of a lack of-self defense, but instead is a reasonable response, as waiting for the gun to get pointed in one's direction is incredibly dangerous and unnecessary. The other evidence consisted of Vance's

friends, one of whom admitted to committing perjury while testifying, and the "whole record" also is now supported with clear evidence that not only did Vance have a .357 Magnum, but he got off a shot as well. Finally, it is uncontested that the remarks occurred during rebuttal, which did not give the Plaintiff an opportunity to rebut the evidence. Finally, this Court should take this remark into the context of the entire rebuttal argument, wherein the prosecutor repeatedly misstated the law and made highly prejudicial comments, which are subject of the Petitioner's cause-and-prejudice arguments, but should be considered nonetheless as part of the "whole record."

II. **The Petitioner was deprived of a fair trial and his due process rights were violated where the State withheld crucial crime-scene evidence in violation of *Brady v. Maryland.***

A. **Standard of review**

In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held the Fifth Amendment's due process clause obliges the prosecution to disclose "evidence favorable to the accused . . . where the evidence is material either to guilt or to punishment, irrespective of good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. In *United States v. Agurs*, 427 U.S. 97 (1976), the Supreme Court held this duty to disclose is applicable even in the absence of a request by a defendant. *Agurs*, 427 U.S. at 107. In *Giglio v. United States*, 405 U.S. 150 (1972), and *United States v. Bagley*, 473 U.S. 667 (1985), the Supreme Court held the *Brady* rule includes the obligation to tender impeachment evidence. *Giglio*, 405 U.S. at 154; *Bagley*, 473 U.S. at 676. In

77

*Kyles v. Whitley*, 514 U.S. 419 (1995), the *Brady* rule was clarified as extending to evidence known only to police. *Kyles*, 514 U.S. at 438. In *Bagley*, the Court equated materiality to prejudice, noting a new trial is warranted where there is a "reasonable probability" that a different outcome would have occurred without the *Brady* violation, one that "undermine[s] confidence in the outcome. *Bagley*, 473 U.S. at 682.

"To establish a *Brady* violation, a defendant must demonstrate that (1) the prosecution suppressed evidence, (2) the evidence was favorable to the defense, and (3) the evidence was material to an issue at trial." *Boss v. Pierce*, 263 F.3d 734, 740 (7th Cir. 2001). In evaluating materiality, "the reasonable probability standard for materiality of suppressed evidence is less rigorous than a preponderance of the evidence standard in that a [plaintiff] need only show that the new evidence undermines confidence in the verdict." *Goudy v. Basinger*, 604 F.3d 394, 399 (7th Cir. 2010) (citing *Kyles v. Whitley*, 514 U.S. 419, 424 (1995)). As the Supreme Court explained in Smith v. Cain, 565 U.S. 73 (2012), "A reasonable probability does not mean that the defendant 'would more likely than not have received a different verdict with the evidence,' only that the likelihood of a different result is great enough to 'undermine[ ] confidence in the outcome of the trial.' " Id. at 75-76 (quoting *Kyles*, 514 U.S.at 434); see also *Wearry v. Cain*, 577 U.S. 385, 392 (2016) ("Evidence qualifies as material when there is a 'reasonable likelihood' it could have 'affected the judgment of the jury.' " (quoting *Giglio*, 405 U.S. at 154). In evaluating a *Brady*

claim, a court cannot dismiss a particular piece of evidence "in seriatim," but instead must look at the cumulative effect of all the withheld evidence. *Goudy*, 604 F.3d at 400. In other words, a court cannot analyze suppressed evidence "in isolation" but must instead look to the "full exculpatory value of this evidence" in conjunction with other suppressed evidence. *Id.* Finally, it must be remembered that courts must take into account the cumulative effect of all of the withheld evidence, based on the entirety of the record, not just the trial record. *Beaman*, 776 F.3d at 507. *See also Toliver v. McCaughtry*, 539 F.3d 766, 780 (7th Cir. 2008) (citing *Kyles*, this Court held that courts are required to conduct a "thorough examination of suppressed *Brady* evidence, what purpose the evidence would have served and how it might have affected the jury's view of the evidence that was introduced."). Finally, it must be remembered that the United States Supreme Court has clearly established that defense counsel has no duties to discover withheld evidence, and that the Government has an affirmative duty to comply with *Brady. Banks v. Dretke*, 540 U.S. 668, 696 (2004) ("A rule thus declaring 'prosecutor may hide, defendant must seek' is not tenable in a system constitutionally bound to afford defendant's due process.")

### B. The State withheld evidence in the form of the Petitioner's keys and jacket, this evidence was favorable to the defense, and the Petitioner was prejudiced by the suppression of this evidence.

In its unpublished Order on appeal from the denial of the Petitioner's post-conviction petition, the First District Appellate Court rejected the Petitioner's *Brady* violation claim, stating that "[e]ven presuming the evidence

was suppressed and that it was favorable to the [Petitioner], we agree with the State that this evidence was not material to the verdict." *People v. Tanna*, 2021 IL App (1st) 161797-U, ¶ 71. The Appellate Court ruled, "[t]he exclusion of the revolver, jacket, and keys thus did not serve to undermine the verdict where the jury was presented with uncontradicted evidence that these items existed." *Id.* at ¶ 76. The Appellate Court's analysis on this issue was an unreasonable application of *Brady* and its progeny. Here, the crime scene investigator, Frank Laskero, never testified that the Petitioner's jacket and keys were at the crime scene. Laskero testified thoroughly regarding the crime scene and recovered bullet "headstamps," but the Petitioner's jacket and keys were not mentioned as being found by Laskero nor were these items depicted in any of the State's crime-scene photographs. Thus, the testimony of Cook County Sheriff's Police Department Investigator Laskero informed the jury that he did not believe that the Petitioner's jacket or keys were important enough to the case to be mentioned or photographed. In fact, the only State's witness to mention the Petitioner's jacket or keys was Sergeant Matt Rafferty, who never personally viewed the crime scene. This sparse testimony about the jacket and keys is not nearly as thorough as it should have been if the items were not withheld. Furthermore, the fact that the jury asked about these items showed how important they were to the jury, and had defense counsel known these items existed she could have presented them at trial as exhibits.

### C. The State withheld evidence in the form of a .357 revolver, this evidence was favorable to the defense, and the Petitioner was prejudiced by the suppression of this piece of evidence

Further, Laskero testified that the .357 revolver found at the scene was not related to the shooting, stating that the gun "wasn't relative to what my crime scene was" and that there was "no other evidence of any other weapon having been used at the scene." (Sup R. 273, 276). Laskero further informed the jury that he "would not have sent that gun to the lab," although he did send the bullets *inside* the revolver to the lab (Sup R. 275). Had the Petitioner been able to present the actual revolver to the jury, he could have countered the State's narrative that the revolver was not related to the shooting. The lack of cooperation and outright concealment of this crucial piece of evidence, the State prevented the Petitioner from showing that the police recovered, inventoried, tested the bullets from inside the revolver, placed the revolver in the evidence locker, and kept a sufficient chain of custody such that the revolver could have been introduced as evidence to the jury.

When the entire trial is considered, a pattern of the State denying any connection between the mishandled evidence and the offense emerges. The State not only presented evidence that cast doubt on any connection between the .357 revolver, jacket, and keys to the crime scene, but the State returned to this theme during rebuttal closing argument. The prosecutor did this despite his full knowledge that the State "lost" the jacket, keys, and revolver, the State took advantage of the defense's inability to physically present these concealed

items to the jury, strongly intimating to the jury that this failure was because the items had no connection to the offense, and blaming the defense for not introducing the evidence:

> Where is that .357? You ask yourselves why didn't they bring that in here. Where is [the Petitioner's] coat? You asked them why they didn't bring that in here. First of all, let me make this especially clear. The defense has no burden whatsoever. They have no burden whatsoever to put on evidence. But once they do, you get to consider that. Not only what they do put on, but what they don't put on (Sup R. 895).

This argument can only be understood as an assertion that the revolver had no connection to the offense and the defense was hiding something by not bringing this evidence. When the State's argument is considered in the context of what is now known about how the State mishandled evidence and repeatedly told defense counsel pre-trial that the evidence was "lost/destroyed," it is clear that the State took advantage of its own misconduct in order to prejudice the Petitioner's case and give itself an undeserved advantage.

The Appellate Court unreasonably concluded the gun itself had no importance, and intentionally did not address, this issue, finding appellate counsel allegedly provided no basis in the record or law to address the issue. This was clearly erroneous. In Petitioner's opening brief, his appellate attorney argued producing the gun would have allowed it to be forensically tested, noting that even though the gun was not tested, the Petitioner noted it should have been pre-trial and Illinois law presumes at the second stage that undisclosed evidence is favorable (Pet. Br. 17-24, 29-36). Having ignored the issue, this Court should review the issue *de novo*. *Ramirez v. Tegels*, 963 F.3d 604, 612-613 (7th Cir. 2020).

Under either standard, however, it is clear that withholding evidence – or in this case falsely claiming the gun was lost so that the item of evidence cannot be tested forensically violates *Brady*, and which does not require a finding of bad faith (*Illinois v. Fisher*, 540 U.S. 544, 547 (2004)), although certainly a prosecutor lying to a defense attorney about the availability of physical evidence qualifies as such.

III. **The Illinois Appellate Court unreasonably applied the *Strickland* standard in ruling the Petitioner was not denied his Sixth Amendment right to the effective assistance of counsel.**

A. Standard of Review

The Petitioner raises a claim of ineffective assistance of trial counsel. The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." *U.S. Const. amend VI*. To prove ineffective assistance of trial counsel, a petitioner must first demonstrate the attorney's performance at trial was deficient, meaning " 'that counsel's representation fell below an objective standard of reasonableness.' " *Koons v. United States*, 639 F.3d 348, 351 (7th Cir. 2011) (quoting *Strickland v. Washington*, 466 U.S. 668, 668 (1984)). Much, but not all, of counsel's performance involves the failure to investigate, interview witnesses, and/or to present favorable evidence. While these claims present a presumption of competence and reasonable trial strategy, strategic choices made after a less than complete investigation are reasonable only to the extent that reasonable professional judgments support the limits on investigation. Thus, for example, "[i]f counsel never learned what the witnesses would have

said, he " 'could not possibly have made a reasonable professional judgment that their testimony would have been cumulative.' " *Blackmon v. Williams*, 823 F.3d 1088, 1105 (7th Cir. 2016).

A petitioner must also show prejudice, meaning "that counsel's errors were so serious as to deprive [him] of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. To show prejudice, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidences in the outcome." *Eckstein v. Kingston*, 460 F.3d 844, 848 (7th Cir. 2006) (quoting *Strickland*, 466 U.S. at 694. To prove ineffective assistance of counsel, it need only be shown that there is a "reasonable chance" the outcome would have been different, and this "needn't be a 50 percent or greater chance." *Blackmon v. Williams*, 823 F.3d 1088, 1105 (7th Cir. 2016).

> B. The Petitioner was denied his Sixth Amendment right to the effective assistance of trial counsel where his trial attorney failed to make record of the prosecutor's assertions that evidence was destroyed. Assuming trial counsel was told evidence was destroyed, counsel was ineffective for failing to ask for sanctions, and trial counsel's failure to make a record also did not give the record on direct appeal the full picture of the impropriety of the prosecutor's rebuttal closing argument, hurting the Petitioner's argument on direct appeal.

In this case, since there was no hearing, Illinois law requires it to be accepted as true that the same prosecutor who asked the jury why defense counsel did not produce the key evidence at issue in this case was the same

prosecutor who had also told the defense attorney pre-trial that this evidence had been lost by the State. *People v. Ward*, 197 Ill. 2d 239, 246 (2001). Where, as here, a criminal defense attorney learns of the destruction of important evidence before trial, attorneys have a duty to inform the court and seeks sanctions. *People v. Bolden*, 2014 IL App (1st) 123527, ¶ 41. The Illinois standard mirrors well-established federal law applying the *Strickland* standard. *Kimmelman v. Morrison*, 477 U.S. 365 (1986). Illinois law puts an "affirmative obligation" on the State to preserve and produce discoverable evidence, and allows for sanctions if this obligation is not fulfilled. *People v. Carballido*, 2011 IL App (2d) 090340, ¶ 50. Dismissal of the charges may have been too much of a sanction, but Illinois law at the time would have allowed for less serious, but still important, sanctions, such as an adverse jury instruction. *People v. Danielly*, 274 Ill. App. 3d 358, 368 (1st Dist. 1995). This is especially important to consider in light of the jury's note asking about the whereabouts of such evidence. Had the jury been told the evidence was lost or destroyed, and it could make an adverse inference against the State, there would have been no need for the note, and no question who would be to blame for such a loss or destruction. This would have gone a long way in helping the Petitioner argue that police or prosecutors were hiding the truth about Vance possessing a weapon at the time the Petitioner shot him, thus causing him severe prejudice. Moreover, dad defense counsel made a record and moved for sanctions, it probably would have prevented the prosecutor from making his improper

rebuttal argument, but if he did, the outcome of the appeal likely would have been quite different and/or such an argument would have been rejected easily by a jury reading an adverse inference instruction.

Moreover, had the Petitioner's attorney made a record of what was told to her by the prosecutor, the efforts of postconviction counsel indicate these items were capable of being found. Had they been found, the Petitioner could have fulfilled his desire to have the gun tested, for example. Perhaps this particular prosecutor would have been successful in obstructing these efforts, perhaps not, but if he did, sanctions would have been a viable option, and an effective one. Under either scenario, the Petitioner suffered prejudice, and the Illinois Appellate Court should have remanded the matter for a third-stage hearing.

The Illinois Appellate Court found the issue failed for the same reasons as the *Brady* claim, *i.e.* the lack of materiality and prejudice. *Id.* at ¶¶ 86-87. However, the issue of the failure to seek sanctions was a separate issue from the Brady claim, but was unreasonably treated as the same by the Illinois Appellate Court. Even if the jury knew of the existence of these items, this does not answer the question of whether the State should have been sanctioned for losing or destroying this evidence. The Court also did not address the Petitioner's argument that this evidence was capable of being found (Pet. Br. 42-43). Given this, there should be no deference given to the Illinois Appellate Court's decision on this issue, and this Court should review the matter *de novo. Ramirez*, 963 F.3d at 612-613.

C. Trial counsel was ineffective for not requesting a second-degree murder instruction based on provocation.

Under *Strickland*, trial counsel renders ineffective assistance when his or her performance falls below an objective standard of reasonableness and a petitioner is prejudiced by that performance. *See Strickland*, 466 U.S. at 687-88; *see also Ward v. Jenkins*, 613 F.3d 692, 699 (7th Cir. 2010). When the evidence at trial supports a lesser jury instruction, trial counsel may nonetheless make a strategic decision not to request such instruction. *See United States ex rel. Barnard v. Lane*, 819 F.2d 798, 805 (7th Cir. 1987). Although *Strickland* generally affords a presumption of strategy, that presumption does not extend to omissions committed by counsel's lack of consideration. *See, e.g., Thomas v. Clements*, 2015 WL 3687911 at ¶ 7 (7th Cir. 2015); *see also Woolley v. Rednour*, 702 F.3d 411, 423 (7th Cir. 2012) (counsel cannot be afforded a presumption of strategy where it is established that there was "no strategic rationale underlying these errors").

When the evidence at trial supports a lesser jury instruction, trial counsel may nonetheless make a strategic decision not to request such instruction. *See United States ex rel. Barnard v. Lane*, 819 F.2d 798, 805 (7th Cir. 1987). Although *Strickland* generally affords a presumption of strategy, that presumption does not extend to omissions committed by counsel's lack of consideration. *See, e.g., Thomas v. Clements*, 2015 WL 3687911 at ¶ 7 (7th Cir. 2015); *see also Woolley v. Rednour*, 702 F.3d 411, 423 (7th Cir. 2012) (counsel

cannot be afforded a presumption of strategy where it is established that there was "no strategic rationale underlying these errors").

In this case, the Petitioner raised the affirmative defense of self-defense, and the court also granted a defense request for second-degree murder instruction, although defense counsel only requested one form of the instruction (imperfect self-defense), not the alternative form of second-degree murder based on provocation. It was clear from the early stages of trial that defense counsel's understanding of the theories of self-defense was seriously lacking. Immediately prior to trial, defense counsel settled on the affirmative defense on self-defense and failed to communicate with the Petitioner regarding the second-degree instruction.

In denying the Petitioner's direct appeal, the Appellate Court concluded that defense counsel was not ineffective for failing to submit to both forms of second-degree murder instruction (imperfect self-defense and provocation), even though the two theories have inconsistent states of mind, chalking it up to a strategic choice on the part of defense counsel (C. 75). However, the Illinois Appellate Court unreasonably applied Strickland because this presumption of strategy does not apply where, as here, counsel's failures were "the result of inattention, not reasoned strategic judgement." *Wiggins v. Smith*, 539 U.S. 510, 534 (2003).

Evidence at trial showed that Vance attacked the Petitioner by kicking him in the head, causing the two to fight in Hurd's living room, and

subsequently threatened to kill the Petitioner while reaching for Jerome Anderson's .357-caliber revolver. Yet, the Petitioner's counsel did not request a jury instruction for second-degree murder on the basis that Vance provoked the Petitioner into killing him, and instead only requested a second-degree self-defense instruction. While deliberating, the jury requested the court to provide the .357-caliber revolver, the Petitioner's coat, and the Petitioner's keys. The court refused to do so and urged the jury to continue deliberating without objection or argument from either the State or defense counsel. The Petitioner's trial counsel failed to request a provocation instruction. It is apparent that she failed to do so based on neglect, not strategy. Moreover, it hard to imagine why there could be a valid strategy of opting for one form of a lesser-included offense, but not another. Having chosen the path of allowing a jury to consider a lesser-included option, there is no downside to giving a jury two ways of arriving at such a verdict. Given the testimony before the jury, it would have been unreasonable for counsel to forego the instruction. Because a reasonable jury could have readily convicted the Petitioner for a lesser offense under the provocation instruction, the Petitioner was prejudiced by counsel's failure.

The Illinois Appellate Court's opinion also was manifestly erroneous because in deciding this issue it referenced the State's evidence, not the Petitioner's evidence, to decide whether the evidence would have fit well within a provocation instruction. The Court ruled that the evidence indicated there was a 10-15 minute cooling off period, and that when the Petitioner returned he

shot an unarmed man (C. 80-81). However, that was the State's version of events, not the Petitioner's, and the Petitioner's version of events – self-defense in response to an imminent threat but also based on numerous provocative words and actions by Vance – would have fit well within the framework of *People v. Parker*, 260 Ill. App. 3d 942 (1994), wherein a previous appellate court allowed for such dual second-degree instructions.

Finally, under Illinois law, whether to give the jury the option of a lesser-included second degree murder instruction also has an element of client choice that must be considered. See *People v. Sparks*, 2021 IL App (1st) 190434-U, ¶ 31; *People v. Jones*, 175 Ill. 2d 126, 131-132 (1997). There was nothing in the record on direct appeal that would have indicated the Petitioner was aware of the option of asking for two different forms of a second-degree murder instruction, and the Petitioner's attached affidavit makes it clear that he was never consulted about this option, and had he been, he would have chosen to have both forms of the second-degree murder instruction submitted to the jury, a matter that was not made part of the record during post-conviction proceedings, and which the Petitioner seeks to have reviewed under the cause and prejudice test.

      D. The Petitioner was denied his Sixth Amendment right to the effective assistance of trial counsel where his trial attorney elicited testimony from the State's witness concerning prejudicial and irrelevant gang evidence, thus opening the door to evidence of the Petitioner's gang membership, and failed to offer and questions during *voir dire* regarding their potential prejudice concerning gang activity.

Counsel was ineffective for failing to keep out irrelevant and prejudicial evidence of the Petitioner's gang membership in failing to object to the State's introduction of such evidence, actively eliciting testimony regarding gang membership, and emphasizing such evidence during closing arguments. Counsel further rendered ineffective assistance of by failing to question potential jurors as to whether or not potential jurors were free of bias against gang members. The Illinois Appellate Court unreasonably applied *Strickland* in finding that the introduction of gang evidence – and not conducting *voir dire* to ferret out potential gang bias – was a valid legal strategy. The U.S. Constitution provides that a fair trial requires the participation of an impartial jury. *Irwin v. Dowd*, 366 U.S. 717 (1961) (U.S. Const., amends. VI, XIV. An impartial jury is one that is "capable and willing to decide the case solely on the evidence before it." *Smith v. Phillips*, 455 U.S. 209, 217 (1982). There is widespread bias against gang members, and thus normally evidence that a criminal defendant is a member of a street gang is the type of prejudicial evidence that a defense attorney will attempt to keep out of evidence or additionally/alternatively seek *voir dire* to keep off a jury individuals who cannot be unbiased toward gang members. *People v. Martin*, 271 Ill. App. 3d 346, 355 (1st Dist. 1995).

A defense attorney has a duty to avoid introducing harmful evidence into a case against a criminal defendant. People v. Lee, 185 Ill. App. 3d 420, 440 (5th Dist. 1989) (taking a page from the Hippocratic oath, attorneys, like physicians, should follow the basic rule, "First, do no harm.")

In this case, the State did not seek to introduce such evidence, and it is hard to imagine how the Petitioner's gang membership would have been admissible. Conversely, the Petitioner already had evidence that Vance's three friends were life-long friends who knew him much better than they knew the Petitioner, so admission based on bias cannot be a reasonable trial strategy for seeking its admission.

Instead, the Illinois Appellate Court concluded that the defense attorney had a reasonable strategy for introducing this highly prejudicial evidence because supposedly gang membership would raise the inference of a gang member being armed, and that it would allow a jury to have a lack of sympathy for the victim (C. 86-90). If it were true that all gang members carry guns, then the Petitioner would have testified all of the gang members had a weapon, but his testimony was that he was armed, and that one of the group was armed, and Vance had to get his gun from Anderson. Moreover, all juries are instructed not to consider sympathy or prejudice in deciding the facts, and if gang membership causes disdain, then it would have caused equal disdain toward the Petitioner, also an admitted gang member. In the end, there was no upside to this evidence, and the Petitioner was severely prejudiced by the introduction of such evidence. Thus, the Illinois Appellate Court unreasonably applied the *Strickland* standard in ruling the admission of gang evidence was not ineffective assistance of counsel.

**IV.  The Petitioner can satisfy the cause and prejudice test that would allow these issue to be raised.**

A.  Standard of Review

A habeas petitioner can overcome procedural default by showing both cause for failing to abide by state procedural rules and a resulting prejudice from that failure. *Wainwright v. Sykes*, 422 U.S. 72, 90 (1977); *Wrinkles v. Buss*, 537 F.3d 804, 812 (7th Cir. 2008). "Cause sufficient to excuse procedural default is defined as 'some objective factor external to the defense that prevented a petitioner from pursuing his constitutional claim in state court." *Murray v. Carrier*, 477 U.S. 478, 492 (1986). Cause is "an objective factor external to the defense that impeded the presentation of the claim to the state courts," and applies to factors that "cannot be fairly attributed to the petitioner." *Crutchfield v. Dennison*, 910 F.3d 968, 973 (7th Cir. 2018) (citation and internal quotation marks omitted). Prejudice is established by "showing that the violation of the petitioner's federal rights worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Thompkins v. Pfister*, 698 F.3d 976, 987 (7th Cir. 2012). To prove prejudice, a petitioner needs merely to show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability if a probability sufficient to undermine confidence in the outcome." *Id.*

Federal law recognizes that claims of actual innocence can be considered the "gateway through which a habeas petitioner must pass to have his otherwise barred

constitutional claim considered on the merits." *Herrera v. Collins*, 506 U.S. 390, 404 (1993).

The Petitioner on today's date filed a motion in state court seeking leave to file a successive post-conviction petition, arguing the issues raised below should be addressed under the state's cause and prejudice test, due to attorney error on behalf of defense counsel, and actual innocence, both of which are recognized methods for filing successive post-conviction petitions. The Petitioner understands that these issues have not yet been exhausted in state court, and thus seeks a stay to fully address these issues in state court. The test in state court for satisfying the cause-and prejudice was recently explained by the First District Court of Appeals in *People v. Soto*, 2022 IL App (1st) 192484:

> Although our supreme court has made clear that the Act contemplates only one postconviction proceeding, 'nevertheless, [our supreme court] has, in its case law, provided two bases upon which the bar against successive proceedings will be relaxed. [*People v. Edwards*, 2012 IL 111711, ¶¶ 22]. Those two bases are (1) cause and prejudice for failing to raise the claim in an earlier proceeding and (2) actual innocence. *Edwards*, 2012 IL 111711, ¶¶ 22-23. Prior to commencing a successive proceeding, a defendant must obtain leave to file his or her petition. *People v. Robinson*, 2020 IL 123849, ¶ 43, 450 Ill. Dec. 37, 181 N.E.3d 37. If leave to file is granted, the petition is docketed for second stage proceedings. *People v. Sanders*, 2016 IL 18123, ¶ 28, 399 Ill. Dec. 732, 47 N.E.3d 237. *Soto*, 2022 IL App (1st) 192484, ¶ 96.

    B. The Petitioner can meet the cause-and-prejudice test as to all of the
       claims set forth below.

The Petitioner can satisfy the cause-and-prejudice test, and thus this Court should docket the petition, and advance the matter to the second stage of proceedings, thereafter grant an evidentiary hearing, allow discovery and

forensic testing, and ultimately grant the petition. Because the right to counsel in postconviction proceedings is derived from statute rather than the Federal or State Constitutions, postconviction petitioners are guaranteed only the level of assistance provided for by the Act. That assistance has been defined by this [supreme] court to mean a 'reasonable' level of assistance. *People v. Flores*, 153 Ill. 2d 264, 276, 606 N.E.2d 1078, 180 Ill. Dec. 1 (1992) (citing *People v. Wright*, 149 Ill.2d 36, 64, 594 N.E.2d 276, 171 Ill. Dec. 424 (1992)). Although the Illinois Supreme Court has not explicitly set a standard for determining whether postconviction counsel has provided 'a reasonable level of assistance,' this court has applied a '*Strickland*-like' analysis for evaluating counsel's performance. *People v. Zareski*, 2017 IL App (1st) 150836, ¶¶ 58-59, 416 Ill. Dec. 545, 84 N.E.3d 527. As noted, under that standard, we evaluate whether the defendant has demonstrated prejudice, that is, whether there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Soto*, 2022 IL App (1st) 192484 at ¶ 162 (emphasis added).

In this case, post-conviction counsel did not provide "reasonable assistance" when he failed to address the issues articulated below. For the reasons set forth in those sections, all of these issues are meritorious, constitute a denial of the Petitioner's Fifth, Sixth, and Fourteenth Amendment rights and should have been raised in the Petitioner's post-conviction petition. There is no reasonable basis apparent from the record why post-conviction counsel could not have raised these issues, and thus the Petitioner can satisfy the cause-and-prejudice test.

      C. The Petitioner can also meet the actual innocence test that would allow for this Court to allow for a successive post-conviction petition.

If a petitioner can meet the Illinois Supreme Court's actual innocence test, then he will be permitted to proceed on a successive post-conviction petition. *People v. Robinson*, 2020 IL 123849, ¶¶ 41-45. To satisfy this test, a petition must show (1) the evidence must be newly discovered; (2) material and non cumulative, and (3) of such conclusive character that it would probably change the result of the trial. *Robinson*, 2020 IL 123849, at ¶¶ 46-47. There is no distinction in the Act between a petitioner presenting evidence that he or she did not commit the crime at issue and a petitioner, as here, who is claiming actual innocence based on a valid claim of self-defense. *People v. Bahena*, 2020 IL App (1st) 161515-U[15], ¶¶ 32-33 (citing *People v. Wingate*, 2015 IL App (5th) 130189, ¶¶ 31-34).

Evidence is material if it is relevant and probative of the Petitioner's innocence, and evidence is non-cumulative if it adds to the information that the fact finder heard at trial. *Robinson*, 2020 IL 123849, ¶ 47. Whether evidence can be considered conclusive of innocence comes down to the question of "whether the evidence supporting the postconviction petition places the trial evidence in a different light and undermines the court's confidence in the judgement of guilt." *Id.* at ¶ 48. Importantly, the new evidence need not be entirely dispositive of on the issue of innocence so long as a petitioner can show a "probability, rather than

---

[15] Illinois Supreme Court Rule has been amended to allow citation to unpublished options for persuasive purposes. That said, the case cited to in the opinion was a published decision.

certainty," that the fact finder would reach a different result after considering the prior evidence and the new evidence. *Id.*

Regarding the newly discovered prong, it appears that some of the evidence presented in this case was discovered only after trial, namely the Flaskamp affidavit obtained by defense counsel and all of the information attached to this petition, including the Ford Heights police reports regarding Patricia Heard bringing a spent bullet to the police department after Laskero had processed the crime scene, that conclusively prove that not only was the .357 Magnum possessed by Vance at the time of the shooting, but that he also shot off a round as well. To be sure, this evidence was discovered by post-conviction counsel during post-conviction proceedings, but the test of whether evidence is new discovered is whether the evidence was not available *at the time of trial*, and not able to be discovered through due diligence. *People v. Rosalez*, 2021 IL App (2d) 200086, ¶ 96; *People v. Burrows*, 172 Ill. 2d 169, 180 (1996); *People v. Barnslater*, 373 Ill. App. 3d 512, 523 (1st Dist. 2007).

Importantly, the fact that evidence may have come to light after trial, but during a prior post-conviction proceeding, does not prevent such evidence from being deemed newly discovered. *People v. Warren*, 2016 IL App (1st) 090884-C, ¶ 114 (collecting cases). In fact, *Warren* is particularly on point in this case because here, as in *Warren*, there is "no good reason why counsel, at the initial postconviction proceeding, failed to present these affidavits." *Id.* at ¶118. In this case, postconviction counsel's actions are beyond puzzling. Armed with the

Flaskamp affidavit (along with a report indicating the investigating officers failed to collect the bullet at issue and which had to be brought to the police station after the crime scene was analyzed), counsel had powerful evidence that would have supported the Petitioner's otherwise uncorroborated claim of self-defense, yet he failed to submit the police report, and he failed to attach the affidavit to the petition itself and attached it instead to a response to a motion to dismiss. Petitioner appeared to have meant to do so, by referring to it as "Exhibit 3," but did not, apparently by mistake. Defense counsel also submitted the withheld Ford Heights report as an exhibit, but inexplicably failed to amend the petition to indicate this evidence was withheld from the defense in violation of *Brady* and/or it was ineffective assistance of counsel in the alternative. Finally, postconviction counsel also did not seek to supplement the petition with *Brady* and *Napue* claims, and he did not alternatively argue it was ineffective assistance of counsel had it been proven at a hearing that all of this information was available to defense counsel, which it appears from the record it was not.

*Brady/Napue* Claims

In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held the Fifth Amendment's due process clause obligates the prosecution to disclose "evidence favorable to the accused . . . where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. In *United States v. Agurs*, 427 U.S. 97 (1976), the Supreme Court held this duty to disclose is applicable even in the absence of a request by a

defendant. *Agurs*, 427 U.S. at 107. In *Giglio v. United States*, 405 U.S. 150 (1972), and *United States v. Bagley*, 473 U.S. 667 (1985), the Supreme Court held the *Brady* rule includes the obligation to tender impeachment evidence. *Giglio*, 405 U.S. at 154; *Bagley*, 473 U.S. at 676. In *Kyles v. Whitley*, 514 U.S. 419 (1995), the *Brady* rule was clarified as extending to evidence known only to police. *Kyles*, 514 U.S. at 438. In *Bagley*, the Court equated materiality to prejudice, noting a new trial is warranted where there is a "reasonable probability" that a different outcome would have occurred without the *Brady* violation, one that "undermine[s] confidence in the outcome." *Bagley*, 473 U.S. at 682.

In evaluating materiality, "the reasonable probability standard for materiality of suppressed evidence is less rigorous than a preponderance of the evidence standard in that a [plaintiff] need only show that the new evidence undermines confidence in the verdict." *Goudy v. Basinger*, 604 F.3d 394, 399 (7th Cir. 2010) (citing *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)). As the Supreme Court explained in *Smith v. Cain*, 565 U.S. 73 (2012), "A reasonable probability does not mean that the defendant 'would more likely than not have received a different verdict with the evidence,' only that the likelihood of a different result is great enough to 'undermine[ ] confidence in the outcome of the trial.' " *Id.* at 75-76 (quoting *Kyles*, 514 U.S.at 434); see also *Wearry v. Cain*, 577 U.S. 385, 392 (2016) ("Evidence qualifies as material when there is a 'reasonable likelihood' it could have 'affected the judgment of the jury.' " (quoting *Giglio*, 405 U.S. at 154). In evaluating a *Brady* claim, a court cannot dismiss a particular piece of evidence "in

seriatim," but instead must look at the cumulative effect of all the withheld evidence. *Goudy*, 604 F.3d at 400. In other words, a court cannot analyze suppressed evidence "in isolation" but must instead look to the "full exculpatory value of this evidence" in conjunction with other suppressed evidence. *Id.* Finally, it must be remembered that courts must take into account the cumulative effect of all of the withheld evidence, based on the entirety of the record, not just the trial record. *Beaman v. Freesmeyer*, 776 F.3d 500, 507 (7th Cir. 2015) ("It is clear that the cumulative effect of all suppressed information should be considered, *Goudy*, 604 F.3d at 399, and an omission is 'evaluated in the context of the entire record,' *United States v. Agurs*, 427 U.S. 94, 112, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)). See also *Toliver v. McCaughtry*, 539 F.3d 766, 780 (7th Cir. 2008) (citing *Kyles*, this Court held that courts are required to conduct a "thorough examination of suppressed *Brady* evidence, what purpose the evidence would have served and how it might have affected the jury's view of the evidence that was introduced."). Finally, it must be remembered that the United States Supreme Court has clearly established that defense counsel has no duties to discover withheld evidence, and that the Government has an affirmative duty to comply with *Brady*. *Banks v. Dretke*, 540 U.S. 668, 696 (2004) ("A rule thus declaring 'prosecutor may hide, defendant must seek' is not tenable in a system constitutionally bound to afford defendants due process.")

A claim made pursuant to *Napue v. Illinois*, 360 U.S. 264 (1959) focuses on whether the Government solicited or permitted false evidence to be presented to the

jury, even if this false evidence "goes only to the credibility of a witness." *Napue*, 360 U.S. at 269; *see also United States v. Cosby*, 924 F.3d 329, 336 (7th Cir. 2019) (citing standard); and *United States v. Dekelaita*, 391 F.Supp.3d 866, 871 (N.D. Ill. 2019). *People v. Martinez*, 2021 IL App (1st) 190490, ¶ 61. " 'A *Napue* violation occurs when (1) a government witness committed perjury, (2) the prosecution knew[16] the testimony to be false, and (3) the testimony was material.' " *Lebere v. Trani*, 746 Fed. Appx. 727, 731 (10th Cir. 2018) (quoting *United States v. Garcia*, 793 F.3d 1194, 1207 (10th Cir. 2015)). Materiality under *Napue* differs from *Brady* in that "[p]erjured testimony is material under *Napue* 'unless failure to disclose it would be harmless beyond a reasonable doubt.' " *Id.* at 731 (quoting *Bagley*, 473 U.S. at 680).

The *Napue* duty extends to testimony that merely gives a false impression of the evidence, since "a prosecutor has a constitutional duty to correct *the false impression of facts.*" *Williams v. Williams*, 232 F. Supp. 3d 1318, 1334 n. 12 (S.D. Ga.2017) (emphasis in original) (citing *United States v. LaPage*, 231 F.3d 488, 492 (9th Cir. 2000)); *United States v. Freeman*, 650 F.3d 673, 679 (7th Cir. 2011).

 The federal circuits are split on the issue of whether, as with *Brady*, a police officer's knowing perjury is imputed to the prosecution for purposes of a *Napue* claim. See *Reis-Campos v. Biter*, 832 F.3d 968, 977, n. 8 (9th Cir. 2016) (collecting cases, noting the Second and Fourth Circuits have ruled the knowing use of perjury by a police officer is imputed to the prosecution, while the Fifth and Tenth Circuits

---

[16] But see *Blanton v. Blackburn*, 494 F. Supp. 895, 900 (M.D. La. 1980) (employing the "should have known" standard).

have ruled it is not). It does not appear the Seventh Circuit has yet weighed in on the issue. Under Illinois law, whether a police officer's perjury can be attributable to the prosecution is a fact-specific analysis. *People v. Rish*, 344 Ill. App. 3d 1105, 1116 (3d Dist. 2003); *People v. Robinson*, 157 Ill. 2d 68, 79 (1993). "Among the factors to be considered would be the reasonableness of such imputation, whether the failure to transmit such knowledge up the information chain was inadvertent or intentional, and whether any real prejudice occurred." *Id.*

In this case, Jon Flaskamp, an Illinois State Police forensic scientist, provided a written affidavit as part of post-conviction proceedings wherein Flaskamp averred: (1) he examined the cartridge cases and bullets said to have been recovered by the Ford Heights Police Department at the scene of the Vance shooting on April 11, 2001; (2) that those bullets and cartridges were inventoried with the Illinois State Police Forensic Science Center in Chicago on April 25, 2001; (3) that he examined Exhibit 5H, a .38 caliber bullet, which was "fired from a different firearm than the 9 mm/38 caliber bullets received this this case as Exhibits #2, #3, and #5A through 5G;" (4) that "these findings were reported in my Laboratory Report dated August 14, 2001"; and (5) that while the list of guns that could have fired the .38 caliber bullet (#5H) would be extensive, "a firearm chambered for a 357 Magnum would be one caliber of firearm in the list of firearms that could possibly have fired the bullet in Exhibit #5H." (C. 428). Flaskamp's affidavit referenced his August 14, 2001 laboratory report in stating his findings, but post-conviction defense counsel never attached that report, nor did defense

counsel ever seek to amend or supplement the post-conviction petition with this information. The affidavit does not specify what happened with the laboratory report, specifically whether it was ever tendered to the prosecution and/or whether this was made available to the defense. Defense counsel also never filed any supplemental affidavit from either defense counsel or the Petitioner regarding whether the defense was aware of such a report before trial.

The Petitioner attaches to this Petition the Flaskamp affidavit (**Exhibit B**)[17]; an affidavit from the undersigned's law clerk indicating this report was not in the Cook County Public Defender's file (**Exhibit C**); and an affidavit from the Petitioner indicating he was not made aware of this evidence until after trial, during post-conviction proceedings (**Exhibit D**). These affidavits – along with the trial testimony that did not even hint that one of the spent bullets was fired from a gun different than the others and was consistent with being fired from the same type of gun found in the bushes (a .357 Magnum owned by Vance's friend) – establish that the State withheld the Flaskamp report from the defense before trial.

Nor is there anything in the record that would positively rebut this assertion. Although Flaskamp was listed by the State as a potential witness at trial, he was called by neither side and there was no trial testimony that would lead to the conclusion that the defense was aware of the Flaskamp report before trial. The record is also unclear whether Flaskamp ever made this report available to the

---

[17] The Petitioner has signed the affidavit in the presence of the undersigned counsel, however, the Petitioner is awaiting to have this affidavit notarized in the law library, and the notarized version will be forthcoming. In any event, a court cannot use this as a basis to dismiss a post-conviction petition at the first stage of post-conviction proceedings. *People v. Allen*, 2015 IL 113135, ¶ 34.

Cook County Sheriff's Police or the Cook County State's Attorney's Office, although this laboratory report would have been written and available on August 14, 2001, and trial was not held in this matter until April of 2004, so it should been known to the investigators and/or the prosecutors, given that the State listed Flaskamp on its answer to discovery.

On July 31, 2001, according to the public docket in this matter, the Petitioner filed a motion for discovery, however this document is not on the public docket, nor is it in the Record on Appeal. On January 8, 2002, the prosecutor stated on the record that the parties are "still in discovery status" and that he has tendered a copy of the transcript of a videotaped statement that the Petitioner made to police, but is waiting on the videotaped statement itself, as the original tender "was of poor sound quality." (Sup R. 571). The prosecutor continued, "[o]ther than that and a possible crime scene report, which I'm not sure exists, but I'm tracking down." (Sup R. 571). The prosecutor stated that, if the "possible crime scene report" does exist, the videotaped statement and report are "the only two things we're waiting for." (Sup R. 571). On the following date, the prosecutor stated that the State tendered "a videotape confession, supplemental reports, police report, officer's notes, sheriff's bulletin, arrest card, arrest record," and a "rights waiver." (Sup R. 575).

On the following date of March 14, 2002, ASA Delehanty appeared on behalf of the State (Sup R. 577-578). [18] The prosecutor informed the court that

---

[18] ASA Delehanty later appeared as a witness for the State to testify regarding the videotaped interview with the Petitioner after his arrest.

discovery was tendered to the defense, which included "the Cook County Sheriff Police Department crime scene investigator reports, photos listing sheet, ET report, property inventory, crime scene diagram, and lab." (Sup R. 578).[19]  When the court asked if more discovery was coming, ASA Delehanty responded, "I have a tendency to believe.  I am not the lead attorney on this case," and that ASA Felgenhauer was the lead attorney on the case (Sup R. 578-579).  She continued, "[b]ased on the fact that we are still on discovery, I believe our answer is that discovery is either complete or substantially complete." (Sup R. 579).  Defense counsel responded that she "think[s] the only thing" that counsel sought from the State was a "completed autopsy report" from the coroner, as she had received "no detailed ones that are supposed to be made out." (Sup R. 579).

On this same date, March 14, 2002, according to the public docket (the stamp on the document is hard to read), the State filed a written answer to the Petitioner's motion for discovery (Sup R. 1029-1033).  In the State's Answer, the State disclosed it may call Jon Flaskamp, identified him as "Illinois State Police Department Personnel," but not as a forensic scientist (Sup. R. 1030).  This disclosure did not identify on what subject matter Flaskamp would testify, did not disclose him as an expert witness, nor did it disclose any CV or specific laboratory report he may have authored.  *Id.*  This disclosure did not specify any laboratory reports that were tendered, only referencing that the State may call as witnesses at trial "Personnel from the Crime Lab" named in any "laboratory

---

[19] Copies of the aforementioned "lab," or other laboratory reports, do not appear in the common law record.

reports." (Sup R. 1039). When referencing tangible items of evidence, the State's answer did not make any reference to any keys, clothing, weapons or bullets (Sup R. 1029-1033). The State disclosed that "reports of experts, if any, made in connection with this particular cause, including the results of physical or mental examinations, scientific tests, examinations and comparisons, will be tendered to the defense upon being received by the People." (Sup. R. 1032).

On the following date, the State tendered a seven-page "general progress report" authored by the Cook County Sheriff's Police Department (Sup R. 583). By September 24, 2002, defense counsel indicated to the court that the State had tendered the remaining discovery previously requested by defense counsel, which were copies of background information for all lay parties, and that she now has everything she needs in order to file motions or answers (Sup R. 596).

Between the dates of February 18, 2003, and November 13, 2003, at which points defense counsel initially notified the court about a potential 402 conference and then later informed the court that the Petitioner was rejecting the offer presented at that 402 conference, defense counsel also introduced and filed a motion to suppress statements. The motion to suppress was filed on May 16, 2003, but then later withdrawn on February 26, 2004 (Sup R. 1071-1073, 666-667).[20] On June 16, 2003, counsel notified the court that "[t]here is also a couple of other outstanding discovery matters . . . " (Sup R. 636).

---

[20] A 402 conference was initially mentioned on the record on February 18, 2003, when defense counsel stated that "[t]here are a couple more matters that are letters," and that she is "potentially seeking a 402 conference." (Sup R. 614). On October 6, 2003, at defense

There is no question the information that Flaskamp's report is material. In fact, Flaskamp's report is nothing short of explosive, in light of the fact that the central issue in the case was whether Vance ever possessed a gun. The fact that there was a spent bullet found in the apart that can be **ruled out** as coming from the Petitioner's 9mm weapon, but that is **consistent with** the .357 Smith & Wesson Magnum weapon found in the bushes outside of the apartment and that the Petitioner testified was possessed by Vance at the time he shot him in self-defense not only would prove Vance possessed this weapon, but that he shot that gun as well. The Petitioner understands that he testified Vance only possessed the gun, not that he shot the gun, however, consistent with the Petitioner's testimony, this would have been a split-second decision to shoot, several shots were fired by the Petitioner, and thus the Petitioner may not even had realized Vance was able to get a shot off before being shot himself.

This evidence would have contradicted all three of the eyewitnesses in this case, all of whom were Vance's friends and one of whom admitted to committing perjury on the witness stand because he believed telling the truth would make it "look bad" for his friend. This evidence would have also contradicted the testimony of Sgt. Rafferty and Investigator Laserko.

---

counsel's request, the court entered into a 402 conference and stated on the record that it would "continue that conference," setting a date for October 22, 2003 (Sup R. 648-650). On November 13, 2003, defense counsel informed the court that the Petitioner was rejecting the offer made at the 402 conference, and the offer was subsequently withdrawn (Sup R. 656).

It is of critical importance in this case that this Court conduct an evidentiary hearing in this matter to determine whether Flaskamp's report was ever tendered to any of the investigative agencies, whether the State's Attorney's Office was made aware of this report, and whether there is any evidence this report was tendered to the defense, as none exists in the current record. As explained above, though, for purposes of this Petition, unless and until there is a hearing on the matter, it has been established that the Flaskamp report was suppressed from the defense, in violation of the Petitioner's clearly established due process rights under *Brady*.

The State also suppressed from evidence a related Ford Heights police report, authored by M. Triche, a Ford Heights police officer, that further undermines the testimony of the State's witnesses in this case, and which would have undermined the integrity of the police investigation (**Exhibit F**). All three of Vance's friends testified Vance did not have a gun at any time either before, during, or at the time Vance was shot. Moreover, Cook County Sheriff's Police Investigator Laskero testified that he prepared a crime scene diagram, collected the evidence, took photographs of each bullet, bullet fragment and shell casings (except one found under Vance's body) (Sup R. 265-271), and never once mentioned that Patricia Heard had to take "one spent round and a 9mm casing" to the Ford Heights police department after Laskero supposedly thoroughly processed the crime scene, which found on the floor of her apartment when she was cleaning. It is clear from the record that the Ford Heights reports were

discovered only after trial, in response to postconviction counsel's motion to compel compliance with his subpoena (Ex. F). Remarkably, post-conviction counsel attached this report to the post-conviction petition (C. 392-395), but did not argue that the withholding of this report was a *Brady* or *Napue* violation.

This report, independent of the Flaskamp affidavit, was material. First, this report undermines the integrity of the police investigation, which is generally considered material. *Kyles v. Whitley*, 514 U.S. 419, 446 (1995) (withheld evidence was material because it could have been used at trial to "attack[ ] the reliability of the investigation . . . "). Second, while it is not clear whether the "spent bullet" that Heard gave the Ford Heights report was the same spent bullet photographed by Laskero and/or the same spent bullet examined by Flaskamp, but one could argue that this failure to inventory the spent bullet went beyond gross negligence, but was perhaps was an intentional attempt to prevent forensic testing on that one spent bullet that Laskero would have likely known was different than the other bullets and casings found on the scene and that would have proved Vance had not only possessed a weapon, but shot it as well.

The above evidence also demonstrates a possible *Napue* violation. Laskero and Rafferty testified to only one weapon being relevant to this investigation, Lafferty opined the .357 Magnum was not "recently used," and the prosecution in closing arguments gave no hint that there was ballistic

evidence that would have supported the Petitioner's theory that Vance possessed a .357 Magnum when he shot Vance.

The Petitioner was denied his Sixth Amendment right to the effective assistance of trial and appellate counsel. The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." *U.S. Const. amend VI*. To prove ineffective assistance of trial counsel, a criminal defendant must first demonstrate the attorney's performance at trial was deficient, meaning " 'that counsel's representation fell below an objective standard of reasonableness.' " *Koons v. United States*, 639 F.3d 348, 351 (7th Cir. 2011) (quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984)). While courts will generally refer to strategic decisions made by trial counsel, strategic choices made after less than complete investigation are reasonable only to the extent that reasonable professional judgments support the limits on investigation. Thus, for example, "[i]f counsel never learned what the witnesses would have said, he " 'could not possibly have made a reasonable professional judgment that their testimony would have been cumulative.' " *Blackmon v. Williams*, 823 F.3d 1088, 1105 (7th Cir. 2016). Moreover even strategic decisions made after a full investigation of a matter may be deemed ineffective when they result in a failure to present exculpatory evidence of which counsel is aware, including the failure to present favorable evidence that would support a valid defense. *People v. King*, 316 Ill. App. 3d 901, 913 (1st Dist. 2000). A criminal defendant demonstrates appellate counsel's deficient performance by showing that

appellate counsel failed to make an argument that would have been reasonable based on the law at the time of the briefing, especially where the issue(s) not raised was "clearly stronger" than the ones that were. *People v. Dixon*, 2019 IL App (1st) 160443, ¶ 46; *Ramirez v. Tegels*, 963 F.3d 604, 613 (7th Cir. 2020).

A criminal defendant must also show prejudice, meaning "that counsel's errors were so serious as to deprive [him] of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. To show prejudice, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Eckstein v. Kingston*, 460 F.3d 844, 848 (7th Cir. 2006) (quoting *Strickland*, 466 U.S. at 694). To demonstrate prejudice, it need only be shown that there is a "reasonable chance" the outcome would have been different, and this "needn't be a 50 percent or greater chance." *Blackmon*, 823 F.3d at 1105.

*Strickland* Claims

The Petitioner also received the ineffective assistance of trial counsel where trial counsel failed to present and/or discovery before trial the evidence referred to Argument. It is not known for certain at the time of this filing whether the evidence regarding the spent bullet from .357 Magnum was known to defense counsel before trial. The record appears to show it was not. However, to the extent that the record may show now or in the future that defense counsel was aware of the existence of this exculpatory evidence, or that it could have been discovered with

due diligence (a remnant of Illinois and Seventh Circuit law that has no basis in Supreme Court jurisprudence after the Supreme Court's decision in *Banks*, supra), then the Petitioner additionally and/or alternatively argues that trial counsel was ineffective for not presenting this evidence to the jury. For the same reasons this evidence was material as to the Plaintiff's *Brady* and/or Napue claims, it was also so for these same reasons under a *Strickland* analysis. The Plaintiff incorporates into this section of the Argument those same arguments raised in Section I, above.

The Petitioner argued on appeal from the denial of his post-conviction petition that it was a *Brady* violation for the prosecutor to inform defense counsel that the .357 Magnum had been lost, and pointed to the fact that this denied the Petitioner the ability to request testing of the .357 Magnum. In response, the Appellate Court found as follows:

> While defendant maintains that the weapon could have been tested for Vance's fingerprints which, if present, would support his self-defense theory, he provides this court with no citation to authority which would allow us to make such a leap. See Ill. S. Ct. R. 431(h)(7) (eff. Oct. 1, 2020 (requiring an appellant's brief 'contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on"); *People v. Fredricks*, 2014 Ill. App. (1st) 122122, ¶ 64, 383 Ill. Dec. 293, 14 N.E.3d 576 ('It is well settled that . . . bare contentions that fail to cite any authority do not merit consideration on appeal.'). Indeed, we may not assume facts which are not supported by the record or affidavits accompanying the petition. [People v. Coleman, 183 Ill. Ill. 2d 366 (1998)]. In addition, nonspecific assertions which merely amount to conclusions are not sufficient to require a hearing under the Act. Defendant's allegations that Vance's fingerprints could be on the revolver amount to such conclusions in this instance and this court is not bound to take them as true when considering whether the dismissal of his petition was proper. See *id.*; [*People v. Pendleton*, 223 Ill. 2d 458, 473 (2006)]. *People v. Tanna*, 2021 IL App (1st) 161797-U, ¶ 74.

The Petitioner contends this conclusion was clearly erroneous for several reasons. First, under Illinois law, the failure of the appellate to address an issue raised by an appellant in the opening brief normally results in conceding the issue on appeal. *Eertmoed v. Pekin*, 83 Ill. App. 3d 362, 364 (3d Dist. 1980); *Marcus v. Green*, 13 Ill. App. 3d 699, 710 (5th Dist. 1973). Second, the Petitioner did provide citation to the record in support of his argument. In the Argument portion of Petitioner's opening brief, the Petitioner cited to proper authorities in the record that the defense attorney was told the .357 Magnum was lost (Pet. Br. 17; PC C. 454); the fact that during post-conviction proceedings these items were found by post-conviction counsel in the evidence locker at the Cook County Sheriff's Police Department (Pet. Br. 17-18; PC C. 456); then argued that had the prosecutor not told defense counsel the revolver was lost, the Petitioner "could have subjected it to forensic testing, which could have potentially impeached the State's witnesses who testified that Vance did not have a gun at the time of the shooting." (Pet. Br. 22). Third, the Petitioner cited legal support in support of his argument. While the conceded that, because the results of that testing cannot be known without the testing have been accomplished, it could not be stated that the results would have been favorable to the defense (Pet Br. 23) However, the Petitioner also pointed to support in Illinois post-conviction law that required courts at the second stage of proceedings to presume the results would have been favorable (Pet. Br. 23) (quoting *People v. Carbadillido*, 2015 IL App (2d) 140760, ¶ 71, appellate counsel wrote, "When 'it is not clear whether the undisclosed evidence would be favorable [courts]

should presume that it would be favorable.' *Id*.; [*People v. Nichols*, 63 Ill. 2d 443, 448 (1976)]).

Despite the fact that the State completely ignored this argument in its response brief and never itself contended this argument has been forfeited, which should have resulted in a concession on appeal that the issue was properly raised and that the revolver could have been subjected to forensic testing and the results should have been presumed to be favorable, the Illinois Appellate Court instead ruled the issue had been forfeited. This conclusion was clearly erroneous, as demonstrated above. That said, the Petitioner realizes that this Court has no power to rule contrary to this conclusion.

Thus, in response to the Appellate Court's ruling, the Petitioner raises in this successive post-conviction petition that trial counsel was ineffective in not seeking the testing and in not taking additional steps to find the weapon after having been told the weapon had been lost, especially since defense counsel knew the Petitioner wanted the gun forensically tested (Ex. D). This argument was not raised in the post-conviction petition, and post-conviction counsel did not request post-conviction forensic testing despite the request of the Petitioner (Ex. D), and the Petitioner alleges this meets the cause and prejudice test, and requests such testing with this Court. This will be the subject of a separately filed motion.

The Petitioner was denied the effective assistance of trial counsel, and appellate counsel on direct appeal, when trial counsel allowed Frank Laskero to testify, without objection, that the .357 revolver had not been fired recently, and

appellate counsel was ineffective for not raising this issue on appeal. Laskero, a Cook County Sheriff's Police investigator, testified that he became aware that Ford Heights police officers recovered a second gun belonging to Jerome Anderson – the same gun the Petitioner contends Vance was holding when he was shot – outside of the apartment, in the bushes, on the date of the shooting (Sup R. 272-273). Even though he was not the person who fired the weapon, and he provided no evidence that he ever examined the gun to determine whether the revolver had recently been fired, Laskero testified, "the weapon hadn't fired recently. You could tell that. And it also was not – it was a 9 millimeter automatic that was used in the scene. So, Ford Heights, they do find guns all spread around the area." (Sup. R. 273). Defense counsel objected, and the court sustained counsel's objection, stating that "[it] will be stricken." (Sup R. 273). Both on direct appeal, and on appeal from the denial of the post-conviction petition, the Appellate Court interpreted this sustained objection to refer only to the last statement that "Ford Heights, they do find guns all spread around the area." (C. 63); *Tanna*, 2021 IL App (1st) 16197-U, ¶ 19.

Trial counsel should have objected to this testimony, and appellate counsel should have raised this issue on direct appeal under the rubric of ineffective assistance of trial counsel and/or plain error. It is objectively unreasonable for defense counsel to fail to object to evidence that is presented without a proper foundation. *People v. Petrie*, 2021 IL App (2d) 190123, ¶ 68-72; *Earls v. McCaughtry*, 379 F.3d 489, 494 (7th Cir. 2004). Moreover, the Petitioner can demonstrate he suffered prejudice. By allowing Laserko to conclude the .357

115

Magnum "had not been fired recently," this allowed the prosecution to discount the significance of the second weapon near the crime scene. Moreover, we now know that this testimony was actually false, given the fact that Jon Flaskamp, an Illinois State Police laboratory technician, provided an affidavit during post-conviction proceedings that he concluded in a laboratory report that the *spent* bullet found on the crime scene not only did not match the Petitioner's 9mm semiautomatic pistol, but it was actually consistent with coming from a Smith & Wesson .357 Magnum (C. 428); (Ex. B).

In this case, the Petitioner raised the affirmative defense of self-defense, and the court also granted a defense request for second-degree murder instruction, although defense counsel only requested one form of the instruction (imperfect self-defense), not the alternative form of the second-degree murder based on provocation. It was clear from the early stages of trial the defense counsel's understanding of the theories of self-defense was seriously lacking. Immediately prior to trial. defense counsel settled on the affirmative defense of self-defense and failed to communicate with the Petitioner regarding the second-degree instruction. In denying the Petitioner's direct appeal, the Appellate Court concluded defense counsel was not ineffective for failing to submit to both forms of second-degree murder instruction, (imperfect self-defense and provocation), even though the two theories have inconsistent states of mind, chalking it up to a strategic choice on the part of *defense counsel* (C. 75). However, under Illinois law, whether to give the jury the option of a lesser-included second degree murder instruction also has an

element of client choice that must be considered.  See *People v. Sparks*, 2021 IL App (1st) 190434-U, ¶ 31; *People v. Jones*, 175 Ill. 2d 126, 131-132 (1997).  There was nothing in the record on appeal that would have indicated the Petitioner was aware of the option of asking for two different forms of a second-degree murder instruction, and the Petitioner's attached affidavit makes it clear that he was never consulted about this option, and had he been, he would have chosen to have both forms of the second-degree murder instruction submitted to the jury (Ex. A).

While a prosecutor is allowed a great deal of latitude in making his opening and closing statements (*People v. Pasch*, 152 Ill. 2d 133, 184 (1992)), assumptions and statements of fact not based upon evidence may not be argued to the jury (*People v. Beier*, 29 Ill. 2d 511, 517 (1963)).  Moreover, prosecutorial statements that attempt to shift the burden of proof to the defense constitute reversible error. *People v. Falconer*, 282 Ill. App. 3d 785, 791 (1996).  In *People v. Scaggs*, the court found that a prosecutor's definition of self-defense during closing argument was highly prejudicial and thus improper. *People v. Scaggs*, 111 Ill. App. 3d 633, 444 (1982).  During closing, the prosecutor stated the following:

> [t]he standard is reasonable men.  I submit to you what goes on in that man's mind is it reason-to begin with?  Reasonable men don't carry guns to visit people in their homes.  Reasonable men don't drag-race on the streets like teenagers.  They don't bet like a teenager and carry guns with them and drink. *Scaggs*, 111 Ill. App. 3d at 637.

On appeal, the court held that the prosecutors closing argument improperly "sought to divert the jury's attention from defendant's actions at the time of the

shooting to an evaluation of defendant as a person." *Id.* at 637. The court reasoned that the jury was encouraged to consider matters irrelevant to self-defense and found that the prosecutor's argument was a clear misstatement of the law of self-defense. *Id.* A prosecutor cannot define what constitutes "reasonable doubt," as what constitutes reasonable doubt is the province of a jury, and cannot be defined by a prosecutor, or a defense attorney for that matter. *People v. Thomas*, 191 Ill. App. 3d 198, 197 (4th Dist. 1989).

In this case, the prosecutor argued the Petitioner wanted to be portrayed as a "hero" for shooting an unarmed man in the back multiple times, and this is "taking the law of self-defense and turning it on its ear." (Sup R. 886). The prosecutor continued:

> That law that's written in our statute books to protect us, they are twisting it around. Because self-defense, ladies and gentleman, it's an honorable thing. Is there anything, you need to ask yourselves, anything honorable or decent about what Leon Tanna did? Absolutely not. What is self-defense, ladies and gentlemen? True self-defense where you are justified, a woman who is in her home late at night and someone breaks into her home and accosts her with some kind of weapon, a knife, gun, whatever. That women gets a gun of her own and shoots and kills that intruder. That is true self-defense. She is justified.
> What the defense wants you to believe, ladies and gentlemen, is that this defendant who had a gun in his pocket the whole day, fully loaded gun, who after leaving the apartment for 15 to 25 minutes, said I'm in fear for my life; I have to go back in, bang, bang, bang, bang, bang, bang, bang. That is the same as the lady who is in her house getting accosted by the intruder? No way, that is not the law (Sup. R. 887).

Later, the prosecutor argued that even under the Petitioner's own version of events he could not properly claim self-defense. The prosecutor commented, "Even if you believe his story, he's not justified. Not justified like that woman

118

whose house got broken into by intruder would be justified. That is straight-up self-defense. He's not justified." (Sup R. 902).

In this same rebuttal closing argument, the prosecutor made similar remarks regarding the law the regarding second-degree murder based on unreasonable self-defense. The prosecutor told the jury:

> Unreasonable belief would be if someone suddenly turns around and points and object at you. If you are in imminent fear of death or great bodily harm, you react right then and there and you should kill that person. But it later turns out that object they had in their hand was a cell phone. That would be unreasonable self-defense.
> Sneaking up behind Dwight Vance and shooting him in the back thirteen times, where is the unreasonable belief there? Again, even if you want to disregard everything and believe everything he says yesterday about how the victim had a gun in his hand, there's no unreasonable belief. He pulls the gun out, takes the safety off, and pulls the trigger, aims it, and fires. Imminent fear. No. Reasonable belief. No. He could have just walked right out. He is trying to get away with murder (Sup R. 904).

There was no objection to any of these arguments, and thus the jury was never told to disregard these comments.

In this case, the prosecutor misstated the law with regard to the standards of self-defense and imperfect self-defense by greatly narrowing the circumstances where a defendant can claim this defense and this lesser-included option. In this way, the prosecutor presented a biconditional statement: you can reach a verdict regarding self-defense or imperfect self-defense *if and only if* you find a congruence between the case at hand and either of the two 'standard' examples. The prosecutor also greatly raised the bar for claiming self-defense by stating that one's actions must be heroic and honorable.

Moreover, in both blatant misstatements of the law, the prosecutor was

commenting that the Petitioner cannot claim self-defense, nor could it be

second-degree murder, even if they believed the Petitioner's trial testimony.

This is crucial because the Petitioner testified he was in fear of his life based on

being physically attacked by Vance, having been threatened with being shot on

multiple occasions, having Vance previously attempting to get Jerome

Anderson's weapon, and being armed with a .357 Magnum at the same time he

was on the phone with someone telling that person he was going to kill the

Petitioner. Of course, this easily rises to the level of self-defense, if believed,

however, not if one must meet the prosecutor's made-up hero/honorable citizen

standard. Moreover, there was no basis for the prosecutor to misstate the law

in stating that one can only have an "unreasonable belief" if the decision if it

was the result of a deliberate act of self-defense, which may be the case for

provocation, an instruction not submitted to the jury, but is not the law

regarding unreasonable self-defense. Compare *People v. Bailey*, 141 Ill. App. 3d

1090, 1104 (1st Dist. 1986) (noting there was no need for a jury instruction on

provocation because all of the defendants testified the defendant acted in self-

defense in approaching the vehicle) with *People v. Divincenzo*, 183 Ill. 2d 239,

249-250) (involuntary manslaughter defense based on an unreasonable belief in

self-defense warranted when there is "some evidence" the defendant's actions

amounted to recklessness). The prosecutor was essentially informing the jury

on the law on second-degree murder on provocation, not based on recklessness,

and even the Appellate Court noted in this case that the facts of the case better suited an unreasonable self-defense theory than a provocation theory (C. 75-76). Thus, the prosecutor, by misstating the law on second-degree murder, took this defense away from the Petitioner, once again based his argument on the Petitioner's own version of events.

The above arguments were extremely prejudicial, alone, or in conjunction with the burden-shifting argument that the Appellate Court conceded was erroneous (C. 96). Trial counsel was ineffective for not objecting to these arguments at trial, and appellate counsel should have raised this issue on direct appeal under either the plain error doctrine or the *Strikland* standard. Regarding appellate counsel, the propriety of the closing argument was raised on appeal, so it is difficult to understand why counsel would not have added these meritorious claims, as well, to add to the prejudicial nature of the prosecutor's rebuttal closing argument.

## V.    Request for stay of habeas proceedings

On October 18, 2022, the Petitioner filed a Motion for Leave to File Successive Post-conviction Relief. The Petitioner would be requesting a stay for any claims the court deems to be unexhausted (Section IV above), but understands that the court may want the State to be heard before the court.

This Court may grant a stay under *Rhines v. Weber*, 544 U.S. 269 (2005), which permits a stay of habeas proceedings for state court review. A stay is appropriate in order to permit the Petitioner to present his claims to the state

court and provide the court the opportunity to address the Petitioner's claims of Constitutional error. *Rhines v. Weber*, 544 U.S. 269 (2005). A stay of habeas proceedings is the preferred course of litigation when a habeas petitioner presents a mixed petition containing exhausted and unexhausted claims. *Rhines*; *Walker v. Martin*, 131 S.Ct. 1120, 1126 n. 3 (2011). In fact, a district court should grant a stay if: (1) good cause exists for a failure to exhaust; (2) the claim is potentially meritorious; and (3) there is no evidence that the petitioner had been dilatory. *Rhines*, 544 U.S. at 278. All three factors support a request to stay the habeas proceedings in this case. The Petitioner seeks further briefing on this issue, but good cause exists do to attorney error during post-conviction proceedings, including not raising meritorious claims in the first post-conviction petition and not introducing newly discovered evidence of actual innocence, these claims are meritorious, as argued above, and the Petitioner has not only met his one-year deadline for habeas, but he has also addressed all of these claims in state court, below, within one year, so as to avoid any potential statute of limitations issues.

WHEREFORE, the Petitioner respectfully requests this Honorable Court grant this Petition.

Respectfully Submitted,

/s/ Richard Dvorak

_____

Attorney for the Petitioner.

## VERIFICATION

I, Richard Dvorak, the undersigned, attorney for the Petitioners, swear and affirm that the information contained in this Petitioner are true and accurate to the best of my information and belief, and I filed the above Petition with the Court, via electronic filing, on October 18, 2022.

/s/Richard Dvorak
_____
Richard Dvorak

## CERTIFICATE OF SERVICE

I, Richard Dvorak, the undersigned attorney for the Petitioner, hereby certify that on October 19, 2022, I will serve the above Petition on the Illinois Attorney General's Office, and the Warden for the Western Illinois Correctional Center, by depositing the same via certified mail from Willowbrook, Illinois to the proper address for each entity.

s/Richard Dvorak
_____
Richard Dvorak