UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Leon Tanna,

    *Plaintiff,*

v.

Andrea Tack,

    *Defendant.*

No. 22 CV 5740

Judge Lindsay C. Jenkins

MEMORANDUM OPINION AND ORDER

Petitioner Leon Tanna ("Petitioner" or "Tanna") brings this habeas corpus action pursuant to 28 U.S.C. § 2254 challenging his conviction in the Circuit Court of Cook County. For the reasons below, the petition is denied.

## I. Background

In reviewing a petition for federal habeas corpus, the court presumes that the state court's factual determinations are correct unless the petitioner rebuts those facts by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Weaver v. Nicholson*, 892 F.3d 878, 881 (7th Cir. 2018).

A jury convicted Tanna of one count of first-degree murder for the death of Dwight Vance, and one count of personally discharging a firearm that caused Vance's death. Tanna does not challenge any of the underlying facts in his petition, so the court draws the following facts from the Illinois state appellate court's opinion in his direct appeal, *People v. Tanna* ("*Tanna I*"), 2006 IL App (1st) 1043569, [Dkt. 40-1]; the Illinois state appellate court's order denying his postconviction appeal, *People v. Tanna* ("*Tanna II*"), 2021 WL 5298614 (Ill. App. Ct. Nov. 12, 2021) [Dkt. 40-7]; and

the state court records that Respondent provided pursuant to Rule 5 of the Rules Governing Section 2254 Cases.[1]

## A.    Underlying Facts and Conviction

As detailed in *Tanna II*, following the death of Dwight Vance, Tanna was arrested and charged with first-degree murder. At trial, Elmer Conway testified that on the evening of April 11, 2001, he was at Patricia Hurd's apartment in Ford Heights where a group had gathered. Among those present at her apartment were Hurd, Reggie Anderson and Jerome Anderson[2], Michael Cunnigan, Mark Fulwiley, Vance and Tanna.

Conway testified that while Tanna was eating a polish sausage, Vance asked if he could have a piece. Tanna responded that Vance should get his own polish sausage from the kitchen. Vance went to the kitchen and when he returned with a polish sausage, he told Tanna that if the sausage did not taste good he would "kick [Tanna] in his face." Vance took a bite of the sausage and immediately kicked Tanna in the face. The two started wrestling and fell through a glass table in the living room. Others broke up the fight, and Hurd asked everyone to leave the apartment so she could clean up. *Tanna II*, ¶ 4.

Conway testified that he stayed behind to help Hurd, and everyone else went outside. A few minutes later some of the guests walked back into the apartment. After Tanna came back inside, he said that he was going to the Chicago Heights police

---

[1]    Citations to docket filings generally refer to the electronic pagination provided by CM/ECF, which may not be consistent with page numbers in the underlying documents.

[2]    To avoid confusion, the court refers to Reggie and Jerome Anderson by their first names.

station to pick up a friend. After Tanna left, Vance came back into the apartment and asked to use the telephone. Vance sat in a chair in the middle of the living room with his back to the front door and picked up the receiver.

At trial, Conway testified that while cleaning glass from the floor, and while standing about 10 feet away from Vance, Conway heard gunshots from inside the house. He turned and saw Vance lying face down on the floor, with the telephone receiver still in his hand, while Tanna was shooting Vance in the back. Conway also testified that he did not see anything other than the telephone in Vance's hands, and that, to his knowledge, no one else in the apartment that night had a firearm.

On cross-examination, Conway acknowledged that he was good friends with Vance and that both were members of the same street gang. Defense counsel attempted to elicit information regarding the "street names" of the individuals present in the apartment, and Conway admitted that all the men in the apartment, including Tanna, were members of the same organization, but that Conway did not know Tanna. Conway acknowledged that Tanna never provoked Vance. He also admitted that he was not facing the door when Tanna returned to the apartment, so he could not explain Vance's position relative to Tanna's. *Id.*, ¶¶ 6–8.

Mark Fulwiley testified that he was in the living room of the apartment with the other guests and that Tanna was eating a polish sausage when Vance interrupted to ask for a piece. Tanna refused, and Vance told Tanna, "if you were one of my guys, you would give me a bite." *Tanna II*, ¶ 9. The two argued until Vance went into the kitchen to get a polish sausage; when he returned, Vance told Tanna that he was

3

going to kick him if the polish sausage was good. Vance tasted his sausage and kicked Tanna in the face. The two wrestled and fell through a glass table, and Hurd told everyone to leave.

According to Fulwiley, Vance and Tanna continued to argue but then agreed to stop fighting. Tanna returned to the apartment but eventually left. Once he was gone, Vance picked up the receiver to use the telephone. About fifteen to twenty minutes later, Tanna returned to the apartment with a firearm in his hand. Fulwiley testified that Vance's back was turned toward the front door, and that Tanna said nothing that would alert Vance to his presence. Fulwiley testified that Tanna pulled the trigger and shot Vance in the head. As Vance fell out of his chair, Fulwiley put a pillow over his own face fearing that Tanna was going to kill others. Although he could not see what was happening, Fulwiley stated that he heard about thirteen to fourteen more shots. When the shooting stopped, Fulwiley observed Tanna standing over Vance with the back of his weapon "stuck back." *Id.*, ¶ 12. Tanna put another clip into his firearm, and walked out. Fulwiley testified that Vance was a good friend, but Fulwiley only knew Tanna from the neighborhood. To Fulwiley's knowledge, no one in the apartment other than Tanna had a firearm.

Reggie Anderson testified to a similar sequence of events. Among other things, Reggie testified that when Tanna returned to the apartment, Vance had been sitting with his back toward the door, facing the window, and talking on the telephone. According to Reggie, Tanna began to shoot even before stepping through the front door. He testified that after Tanna shot Vance in the head, Vance fell "right on

[Reggie's] lap." *Id.*, ¶ 16. Tanna continued to shoot, then stopped, took his clip out, put another one in, and walked off while mumbling a reference to a street gang.

On cross-examination, defense counsel elicited testimony that everyone in the apartment that night except for Hurd was a gang member. Reggie also acknowledged that his brother, Jerome, owned a .357-caliber revolver, but according to Reggie, he did not believe Jerome had the weapon on him on the night of the shooting.

A crime scene investigator, Frank Laserko, responded to the scene early on the morning of April 12, 2001. Laserko photographed and searched the crime scene, which consisted of the living room area of the residence. He testified that he discovered a total of twelve shell casings, eleven of which were in the northeast corner of the living room, and the remaining one was recovered from underneath Vance's body. Laserko testified that all the shell casings came from a 9-millimeter Luger CVC. *Id.*, ¶ 18.

Laserko did not recover a weapon from the crime scene, but officers from the Ford Heights Police Department retrieved a Smith and Wesson .357-caliber revolver hidden in the bushes near the south side of the residence. This revolver contained three live bullets, and no spent shell casings. Laserko testified that based on his examination, the weapon had not been recently fired and that it was not the 9-millimeter automatic used in the shooting. Laserko did not request that the firearm he found be forwarded to a crime lab for analysis. He did not fingerprint or inventory the .357-caliber revolver, but returned it to the Ford Heights Police Department.

Laserko admitted that he did not know whether the .357-caliber revolver had been at the crime scene. *Id.*, ¶ 19.

The medical examiner Joseph Lawrence Cogan testified that he performed Vance's autopsy. Dr. Cogan testified that Vance suffered two gunshot wounds to the head and multiple gunshot wounds to the back and left shoulder. All the wounds were entrance wounds, which had a pattern of traveling from left to right and from the back forward, in similar directions. Dr. Cogan testified that Vance died from multiple gunshot wounds and that the manner of death was homicide. Dr. Cogan acknowledged on cross-examination that he tested Vance's body for gun powder residue which, if found, would indicate that the victim was shot at a range of 18 inches or less. No gun powder residue was found on Vance's body. *Id.*, ¶¶ 21–22.

Cook County Sheriff's Sergeant Matt Rafferty testified that as part of the investigation, he conducted interviews and took statements from witnesses. Rafferty testified that the victim was shot with a 9-millimeter firearm, but that the .357-caliber revolver discovered in the bushes belonged to Jerome who had been at the apartment on the day of the shooting. Rafferty also testified that a jacket and keys were recovered from the crime scene. *Id.*, ¶¶ 23–25.

Rafferty eventually obtained an arrest warrant for Tanna, who was taken into custody on the warrant in June 2001. Rafferty interviewed Tanna at Area 4 headquarters. Following this interview, Tanna was transported to the Markham courthouse, where he was interviewed by an Assistant State's Attorney. Tanna made a videotaped statement that was entered into evidence at trial without objection. *Id.*,

¶ 26. Among other things, the statement recounted the fight between Tanna and Vance. Tanna stated that Vance yelled, "I'm fitting to kill your m—f—ass," and reached for the firearm in Jerome's pocket. *Id.*, ¶ 31. Tanna's statement also described how Tanna returned to the apartment, saw Vance sitting and talking on the phone, and Tanna shot Vance twice in the head. Vance fell on the floor, and Tanna continued to shoot at Vance until his clip was empty. Tanna admitted to shooting Vance eleven more times because he knew that his loaded 9-millimeter handgun had thirteen bullets. Tanna explained that he disposed of the weapon in a cornfield, took off his clothes, and walked in his underwear to his girlfriend's house.

Tanna testified in his own defense at trial. Among other things, he identified from a photograph the .357-caliber revolver as the weapon that Vance reached for in Jerome's pocket. According to his testimony at trial, Tanna left the apartment but remembered he had forgotten his keys and black jacket so he returned and knocked at the front door. Tanna saw his coat on the couch next to Vance, and noticed that Vance was holding Jerome's firearm in his hand. Vance, who was on the phone, told Tanna that Vance was waiting for Tanna to return to kill Tanna. Tanna testified he began shooting at Vance "in fear for his life"—he was scared because Vance had already hit Tanna in the face, threatened him, and tried to reach for Jerome's weapon earlier that day. *Id.*, ¶ 32. Tanna testified that during his initial interview with the ASA, he noticed the .357-caliber revolver wrapped in plastic at the State's Attorney's Office. *Id.*, ¶ 36.

7

On cross-examination, Tanna admitted that he brought a fully loaded 9-millimeter handgun to Hurd's apartment and that he always carried the weapon with him. He admitted that when he returned to the apartment, he already had the safety switch in the off position and a live round in the chamber of the weapon. When asked whether Vance ever raised his weapon toward Tanna, Tanna responded, "with all due respect, I didn't give him a chance to because I knew for a fact that he would kill me after the things that I had already been through with him." *Id.,* ¶ 39; Dkt. 40-19 at 506.

During closing arguments, the State argued that Tanna returned to the apartment to execute Vance. Defense counsel argued that Tanna acted in self-defense, or alternatively, unreasonably believed he was acting in self-defense. Defense counsel argued that the case was about a violent lifestyle, and that Tanna was justified in his belief that Vance posed a real threat given all that had occurred. Counsel also argued that the State purposely failed to fingerprint and introduce (1) Jerome's revolver into evidence at trial, and (2) Tanna's keys and jacket recovered from the crime scene. Specifically, defense counsel argued that the State could have fingerprinted the revolver that Vance had in his hand, and that introducing Tanna's jacket and keys would have corroborated Tanna's testimony that he returned to the apartment to retrieve these items, not to kill Vance. In its rebuttal argument, the prosecutor stated, in part:

> Where is that .357? You ask yourselves why didn't they bring that in here. Where is [Tanna's] coat? You asked them why and they didn't bring that in here. First of all, let me make this especially clear. The defense has no burden whatsoever. They have no burden whatsoever to put on evidence. But once they

8

do, you get to consider that. Not only what they do put on, but what they don't put on.

[Dkt. 40-19 at 895.] Defense counsel objected; the trial court sustained the objection.

The jury was instructed on the elements of first-degree murder, self-defense, and second-degree murder based on the unreasonable belief in self-defense, but not as to provocation. During deliberations, the jury sent a note asking for Tanna's jacket and keys. The court responded by informing the jury that they had seen and heard the evidence and should continue deliberating. *Tanna II*, ¶ 47.

The jury returned a verdict of guilty of first-degree murder. After his post-trial motion for a new trial was denied, Tanna was sentenced to 22 years' imprisonment for first-degree murder and an additional 25 years because the jury found that he personally discharged the firearm that caused Vance's death, for a total term of 47 years. *Id.*, ¶¶ 47–48.

### B.    Direct Appeal

Tanna filed a direct appeal arguing that his trial counsel was ineffective for failing to request a second-degree murder instruction based upon provocation and mutual combat; for eliciting gang testimony that opened the door for the State to introduce evidence of Tanna's gang affiliation; and for failing to question potential jurors about their views on gangs, and emphasizing gang evidence during closing arguments. He also claimed that his right to a fair trial was denied when the State made improper arguments in its rebuttal closing argument. [Dkt. 40-1.] Tanna's conviction was affirmed, *Tanna I*, and the Illinois Supreme Court denied Tanna's

petition for leave to appeal ("PLA"). *People v. Tanna*, 865 N.E.2d 976 (Ill. 2007) (Table).

### C.    Postconviction Proceedings

#### 1.    First Postconviction Petition

Tanna filed a *pro se* postconviction petition pursuant to 725 ILCS 5/122-1 *et seq. Tanna II*, ¶ 2. The circuit court appointed post-conviction counsel, and the parties engaged in discovery regarding the .357 revolver, as well as Tanna's jacket and keys. In 2014, discovery revealed that the items were in the Cook County Sheriff's Police Department's possession. *Id.*, ¶ 52. Tanna supplemented his postconviction petition to add new claims, one of which was that the State violated his due process rights by failing to tender exculpatory evidence specifically requested by defense counsel under *Brady v. Maryland*, 373 U.S. 83 (1963).

The State moved to dismiss the petition, arguing that no *Brady* violation occurred because defense counsel was aware that Tanna's clothing and keys had been recovered from inside the apartment and that the .357-caliber revolver had been found outside of the building such that these items were not hidden from the defense. In response, Tanna attached an affidavit from John Flaskamp, an Illinois State Police forensic scientist who averred that a .38 caliber bullet was discovered at the crime scene and that that bullet was fired from a weapon other than Tanna's 9-millimeter. According to Flaskamp, this bullet could have been fired from a .357-caliber revolver. *Id.*, ¶ 56. The circuit court dismissed the supplemental petition, concluding that the jacket, keys, and firearm were never hidden from Tanna or his counsel.

On appeal, Tanna argued that the State violated its discovery obligations by failing to produce the .357 revolver, jacket, and keys. He also raised two ineffective assistance of counsel claims: first, that trial counsel was ineffective for failing to seek discovery sanctions; and second, that appellate counsel was ineffective for failing to raise that claim on direct appeal. The appellate court affirmed. *Id.*, ¶ 2. The Illinois Supreme Court denied Tanna's PLA. *People v. Tanna*, 187 N.E.3d 709 (Ill. 2022) (Table).

### 2.     Successive Postconviction Petition

In October 2022, Tanna sought leave to file a successive postconviction petition, which also included a motion for forensic testing and discovery. [Dkt. 40-13 at 4–5.] The circuit court denied the request, noting that Tanna "failed to show cause because Flaskamp's report was raised in the initial postconviction petition and appeal," and because the "evidence of defendant's guilt was overwhelming so he was not prejudiced." [*Id.* at 5.] Tanna appealed. He asserted that the circuit court improperly denied his *Brady* claim, and he argued actual innocence "in that newly-discovered evidence supported his claim that he killed Vance in self-defense." [*Id.*]

The appellate court affirmed the denial of leave to file a successive petition. Tanna filed a PLA *pro se* arguing it was error to deny him leave to file a successive petition and to deny his request for testing. [Dkt. 40-16.] The Illinois Supreme Court denied the PLA on September 25, 2024. [Dkt. 40-17.]; *People v. Tanna*, 244 N.E.3d 266 (Ill. 2024) (table).

### D.    Habeas Petition

In 2022, while his successive postconviction petition was still pending, Tanna filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. [Dkts. 1, 4.] The court granted Tanna's motion to stay while he pursued postconviction relief. [Dkt. 16.] After the PLA was denied, Respondent filed its answer and Tanna filed his reply. [Dkt. 39, 44.]

Tanna's petition raises the following issues:

(1)    The prosecutor's closing argument about the burden of proof denied Tanna due process, [Dkt. 1 at 72–77];

(2)    The prosecution violated *Brady*, by failing to produce crime-scene evidence, including the .357 revolver, jacket, and keys; [*Id*. at 77–83];

(3)    Trial counsel was ineffective for failing to make a record of the prosecutor's assertions that evidence had been destroyed and for failing to seek discovery sanctions; [*Id*. at 84–86;][3]

(4)    Trial counsel was ineffective for not requesting a second degree murder instruction based on provocation; [*Id*. at 87–90]; and

(5)    Trial counsel was ineffective for eliciting testimony at trial concerning gang evidence, and for failing to question potential jurors about their views on gang activity. [*Id*. at 90–92.]

---

[3]    As discussed below, there is no dispute that the items in question—the revolver, jacket and keys—were not destroyed. The items were in the custody of the Cook County Sheriff's Police Department. *Tanna II*, 2021 WL 5298614, at *8.

## II.    Legal Standard

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254, a petitioner in custody pursuant to the judgment of a state court must make two showings to be eligible for a writ of habeas corpus: (1) "that he is in custody in violation of the Constitution or laws or treaties of the United States," § 2254(a), and (2) that the state postconviction court's adjudication of his claim "resulted in a decision that" either "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d)(1)–(2).

The requirements of § 2254 are difficult to clear. As the Supreme Court "has stated unequivocally, and on more than one occasion, . . . 'clearly established law as determined by [the Supreme] Court refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'" *Berkman v. Vanihel*, 33 F.4th 937, 945 (7th Cir. 2022) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 660–61 (2004)). The "contrary to" prong does not apply unless "the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases . . . [or] confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [] precedent." *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000). And a state court decision is not an "unreasonable application" of clearly established federal law unless it is "objectively unreasonable," "lying well outside the boundaries of permissible differences of opinion." *Felton v. Bartow*, 926 F.3d 451, 464 (7th Cir.

13

2019) (quoting *McGhee v. Dittmann*, 794 F.3d 761, 769 (7th Cir. 2015)). The decision must be "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

## III. Analysis

Respondent argues that Grounds 1 and 3 are procedurally defaulted, and that Grounds 2, 4 and 5 are barred by § 2254(d) and are meritless. The court takes each in turn.

### A. Procedural Default

Federal courts may not review state prisoners' habeas claims that have been "procedurally defaulted in state court," a doctrine that advances "comity, finality, and federalism interests." *Davila v. Davis*, 582 U.S. 521, 527–28 (2017). There are two "paradigmatic" ways a petitioner can procedurally default a claim. *Clemons v. Pfister*, 845 F.3d 816, 819 (7th Cir. 2017) (quoting *Richardson v. Lemke*, 745 F.3d 258, 268 (7th Cir. 2014)). One is when a petitioner fails to "fairly present" a claim "throughout at least one complete round of state-court review, whether on direct appeal of [the] conviction or in post-conviction proceedings," and "it is clear that those courts would now hold the claim procedurally barred." *Id.*; *Perruquet v. Briley*, 390 F.3d 505, 514 (7th Cir. 2004). Default also occurs when a state court denies a claim on an adequate and independent state procedural ground. *Davila*, 582 U.S. at 527; *Wilson v. Cromwell*, 69 F.4th 410, 418 (7th Cir. 2023), *cert. denied sub nom. Wilson v. Gierach*, 144 S. Ct. 1034 (2024); *Flint v. Carr*, 10 F.4th 786, 793 (7th Cir. 2021).

14

A ground is adequate if it is "firmly established and regularly followed." *Wilson*, 69 F.4th at 419 (7th Cir. 2023) (quoting *Clemons*, 845 F.3d at 820). A ground is independent "if it does not depend on the merits of the petitioner's claim." *Flint*, 10 F.4th at 793 (quoting *Triplett v. McDermott*, 996 F.3d 825, 829 (7th Cir. 2021)). When a state court refuses to adjudicate a petitioner's federal claims because he didn't raise them in accordance with the state's procedural rules, "that will normally qualify as an independent and adequate state ground for denying federal review." *Id.* at 794 (quoting *Woods v. Schwartz*, 589 F.3d 368, 373 (7th Cir. 2009)).

A court may excuse procedural default and reach the merits of a petitioner's claim if he "demonstrates either (1) cause for the default and actual prejudice or (2) that failure to consider the claim will result in a fundamental miscarriage of justice." *Snow v. Pfister*, 880 F.3d 857, 864 (7th Cir. 2018) (quoting *Thomas v.* Williams, 822 F.3d 378, 384 (7th Cir. 2016)); *see also Perruquet*, 390 F.3d at 514 ("[The procedural default doctrine] provides only a strong prudential reason . . . not to pass upon a defaulted constitutional claim presented for federal habeas review" and "is therefore subject to equitable exceptions." (cleaned up)).

Cause for procedural default exists when a petitioner "'can show that some objective factor external to the defense impeded' compliance with the procedural rule." *Love v. Vanihel*, 73 F.4th 439, 446–47 (7th Cir. 2023) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). Prejudice requires a trial error that "worked to [the petitioner's] actual and substantial disadvantage." *Id.* at 448 (cleaned up). The "miscarriage of justice exception 'applies only in the rare case where the petitioner

can prove that he is actually innocent of the crime of which he has been convicted.'" *Blackmon v. Williams*, 823 F.3d 1088, 1099 (7th Cir. 2016).

Illinois' Post-Conviction Hearing Act allows a petitioner to file only one postconviction petition as a matter of right. 725 ILCS 5/122-1(f). Thereafter, the petitioner must move for leave to file a successive postconviction petition, which can only be granted if the petitioner shows cause for failing to bring his claims earlier and prejudice results from that failure. *Id.*

### 1. Ground 1: The prosecutor's closing remarks about the burden of proof.

In Ground 1, Tanna claims that his due process rights were violated when the prosecutor made improper and prejudicial comments that shifted the burden of proof at trial. [Dkt. 1 at 73.] He argues that, once defense counsel introduced testimony on cross-examination regarding exculpatory or impeachment evidence, the prosecution improperly suggested that the jury "had a right to consider what evidence *the Petitioner* had not introduced," improperly implying that Tanna had a duty to produce exculpatory evidence. [*Id.*] Tanna maintains that the Illinois Appellate Court unreasonably applied federal law when it concluded that the prosecutor's arguments were "neither prejudicial nor so erroneous as to deny the Petitioner his right to a fair trial." [*Id.*]

Respondent argues that Ground 1 was defaulted because the state appellate court rejected it on an independent and adequate state law ground. The state appellate court held the claim was forfeited when Tanna failed to preserve it for

16

appellate review by not raising it in his post-trial motion as required by state law. [Dkt. 39 at 11–12.]

"Illinois law requires a convicted defendant to include any and all claims of error in a post-trial motion for a new trial." *Miranda v. Leibach*, 394 F.3d 984, 992 (7th Cir. 2005) (citing 725 ILCS 5/116–1). Failure to do so results in a waiver of the claim. *Id.*

Ground 1 is procedurally defaulted because the state appellate court's decision rests on independent and adequate state grounds: waiver. On direct appeal, the state appellate court found that Tanna's claim concerning improper remarks during closing arguments was waived because Tanna did not raise it in a post-trial motion. [Dkt. 40-1 at 36–41 (citing *People v. Enoch*, 522 N.E.2d 1124, 1129–30 (Ill. 1988)).] This is true even though the state appellate court reviewed the claim for plain error. *Miranda*, 394 F.3d at 992 ("As we have previously recognized, an Illinois court does not reach the merits of a claim simply by reviewing it for plain error.") Tanna does not seriously argue otherwise, *see* dkt. 44 at 3, so the court concludes this claim is defaulted.

Tanna argues that he can overcome default because he can show actual innocence. As noted, "actual innocence, if proved, serves as a gateway through which a petitioner may pass [where] the impediment is a procedural bar." *Cobbs v. United States*, 141 F. 4th 872, 878 (7th Cir. 2025) (quoting *Schlup v. Delo*, 513 U.S. 298, 317 (1995) (a petitioner who procedurally defaults his claims can overcome the procedural bar if he successfully raises a claim of actual innocence—that is, if he "raise[s] sufficient doubt about [his] guilt to undermine confidence in the result.").] The actual

innocence rule is "grounded in the 'equitable discretion' of habeas courts to see that federal constitutional errors do not result in the incarceration of innocent persons." *Herrera v. Collins*, 506 U.S. 390, 404 (1993). "To establish actual innocence, 'a petitioner must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *Lund v. United States*, 913 F.3d 665, 667 (7th Cir. 2019) (quoting *Schlup*, 513 U.S. at 327).

Tenable actual-innocence claims are rare: it is a "demanding" and "seldom met" standard. *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013). A petitioner "does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *McQuiggin*, 569 U.S. at 386 (quoting *Schlup*, 513 U.S. at 329). "In applying this standard, [courts] must consider all the evidence, both old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted at trial." *Wilson*, 69 F.4th at 422.

The Seventh Circuit's decision in *Wilson* is instructive. There, a state habeas petitioner sought to excuse procedural default by showing that he was actually innocent, and he offered the testimony of an eyewitness who identified the shooter not as the petitioner, but as another witness who testified for the prosecution. *Id.* at 421–22. The eyewitness testimony was both new (because it was not presented at trial) and credible (because the state appellate court found the witness's testimony generally worthy of belief). But, the court explained, the "presentation of new and

credible evidence does not automatically satisfy the *Schlup* standard for actual innocence." *Id*. at 422.

The eyewitness evidence was not so compelling and unequivocal that no reasonable juror would have convicted Wilson. Rather, the testimony, though credible, "just add[ed] a new voice to a highly complex, and often inculpatory, evidentiary record," with some witnesses "unequivocally identif[ying] [the defendant] as the gunman." *Id*. at 422–23. This included, for instance, two trial witnesses who "still unequivocally identified Wilson as the gunman and described him emerging from an alleyway and opening fire." *Id*.

Applying this framework to Tanna's claim, the new evidence Tanna points to is much less impactful than in *Wilson*. Tanna relies first on a police report indicating that a day after the murder, and after the crime scene had been processed, Patricia Hurd found a spent round and a 9mm casing in her apartment and turned the items over to police, (*see* dkt. 1 at 97); and second on Flaskamp's affidavit, who avers that he examined a .38 caliber bullet recovered by police and concluded it was fired from "a different firearm than the 9mm/38 caliber bullets" recovered from the crime scene. [Dkt. 1-2, ¶¶ 6-8.] According to Flaskamp, the list of firearms that could have possibly fired the .38 caliber bullet is "extensive" and includes a .357 Magnum. [*Id*.] Tanna argues this constitutes "powerful evidence that would have supported the Petitioner's otherwise uncorroborated claim of self-defense." [Dkt. 1 at 98.]

*Wilson* instructs that the court's analysis requires it to make a "probabilistic determination about what reasonable jurors would do," and that the requisite

probability is established only if Tanna "shows that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence.'" 69 F.4th at 422. Under this standard for actual innocence, the court cannot say that the evidence described above, even though new, is so compelling and unequivocal that no reasonable juror would have convicted Tanna in the light of it.

Adding Tanna's new evidence to the evidentiary record at trial would not prevent a reasonable jury from finding him guilty. First, as Respondent argues, the new evidence does not establish that the .38 caliber bullet recovered by police was fired from a .357 revolver. A .357 revolver is merely among the "extensive" list of firearms that possibly could have fired the .38 caliber round. Second, the evidence does not establish that the .38 caliber bullet was fired from the .357 revolver that Jerome had on the night of Vance's death, or that the bullet was even fired on the night of Vance's murder. And even if these things were the case, this evidence does not show that Vance fired a .357 revolver.

As important, the arguments are inconsistent with Tanna's own trial testimony. Recall that Tanna told the jury that he never gave Vance a chance to raise a weapon. [Dkt. 40-19 at 506.] This testimony, which must be considered alongside the new evidence, only adds to a complex and inculpatory evidentiary record. That record also included Vance's videotaped statement describing the shooting as well as eyewitness testimony that Tanna shot Vance without provocation while Vance was seated and using the phone. [Dkt. 40-1 at 3–6 (describing the trial testimony of Conway, Fulwiley and Reggie Anderson); at 26 ("The record further reveals that three

20

eyewitnesses testified that they saw defendant enter Hurd's apartment with a handgun, and fire 13 times at an unarmed victim. Two of those witnesses also testified that the victim never saw defendant before he was shot.")] When considered all together, the evidence is not so compelling and unequivocal that no reasonable juror would have convicted. Even with the new evidence, reasonable jurors would have convicted. In short, if the new evidence in *Wilson* did not satisfy the petitioner's burden, the new evidence here does not satisfy the demanding actual-innocence standard either.

A reasonable juror could still vote to convict, so Tanna's claim of actual innocence fails and, thus, cannot excuse procedural default. See *McQuiggan*, 569 U.S. at 386.

### 2. Ground 3: Trial counsel's ineffectiveness for failure to make a record about destroyed evidence and related failure to seek discovery sanctions.

Respondent also argues that Ground 3 is procedurally defaulted because this claim never made it through a full round of state court review as required for exhaustion. Tanna raised this claim in his post-conviction petition and ensuing appeal, but not in his postconviction PLA to the Illinois Supreme Court.

Tanna does not seriously dispute that he did not raise Ground 3 in his 2021 PLA. [Dkt. 44 at 5–7; Dkt. 40-11 (2021 PLA).] Instead, he argues that in his 2024 PLA, which was filed *pro se*, he "discussed the issue of evidence being withheld in violation of his Constitutional rights." [Dkt. 44 at 7; Dkt. 40-16.] But even if that is so, Tanna does not point to where the record demonstrates that this claim received

one *full round* of state court review.[4] Because he did not fairly present the operative facts and legal principles controlling the claim through one full round, the court agrees that this claim is procedurally defaulted. *Rogers v. Wells,* 96 F.4th 1006, 1013 (7th Cir. 2024); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842–46 (1999) ("state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process.").

Alternatively, Tanna argues that even if this claim is defaulted, he can show actual innocence, *see* dkt. 44 at 9, but as discussed above, this argument fails. The court agrees that Ground 3 is procedurally defaulted without excuse.

### B.   Claims Barred by § 2254(d) and Merits

Respondent argues that the *Brady* Claim (Ground 2), and the *Strickland* Claims, (Grounds 4 and 5) all fail on the merits.

#### 1.   Ground 2: *Brady*

Tanna alleges that the prosecution deprived him of a fair trial and of due process by withholding "crucial crime scene evidence," namely, his keys and jacket, and the .357 revolver, in violation of *Brady v. Maryland*. [Dkt. 1 at 77.] Respondent argues that this claim fails because the state appellate court reasonably rejected it.

A petitioner may establish a violation of his due process rights under *Brady* when he demonstrates that the State suppressed evidence favorable to the accused that is material to his guilt or punishment. *Brady*, 373 U.S. at 87. Evidence is material if there is a reasonable probability that the result of the proceedings would

---

[4]    It does not appear that Tanna raised this claim in his successive post-conviction petition in 2022 before he filed the *pro se* 2024 PLA. [Dkt. 40-13.]

have been different if the evidence had been disclosed to the defendant. *See United States v. Bagley*, 473 U.S. 667, 682 (1985). On habeas review, a district court can only find such a decision an unreasonable application of *Brady* if the prior decision erroneously found that the evidence would not have affected the outcome of the trial. *Snow*, 880 F.3d at 867 ("To be entitled to habeas corpus relief on this basis, Snow must demonstrate that the Illinois court's decision is contrary to or involves an unreasonable application of *Brady* and its progeny.")

For AEPDA deference purposes, the court looks to the "last reasoned state-court decision" addressing the merits of this claim. *Dassey v. Dittmann*, 877 F.3d 297, 302 (7th Cir. 2017) (en banc) (quoting *Johnson v. Williams*, 568 U.S. 289, 297 n.1 (2013)). Here, that was the state appellate court's decision on postconviction appeal. Because that decision was neither contrary to nor involved an unreasonable application of the Supreme Court's caselaw, the court must deny relief. 28 U.S.C. § 2254(d).

Starting with the "contrary to" prong, the state appellate court correctly identified and articulated *Brady* as the standard governing the suppressed evidence claim. *Tanna II*, ¶¶ 68–70.

Nor did the state appellate court unreasonably apply *Brady*. It reasonably concluded that even assuming the revolver, jacket, and keys were both suppressed and favorable, it was not material to the verdict. The state appellate court described how the jury heard testimony about the jacket and keys, including from Tanna himself, and heard evidence regarding the condition, ownership and recovery location

of the revolver such that the fact that "the physical revolver was not presented to the jury did not undermine the verdict." *Id.*, ¶ 73. It also rejected Tanna's argument that fingerprint testing would have supported his self-defense theory, noting that mere allegations that Vance's fingerprints *could* have been on the revolver were insufficient to show a reasonable probability that the outcome of the trial would have been different. *Id.*, ¶ 74

The state appellate court also observed that evidence of Tanna's guilt was "overwhelming" based on the three eyewitnesses who observed Tanna "enter the apartment and immediately shoot Vance in the head," and who testified that Vance did not have a weapon on him at the time of the killing. *Id.*, ¶ 75. Together with Tanna's own testimony from the witness stand that he did not give Vance a chance to raise his weapon and that he emptied the clip, the court concludes that the state appellate court did not unreasonably apply *Brady*.

Tanna argues unreasonable application of *Brady* because, had he been able to present the items of evidence to the jury, it would have countered "the State's narrative that the revolver was not related to the shooting." [Dkt. 44 at 15.] According to Tanna, the state appellate court incorrectly concluded that the jury's awareness of the items alone was enough—the mere existence of this evidence, Tanna argues, did not allow "the jury to fully consider [] how the weapon and evidence recovered at the scene supported the Petitioner's version of events." [*Id.* at 16–17.]

But the state appellate court addressed why the testimony presented at trial encompassed Tanna's version of events—self-defense—even though the revolver,

24

jacket, and keys were not offered as evidence at trial. *Tanna II*, ¶ 76. It addressed how the items, together with the circumstances of their recovery, were thoroughly covered at trial, including through witness testimony, physical evidence, cross-examination and argument. It distinguished the facts of this case from other state court decisions finding *Brady* violations,[5] such as when excluded evidence was "completely hidden" from a defendant or when the existence of the excluded item was "a matter of credibility." *Id.*, ¶¶ 78, 81. It also explained why the actual .357-caliber revolver was not material: there was no dispute that the revolver existed, "It did exist; the question was only whether, at the time of the shooting, it was in the hands of the victim or outside the apartment building in the bushes." *Id.*, ¶ 81. And it noted that the jury was instructed on both self-defense and second-degree murder based on an unreasonable belief in self-defense.

Given the reasonableness of the appellate court's application of *Brady*, there is no basis for habeas relief on this claim.

### 2. Grounds 4 and 5: Ineffective Assistance of Counsel

Tanna contends that his trial counsel was ineffective for declining to request an instruction on second degree murder based on provocation (Ground Four); and for eliciting testimony regarding gang membership on cross-examination that opened the door to testimony regarding petitioner's gang membership (Ground 5). Tanna exhausted these claim through the state courts, so § 2254(d) governs the analysis.

---

[5]    *People v. Nichols*, 349 N.E.2d 40 (1976), and *People v. Wisniewski*, 290 N.E.2d. 414 (1972).

### i.    Strickland Standard

To prevail on a claim for ineffective assistance of counsel under *Strickland*, Tanna must demonstrate that (1) "counsel's performance was deficient" and (2) "the deficient performance prejudiced the defense." 466 U.S. at 687. The first prong requires a showing "that counsel's representation fell below an objective standard of reasonableness," or was "outside the wide range of professionally competent assistance," judged "under prevailing professional norms." *Id.* at 688, 690. A court deciding an ineffective assistance claim "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 690. Additionally, to help eliminate "the distorting effects of hindsight," the court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. Once a petitioner has established that counsel's performance was deficient, he must then demonstrate that counsel's deficient performance prejudiced his defense. To do so, a petitioner must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

### ii.    Application to Ground 4

For AEPDA deference purposes, the court looks to the "last reasoned state-court decision" addressing the merits of this claim. *Dassey*, 877 F.3d at 302 (quoting *Johnson*, 568 U.S. at 297 n.1). Here, the parties agree that was the state appellate court's decision on direct appeal. [Dkt. 40-1.] Because that decision was neither

26

contrary to nor involved an unreasonable application of the Supreme Court's caselaw, the court must deny relief. 28 U.S.C. § 2254(d).

Starting with the "contrary to" prong, the state appellate court correctly identified and articulated *Strickland* as the standard governing an ineffective assistance of counsel claim. [Dkt. 40-1 at 16 (citing *Strickland's* two-pronged standard).] The court also noted that as to the first prong (the performance prong), the petitioner "must overcome a strong presumption that, under the circumstances, the challenged action or inaction of counsel was a valid trial strategy." [*Id.* at 16.]

The state appellate court reasonably held that trial counsel's decision not to seek a second degree murder instruction based on provocation engendered by mutual combat was a sound strategic decision. [Dkt. 40-1 at 20.] First, the court explained that in choosing jury instructions, "the decision to rely on one theory of defense to the exclusion of others, is [] a matter of trial strategy." [*Id.* at 17–18.] It explained that second degree murder under Illinois law occurs when a person commits what would otherwise constitute first-degree murder but for the presence of either: (a) proof that the defendant was acting based on an unreasonable belief that the killing was justified, such as by self-defense; or (b) proof that the defendant was acting under a sudden and intense passion resulting from serious provocation by the victim.

The state appellate court explained why the facts developed at trial would undercut a provocation strategy. The court observed that while "it is permissible to instruct the jury as to both types of second degree murder," the theories of unreasonable belief in the necessity for self-defense and provocation "require

inconsistent frames of mind that cannot both be present in the same act." [*Id.* at 19 (noting that a deliberate act of self-defense negates an inference of intense passion).] Accordingly, the court explained, "counsel could have reasonably concluded that defendant's testimony at trial better supported the giving of a second-degree murder instruction based on the unjustifiable belief in self-defense rather than the provocation instruction." [*Id.*] This was so because, although there was evidence of an earlier, overt threat by Vance, the "lack of immediate danger in this particular threat [] would make the danger of provocation exceedingly remote." [*Id.* at 19–20.] The court also observed that under Illinois law, there is no mutual combat without a "readiness and intention of both parties to engage in *immediate* conflict with each other," which was particularly inapplicable where, as here, there had been a "cooling off" period. [*Id.* at 20 (emphasis in original).] Indeed, the court explained that Tanna himself testified that upon returning to the apartment, Vance never raised a weapon and that Tanna "never gave him a chance" to do so. [*Id.* at 21.] As a result, the court could "see how it would have been strategically improvidential for defense counsel to ask the jury to believe that defendant did not have sufficient time or opportunity to 'cool off' … or that at the time of the shooting, Vance intended to enter into immediate mutual combat" with Tanna. [*Id.*]

The court also evaluated the prejudice prong, concluding that Tanna had not shown prejudice "in light of the overwhelming evidence of his guilt for first degree murder." [*Id.* at 25.] The court highlighted, among other things, Tanna's videotaped confession, Tanna's testimony at trial, eyewitness testimony, and the aftermath of

28

the shooting, all of which would not have changed the outcome of the trial even if the instruction had been requested. [*Id.* at 25–27.]

Tanna argues that the state appellate court's decision was erroneous because self-defense based on an imminent threat and on provocation maps onto cases where courts allowed for "dual second-degree instructions." [Dkt. 44 at 19.] But the state appellate court's analysis acknowledged that it was permissible to instruct the jury as to both types of second degree murder. [Dkt. 40-1 at 19.] It simply explained why, in the context of *Strickland*, counsel's choice not to pursue a provocation instruction was not deficient: the jury was more likely to believe Tanna acted out of an unreasonable belief of self-defense given the state of the evidence.

The state appellate court didn't unreasonably apply *Strickland*. It explained why the decision not to seek a second degree murder instruction based on provocation was strategically sound given that he reasonably pursued an imperfect self-defense theory. It explained why Tanna wasn't prejudiced by trial counsel's choice. The court denies Tanna relief on Ground 4.

### iii.   Application to Ground 5

Finally, the state appellate court reasonably held that counsel's decision to elicit testimony that the State's witnesses had gang affiliations was a strategic choice. After re-stating *Strickland*'s principles, the court detailed how the thrust of counsel's cross-examination was to challenge the eyewitnesses' credibility. This included showing that those involved in the incident, including the victim, were gang members, making it more likely that they carried guns such that it was more likely that Vance had access to Jerome's revolver. It also evaluated counsel's arguments

that the eyewitnesses were biased, close friends of Vance's with a reason to lie at trial. It was likewise reasonable for counsel to "destroy any sympathy the jury might harbor towards the victim," who was a gang member. [*Id*. at 29–30.] All of this, the court observed, was part of a strategic choice to show that Tanna reasonably feared for his life.

The state appellate court also considered Tanna's related argument that counsel was ineffective because he failed to question potential jurors about whether they were biased against gang members. The court observed that counsel's decision about whether to question potential jurors on a particular subject is trial strategy, that has no bearing on counsel's competency, particularly when both Tanna and the victim were gang members and gang affiliation might be used to explain motive. [Dkt 40-1 at 30-31.] This, the court concluded, was also a matter of trial strategy.

Lastly the state appellate court concluded that even if the decision to "introduce and emphasize gang evidence, and not question the venire regarding potential gang bias was professionally unsound," Tanna had not shown prejudice given the strength of the evidence establishing guilt. [*Id*. at 33–34.]

Tanna argues that "prejudicial evidence of gang-membership offered no useful development to the defense theory at trial," given that juries are instructed not to consider sympathy or prejudice. [Dkt. 44 at 21.] Even assuming this is true, Tanna does not grapple with the state court's prejudice finding, other than by saying he was "severely prejudiced" by the introduction of gang evidence. [*Id*.] Even without the gang references, he has not shown a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different. *Westray v. Brookhart*, 36 F.4th 737, 749 (7th Cir. 2022). Accordingly, the state court correctly — and at the very least reasonably — concluded that trial counsel was not ineffective in his approach to gang evidence at the trial.

The state appellate court didn't unreasonably apply *Strickland*. It detailed why counsel's decision to use the gang evidence was strategically sound, and why it wasn't error to probe gang topics during voir dire. It also explained why Tanna wasn't prejudiced by trial counsel's choice. The court therefore denies relief on Ground 5.

## IV.     Certificate of Appealability and Right to Appeal

This court's denial of Tanna's petition is a final decision ending the case. Tanna may appeal only if he obtains a certificate of appealability from this court or the Court of Appeals. 28 U.S.C. § 2253(c)(1)(A). This court declines to issue a certificate of appealability because Tanna does not make a substantial showing of the denial of a constitutional right, *see* § 2253(c)(2), and reasonable jurists would not debate, much less disagree with, this court's resolution of his claims. *See Arredondo v. Huibregtse*, 542 F.3d 1155, 1165 (7th Cir. 2008). If Tanna wishes to appeal, he must request a certificate of appealability from the Court of Appeals pursuant to Federal Rule of Appellate Procedure 22 and 28 U.S.C. § 2253(c), in addition to filing his notice of appeal.

## V.    Conclusion

For the foregoing reasons, the petition for a writ of habeas corpus [Dkt. 1] is denied. The Court declines to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c). Final judgment shall enter in favor of Respondent Tack and against Petitioner Tanna.

Enter: 22-cv-5740
Date:   August 5, 2025

_____

Lindsay C. Jenkins
United States District Court Judge